**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Mary E. Seymour, Esq.
Michael Savetsky, Esq.
Michael Papandrea, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Proposed Counsel to the Debtors and*
*Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| Cinram Group, Inc., *et al.*,[1] | Case No. 17-15258 (     ) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF GLENN R. LANGBERG IN SUPPORT OF DEBTORS'**
**CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Glenn Langberg, pursuant to 28 U.S.C. § 1746, hereby declare, under penalty of

perjury, the following to the best of my knowledge, information and belief:

1.     I am the Chief Executive Officer ("CEO") of Cinram Group, Inc., a

Delaware corporation ("CGI"), Cinram Property Group, LLC, a single member Delaware limited

liability company ("CPG"), and Cinram Operations, Inc., an Alabama corporation ("COI" and

collectively, with CGI and CPG,  the "Debtors").  CGI is the sole stockholder of COI and the

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Cinram Group, Inc. (0588), Cinram Property Group, LLC (9738), and Cinram Operations, Inc. (7377). The Debtors conduct all of their business affairs out of offices located at 220 South Orange Avenue, Livingston, New Jersey 07039.

sole member and manager of CPG.  An organizational chart that includes the Debtors and their non-debtor parent, CAI Holdings, Inc., is attached hereto as Exhibit A.

2.      I was duly appointed by the board of directors of CGI and COI, and by action of the sole member of CPG, to serve as CEO of each of the Debtors on September 1, 2016.  My original appointment as CEO of the Debtors was pursuant to an engagement letter between CGI and GRL Capital Advisors, LLC ("GRL"), dated August 22, 2016.  I am the principal and founder of GRL, which is a firm specializing in, among other things, providing corporate consulting, advisory services, and real estate development and management services. GRL's engagement by CGI ended shortly prior to the Petition Date, and I was directly engaged by the Debtors to continue to serve as CEO at that time.   Another GRL employee, Joseph Catalano, was also directly engaged by the Debtors shortly before the Petition Date to serve as the Debtors' corporate Secretary and provide certain other ordinary course services for the Debtors.[2]

3.      In my capacity as CEO of the Debtors, I have become familiar with the day-to-day operations, assets, financial condition, business affairs and books and records of the Debtors.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my service as CEO of the Debtors, my review of the Debtors' books and records and other relevant documents, my review of information provided and/or communicated to me by former management and employees of the Debtors or their affiliates, my review of publically available information, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

---

[2] Mr. Catalano had previously been duly appointed by the board of directors of CGI and COI, and by action of the sole member of CPG, to serve as Secretary of each of the Debtors on September 2, 2016.

4.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Court"), thereby commencing these chapter 11 cases (collectively, the "Chapter 11 Cases"). The Debtors intend to operate their business and manage their properties as debtors in possession while they pursue possible restructuring alternatives, including potential asset sales, in an effort to maximize the value of their estates for the benefit of their creditors and other parties in interest in the Chapter 11 Cases.

5.      I submit this declaration ("Declaration") in order to provide an overview of the Debtors and the circumstances leading to the commencement of these Chapter 11 Cases, and in support of the Debtors' chapter 11 petitions and "first day" motions (each a "First Day Motion," and collectively, the "First Day Motions"), which have been or will be filed in connection herewith.

## I.      Background and Overview of Debtors' Business

6.      It is my understanding that CGI was formed as part of a 2012 acquisition of substantially all of the assets and businesses of Cinram International Income Fund in the United States, Canada, the United Kingdom, France, and Germany.  It is my understanding that CGI and its Debtor and non-Debtor affiliates (collectively, "Cinram") were once one of the world's largest providers of media development and delivery services.   Located in North America and Europe, Cinram worked with some of the biggest names in home entertainment and retail.   With a full range of supply chain services, including pre-recorded media product manufacturing, packaging, distribution and business solutions, Cinram guaranteed the flow of products smoothly and profitably to consumers around the world.

7.       As consumer demand has rapidly shifted away from physical media for audio and video over the past several years, Cinram has exited the manufacturing and supply chain services business, selling or winding down substantially all of its operations and operating assets, including those of the Debtors.  As a result, the Debtors no longer have any active business operations.  The Debtors' remaining assets consist primarily of approximately four million square feet of owned and leased industrial property and undeveloped land located in Pennsylvania and Alabama, which is further described below.

A.       The Huntsville Lease and the Huntsville Sublease

8.       CGI leases a 1.4 million square foot industrial facility and undeveloped land on approximately 161 acres (or 7 million square feet of land), located at 4905 Moores Mill Road in Huntsville, Alabama (the "Huntsville Property"), from SIR Properties Trust, a Maryland real estate investment trust ("SIR Properties"), pursuant to a lease dated August 31, 2012 (together with all amendments, exhibits, and/or supplements thereto, the "Huntsville Lease"). The Base Rent due from CGI to SIR Properties under the Huntsville Lease is currently $642,934.71 per month, subject to an annual increase of three percent (3%) on August 31 of each year.  The Huntsville Lease expires on August 31, 2032.

9.       It is my understanding that on November 12, 2015, CGI consummated the sale (the "Technicolor Sale") of its North American optical disc (DVD and Blu-ray) manufacturing and distribution assets to Technicolor Home Entertainment Services, Inc. ("Technicolor").   In connection with the Technicolor Sale, CGI, with the consent of SIR Properties, entered into a sublease of the Huntsville Property (together with all amendments, exhibits, and/or supplements thereto, the "Huntsville Sublease") to CT Acquisition Holdco, LLC n/k/a Technicolor Home Entertainment Services Southeast, LLC ("Technicolor Southeast").  The

Monthly Base Rent due from Technicolor Southeast to CGI under the Huntsville Sublease is equal to the Base Rent under the Huntsville Lease.  In addition, pursuant to the Huntsville Sublease, Technicolor Southeast agreed to assume all of CGI's obligations under the Huntsville Lease with respect to the Huntsville Property, including, without limitation, the obligation for payment of all monetary obligations of CGI under the Lease.  As a pure pass-through, however, the Huntsville Sublease does not generate any income for the Debtors' estates, but instead, only creates additional administrative overhead.

10.    As I understand it, the Huntsville Sublease will expire by its terms on August 29, 2032.  However, Technicolor Southeast has the right to terminate the Huntsville Sublease (a) at any time after November 12, 2017, upon not less than one (1) year's written notice to CGI, or (b) upon 30 days' written notice to CGI if Technicolor Southeast or its affiliates cease providing optical media replication or distribution services to 20th Century Fox Home Entertainment, Inc. or its affiliates.  In addition, at any time after November 12, 2017, Technicolor Southeast has the right to request that CGI negotiate in good faith a reduction in the size of the subleased portion of the Huntsville Property and the corresponding rent amount under the Huntsville Sublease to reflect any reduced scope of Technicolor Southeast's operations, with such reduction to be effective no earlier than November 12, 2018.

11.    SIR Properties is not currently holding any security deposit under the Huntsville Lease.  As I understand it, pursuant to the first amendment to the Huntsville Lease, dated as of November 12, 2015, if CGI's Tangible Net Worth (as defined therein) falls below $20,000,000, CGI would be required to provide SIR Properties with a security deposit equal to the Base Rent payable under the Huntsville Lease for the following eighteen months.  For

instance, if the deposit requirement were triggered at the present time, CGI could become obligated to post a security deposit in the amount of more than $11.8 million.

      B.    <u>The Hanover Lease</u>

      12.    On November 12, 2015, Bookspan LLC (as tenant) assigned to CGI a lease dated September 24, 2008 (together with all amendments, exhibits, and/or supplements thereto, the "<u>Hanover Lease</u>"), for a 500,000 square foot industrial facility and undeveloped land on approximately 120 acres (or 5 million square feet of land), located at 501 Ridge Avenue in Hanover, Pennsylvania (the "<u>Hanover Property</u>").  SIR Properties is also the landlord under the Hanover Lease and consented to the assignment of the Hanover Lease to CGI.

      13.    The Base Rent due under the Hanover Lease is currently $286,430.10 per month, subject to an annual increase of four percent (4%) on September 24 of each year.  In addition, CGI pays annual real estate taxes for the Hanover Property of approximately $300,000, as well as insurance, maintenance, utilities, and security costs totaling approximately $25,000 per month.  The term of the Hanover Lease expires on September 24, 2028, subject to certain options to extend the term at CGI's election.

      14.    The Debtors do not occupy any portion of the Hanover Property.  While there are two month-to-month subtenants (the "<u>Hanover Subtenants</u>") occupying a small portion of the Hanover Property without written leases, the income received by the Debtors from the Hanover Subtenants is relatively insignificant, particularly in comparison to the substantial rent due to SIR Properties under the Hanover Lease.  The rent due from the Hanover Subtenants also varies from month to month depending upon the amount of space occupied by the Hanover Subtenants each month.[3]  In addition, upon information and belief, a 60 acre portion of the

---

[3] The Hanover Subtenants are Hanover Foods Corporation and Hanover Terminal, Inc.  During the last few months, CGI has received approximately $26,000 per month in rent from Hanover Foods and $11,000 per month in rent from

Hanover Property is subject to a farm lease dated October 2, 1987 (together with all amendments, exhibits, and/or supplements thereto, the "Farm Lease"), that predates the assignment of the Hanover Lease to CGI.  CGI receives only $175 per month in rent on account of the Farm Lease.

15.    After taking into account the minimal income from existing subleases, the Debtors are still *incurring approximately $300,000 in losses per month* associated with the Hanover Lease due to its high base rent, real estate taxes, insurance and other costs and expenses due under the Hanover Lease.

16.    SIR Properties is currently holding a cash security deposit under the Hanover Lease in the amount of $3,739,382.00 (the "Hanover Deposit").  As I understand it, pursuant to an amendment to the Hanover Lease dated November 12, 2015, if CGI's Tangible Net Worth (as defined therein) falls below $20,000,000, CGI would be required to increase the Hanover Deposit to an amount equal to the Base Rent payable under the Hanover Lease for the following eighteen months.  For example, if this provision were triggered at the present time, CGI could be required to increase the Hanover Deposit to approximately $5.3 million, a cash outlay of more than $1.5 million.

C.    The Olyphant Property

17.    CPG owns a one million square foot manufacturing plant on approximately 103 acres of property located at 1400 East Lackawanna Avenue in Olyphant, Pennsylvania (the "Olyphant Property"), which, upon information and belief, the Debtors acquired in 2014.  In connection with the Technicolor Sale, the Olyphant Property was leased to Technicolor Southeast pursuant to a lease dated November 12, 2015 (the "Olyphant Lease").  While Technicolor Southeast is responsible for payment of all expenses associated with the

Hanover Terminal.

Olyphant Property, including all real estate taxes, insurance, maintenance and security costs, Technicolor Southeast pays just $100 per month in Base Rent to CPG.  Thus, the Debtors derive only *nominal* income from the Olyphant Property.

18.    Unless sooner terminated in accordance with its terms, the Olyphant Lease will expire on August 29, 2032.   As I understand it, while Technicolor Southeast has the right to terminate the Olyphant Lease at any time upon not less than six (6) months' prior written notice to CPG, CPG has no similar right.

D.    The Tuscaloosa Property

19.    COI owns two manufacturing plants that are approximately 240,000 and 230,000 square feet in size, respectively, on approximately 100 acres of property located at 1 JVC Road and 2 JVC Road in Cottondale, Alabama, an unincorporated community that is part of Tuscaloosa, Alabama (the "Tuscaloosa Property").   It is my understanding that the Debtors acquired the Tuscaloosa Property in 2014, as part of CGI's acquisition of JVC America, Inc., the games software division of JVC Americas Corp.

20.    It is my understanding that the Debtors most recently used the Tuscaloosa Property to produce and package compact discs, but the Debtors ceased operations entirely at the Tuscaloosa Property in 2015, and the Tuscaloosa Property has been vacant since that time.  The Debtors currently derive no income from the Tuscaloosa Property, but incur approximately $33,000 per month in carrying costs associated with the Tuscaloosa Property, including real estate taxes, insurance, maintenance, utilities and security costs.

E.      Prepetition Debt

21.     The Debtors do not have any funded debt obligations on either a secured or unsecured basis.  The Debtors do not believe that any valid liens against, or security interests in, any of their assets currently exist.

22.     While the Debtors are current with respect to most of their unsecured payment obligations as of the Petition Date, the Debtors have substantial future obligations under the Huntsville Lease and Hanover Lease, as described herein, that the Debtors do not believe they will be able to meet.

23.     In addition, in connection with the Technicolor Sale, Technicolor has asserted a claim for a $500,000 payment that was allegedly due from CGI on June 30, 2016, pursuant to the Purchase and Sale Agreement between the parties, dated August 10, 2015 (the "PSA").[4]

24.     The Debtors may also be liable for residual workers' compensation claims by former employees of the Debtors or their affiliates, although the Debtors have not quantified the amount, or determined the validity, of any such claims.

25.     In addition to the foregoing obligations, the Debtors had approximately $400,000 of aggregate accounts payable owed to various vendors and services providers as of the Petition Date and may have certain other potential contingent, unliquidated and/or disputed liabilities arising from the historical operations of Cinram.

## II.    Circumstances Leading to Commencement of the Chapter 11 Cases

26.     As described above, CGI is lessee under two burdensome real property leases from which it derives virtually no income whatsoever and under which it has very

---

[4] The Debtors reserve all of their rights and defenses under the PSA and otherwise in connection with this claim of Technicolor.

significant future liabilities that it has no current ability to fund.[5]  The Debtors are experiencing

mounting losses and increasing financial distress, and I believe that the Debtors' long term

liabilities in connection with the Huntsville Lease and Hanover Lease are unsustainable.

27.    The Huntsville Lease and Huntsville Sublease, together, amount to a pass-

through lease that does not benefit the Debtors in any way, while leaving the Debtors with

tremendous financial exposure.  If Technicolor Southeast were to exercise its rights to terminate

the Huntsville Sublease, CGI would remain liable for rent payments that currently amount to

$642,934.71 per month, plus real estate taxes and other charges, for a property that it does not

occupy and for which the Debtors have no use.

28.    I believe it would be very difficult and time consuming for CGI to find a

new subtenant in the event Technicolor Southeast successfully terminates the Huntsville

Sublease, given the enormous size and nature of the Huntsville Property and the onerous

requirements that would have to be met before SIR Properties will consider approval of any

replacement subtenant.

29.    In addition, as described above, it is my understanding that CGI could

potentially be required to post a security deposit of almost $12 million under the Huntsville

Lease, and CGI does not currently have the ability to do so.  Given CGI's ongoing losses, this

potential obligation is a serious concern for the Debtors.  Accordingly, in the exercise of their

business judgment, the Debtors are seeking to reject the Huntsville Lease and Huntsville

Sublease as part of the First Day Motions, effective as of the Petition Date.

30.    The Debtors are incurring continuing losses in connection with the

Hanover Lease at a rate of approximately $300,000 per month.  The Debtors have not been able

---

[5] While CGI make no admission and reserves all of its rights in this regard, I believe that CGI's future liabilities for
rent alone, after taking into account the annual rent escalations, total approximately $145 million for the duration of
the Huntsville Lease and approximately $50 million for the duration of the Hanover Lease.

to find a long-term subtenant for the Hanover Lease to reverse these losses for a variety of reasons, including (1) the enormous size of the Hanover Lease and likelihood that it would need to be further demised to accommodate the needs of potential subtenants, (2) the age and layout of the building and need for substantial capital improvements, and (3) the fact that SIR Properties has put in place onerous requirements that must be met before it will consider approval of any proposed subtenant, despite its obligation under the Hanover Lease not to unreasonably withhold, condition, or delay such approval.

31.    In addition, as described above, it is my understanding that CGI could potentially be required to increase the Hanover Deposit to $5,316,600.90, a cash outlay of more than $1.5 million, which would further deplete the Debtors' limited resources.  Accordingly, in the exercise of their business judgment, the Debtors are seeking to reject the Hanover Lease and any and all subleases of portions of the Hanover Property as part of the First Day Motions, effective as of the Petition Date.

32.    The Debtors are also embroiled in a dispute with Technicolor Southeast regarding CGI's and CPG's alleged obligations to repair and/or replace certain allegedly defective and/or non-operational systems and equipment at the Huntsville Property and the Olyphant Property pursuant to the terms of the Huntsville Sublease and the Olyphant Lease, respectively (the "TS Claims").  The Debtors dispute the TS Claims and believe they have affirmative claims against Technicolor Southeast for failure to maintain the Huntsville Property and the Olyphant Property in the condition required by the Huntsville Sublease and the Olyphant Lease, respectively.  The Debtors intend to address the TS Claims as part of the claims process in the Chapter 11 Cases.

33.     After exploring all options available to the Debtors, the Debtors' Board of Directors determined that commencing these Chapter 11 Cases would be the best means to preserve and maximize the value of the Debtors' assets for the benefit of their creditors and other parties in interest, while the Debtors pursue possible restructuring alternatives, including potential asset sales.

### III.    First Day Motions[6]

34.     To minimize the impact the commencement of these Chapter 11 Cases might have on the Debtors and allow the Debtors to effectively transition into chapter 11, the Debtors have filed several First Day Motions seeking relief on an expedited basis.

35.     I have participated in preparing and/or have reviewed each of the First Day Motions (including the exhibits attached thereto) and, to the best of my knowledge, believe the facts set forth therein and described below are true and correct.  Such representation is based upon information and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtors' business affairs and financial condition, and information provided to me by the Debtors on which I reasonably relied.  If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each First Day Motion and this Declaration.

36.     At all times, the Debtors' and their professionals have remained cognizant of the limitations imposed on a debtor-in-possession and, in light of those limitations, the Debtors narrowed the relief requested at the outset of these Chapter 11 Cases to those matters

---

[6] This section is intended only as a summary of the key aspects of the First Day Motions and the relief sought therein.  To the extent that this summary is inconsistent with any of the First Day Motions, the terms of the First Day Motions shall control.  The Court and parties in interest are respectfully referred to the First Day Motions for the full details thereof.

that require urgent relief to sustain the Debtors' operations, avoid immediate and irreparable harm, and preserve value during the pendency of these Chapter 11 Cases.

37.     I believe, on behalf of the Debtors, that the relief sought in each of the First Day Motions is necessary to enable the Debtors to transition to and operate in chapter 11 with minimal disruption, and help ensure that the value of the Debtors' assets is maximized for the benefit of all interested parties.

*(i)     Debtors' Motion for an Order Directing Joint Administration of the Debtors' Chapter 11 Cases*

38.     By this motion (the "Joint Administration Motion"), the Debtors request entry of an order pursuant to Bankruptcy Rule 1015(b) directing the joint administration of their Chapter 11 Cases for procedural purposes only.  Specifically, the Debtors request that this Court maintain one file and one docket for each of the jointly-administered cases.  The Debtors propose to designate the Chapter 11 Case of Cinram Group, Inc. as the main bankruptcy case.  The Debtors also request that a docket entry be made in each of the Chapter 11 Cases to reflect their joint administration.

39.     Given the integrated nature of the Debtors' business affairs, I am informed by counsel and believe that joint administration of the Chapter 11 Cases will provide significant administrative convenience and reduce fees and costs incurred by all parties-in-interest in connection with the Chapter 11 Cases, without harming the substantive rights of any party-in-interest.

40.     Accordingly, on behalf of the Debtors, I respectfully request that the Joint Administration Motion be granted.

(ii)     *Debtors' Motion for an Order Extending the Debtors' Time to File Their
Schedules of Assets and Liabilities and Statements of Financial Affairs*

41.    By this motion (the "Schedules and Statements Motion"), the Debtors

request entry of an order granting a thirty (30) day extension of the time to file their schedules of

assets and liabilities and statements of financial affairs (collectively, the "Schedules and

Statements") required under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007,

which will provide the Debtors with a total of forty-four (44) days from the Petition Date to file

their Schedules and Statements.

42.    The nature and complexity of the Debtors' current and historical business

affairs, the very limited staff available to perform the required internal review of their financial

and other records, the numerous matters that the Debtors must address in the early days of these

Chapter 11 Cases, and the pressure incident to the commencement of the Chapter 11 Cases

necessitate additional time for the Debtors to prepare and file the Schedules and Statements.

43.    In addition, I believe that the additional time requested by the Debtors to

prepare and file the Schedules and Statements will help the Debtors make a smoother transition

into chapter 11 and, therefore, ultimately maximize the value of their estates for the benefit of

creditors and all parties-in-interest.

44.    Accordingly, on behalf of the Debtors, I respectfully submit that the

Schedules and Statements Motion should be granted.

(iii)    *Debtors' Motion for an Order (I) Authorizing the Debtors to Continue and
Maintain their Existing Cash Management System, Bank Accounts and Business
Forms, (II) Modifying the Investment Guidelines, (III) Providing the United States
Trustee With a 60-Day Objection Period and (IV) Granting Related Relief*

45.    By this motion (the "Cash Management Motion"), the Debtors request

entry of an order (i) authorizing them to continue to utilize their existing cash management

system, bank accounts and business forms, (ii) modifying the investment guidelines set forth in

section 345 of the Bankruptcy Code, (iii) providing the United States Trustee with a 60-day
objection period, and (iv) granting related relief.  In addition, the Debtors request a waiver of
certain of the operating guidelines established by the Office of the United States Trustee for the
District of New Jersey (the "U.S. Trustee") that that would require the Debtors to close all of
their prepetition bank accounts, open new accounts designated as debtor-in-possession accounts
and obtain new business forms with that designation.

46.    As described in the Cash Management Motion, the Debtors maintain three
(3) bank accounts (the "Bank Accounts") with JP Morgan Chase ("JP Morgan").  In the ordinary
course of business, the Debtors maintain a cash management system (the "Cash Management
System") to receive and disburse funds utilizing the Bank Accounts.  The Cash Management
System is used in connection with satisfying the Debtors' day-to-day operating expenses,
including, among other items, maintenance, tax, and rent obligations in connection with the
Debtors' owned and leased real estate.

47.    I believe that permitting the Debtors to use their existing Bank Accounts
and Cash Management System is in the best interests of the Debtors' estates, their creditors and
other interested parties.  To require the Debtors to establish new Bank Accounts would be
disruptive to their affairs, create unnecessary administrative burdens, and unnecessarily distract
the Debtors' personnel whose efforts are more appropriately focused on assisting with the
Debtors' restructuring efforts.  Conversely, maintenance of the Debtors' Bank Accounts and
Cash Management System will ensure a smooth transition into chapter 11 without the
inconvenience, cost, confusion and delay associated with transferring cash management
operations to new accounts.  Similarly, authorization for the Debtors to use their existing
business forms will facilitate a smooth and orderly transition into chapter 11, while changing

business forms would be expensive, unnecessary and would not confer any benefit upon the Debtors' estates.

48.     I further believe that the modification of the deposit guidelines of section 345(b) of the Bankruptcy Code that is requested in the Cash Management Motion will facilitate a smooth and orderly transition into chapter 11 and minimize disruption to the Debtors' business affairs.  I believe that the deposits at issue are secure because of the strength of the Debtors' banking institution (JP Morgan).

49.     Accordingly, on behalf of the Debtors, I respectfully request that the relief requested in the Cash Management Motion be approved.

(iv)     *Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Companies From Discontinuing, Altering or Refusing Service on Account of Pre-Petition Invoices, (II) Approving the Debtors' Proposed Form of Adequate Assurance of Future Payment and (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance*

50.     In connection with the ownership and maintenance of the Tuscaloosa Property, the Debtors incur utility expenses in the ordinary course of business for, among other things, water, electricity, gas, internet, telephone and similar utility products and services (collectively, the "Utility Services") from various utility companies (the "Utility Companies").

51.     Uninterrupted Utility Services are essential to maintaining and preserving the value of the Tuscaloosa Property and, therefore, such services are essential to the success of these Chapter 11 Cases.  Any interruption of Utility Services, even for a brief period of time, could seriously jeopardize the Debtors' efforts to reorganize their affairs for the benefit of their creditors and other stakeholders.   It is therefore critical that Utility Services continue uninterrupted during these Chapter 11 Cases.

52.     Accordingly, by this motion (the "Utilities Motion"), the Debtors request entry of interim and final orders (i) prohibiting the Utility Companies from discontinuing,

altering or refusing Utility Services to the Debtors on account of prepetition invoices, (ii) approving the Debtors' proposed form of adequate assurance of post-petition payment within the meaning of section 366 of the Bankruptcy Code and determining that the Utility Companies have been provided with adequate assurance, and (iii) establishing procedures for resolving requests for additional or different adequate assurance of payment.

53.      The Debtors intend to pay for post-petition Utility Services provided by the Utility Companies in a timely manner.  To provide adequate assurance of payment for future Utility Services to the Utility Companies, the Debtors propose to establish a segregated account into which the Debtors will deposit an amount equal to the Debtors' estimated aggregate cost for two (2) weeks of Utility Service from each Utility Company, and further propose to establish procedures to address any request made by the Utility Companies for additional adequate assurance of payment in the event that a Utility Company believes that the proposed deposit does not provide it with satisfactory adequate assurance.

54.      I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors, their estates and their creditors, and will enable the Debtors to continue to conduct their business affairs in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be granted.

(v)      *Debtors' Motion for an Order Authorizing, But Not Directing, the Debtors to Pay Certain Pre-Petition Real Property Taxes and Granting Related Relief*

55.      By this motion (the "Tax Motion"), the Debtors request entry of an order (i) authorizing, but not directing, the Debtors to pay to various federal, state, and local governments, including taxing and licensing authorities (each a "Taxing Authority," and collectively, the "Taxing Authorities") any taxes, including real property, income and other taxes, and regulatory, permitting and/or licensing fees, assessments and charges (collectively, the

"Taxes"), that have accrued, but were not yet due and owing, or were due and owing but not paid

in full, as of the Petition Date, in the ordinary course of their business, and (ii) directing all banks

to honor and pay (to the extent that sufficient funds are available in the Debtors' accounts) all

checks and electronic transfers for payment of such prepetition Taxes.

56.    The Debtors are required to pay real property taxes with respect to the

Tuscaloosa Property and the Olyphant Property (together, the "Owned Real Property").  As

noted above, the Olyphant Property is leased to Technicolor Southeast and, under the terms of

the Olyphant Lease, Technicolor Southeast is responsible for payment of all property taxes

related to the Olyphant Property.

57.    I believe that the Debtors—and Technicolor Southeast—are current with

respect to payment of all Real Property Taxes on the Owned Real Property as of the Petition

Date.  However, in an abundance of caution, the Debtors seek authority, in their discretion, to

pay any Real Property Taxes that may have accrued during the prepetition period but remain

unpaid with respect to the Owned Real Property.[7]

58.    Any prepetition Real Property Taxes that the Debtors may owe are

secured by the Owned Real Property and, if not paid when due, may give rise to liens against

such property.  In addition, if not timely paid when due, interest and penalties would accrue on

such Real Property Taxes, and the Taxing Authorities may potentially assert claims for post-

petition interest and penalties.  I believe that payment of any prepetition Real Property Taxes

would, therefore, affect only the timing of the payments, and not the amounts that would

ultimately be payable to the applicable Taxing Authority, and may, in some instances, allow the

Debtors to avoid the payment of unnecessary interest and penalties.

---

[7] The Debtors are seeking the authority to pay any prepetition Real Property Taxes that may be owed in connection
with the Olyphant Property to ensure that their estates will not be harmed in the event that Technicolor is not
actually current on its obligations.

59.     With the exception of potential prepetition Real Property Taxes, the Debtors do not believe that they owe any prepetition income or other Taxes to any Taxing Authority.  However, in the event that any income or other taxes are or become due, the Debtors seek authority to pay such taxes post-petition in the ordinary course of business.

60.     To the extent the Debtors owe any prepetition income taxes to any Taxing Authority, I understand that such taxes may be entitled to priority status and payment in full under any plan in the Chapter 11 Cases.  Therefore, I believe the Debtors' payment of any such taxes would affect only the timing of the payments and not the amounts to be paid to the relevant Taxing Authority, and other creditors and parties-in-interest will not be prejudiced by such payment.

61.     I believe that the Debtors' failure to pay any Taxes could have a material adverse impact on the Debtors' ability to maximize the value of their assets for the benefit of all stakeholders.  Accordingly, for the reasons set forth herein and in the Tax Motion, I respectfully request that the Tax Motion be granted.

    *(vi)*    *Debtors' Motion for an Order Authorizing the Debtors to (I) Pay Pre-Petition Insurance Premiums (II) Continue Pre-Petition Insurance Policies and Programs (III) Perform All Pre-Petition Obligations in Respect Thereof and (IV) Enter Into New Insurance Policies and Premium Finance Agreements as Necessary Post-Petition in the Ordinary Course of Business*

62.     In connection with the day-to-day operation of their business, the Debtors maintain various business insurance programs (the "Insurance Programs") and related insurance policies (the "Insurance Policies"), through several different insurance providers (the "Insurance Providers").  The Debtors have numerous Insurance Policies covering a variety of matters such as general liability, umbrella liability, commercial property, and directors' and officers' liability.

63.     The Debtors pay premiums under the Insurance Programs based on a fixed amount established and billed by each Insurance Provider.  Depending on the particular

Insurance Policy, premiums are either: (i) paid in installments to the carrier over an agreed period; (ii) pre-paid at a policy's inception or renewal; or (iii) financed under premium finance agreements.

64.     Currently, the Debtors' Insurance Policies are financed through three (3) commercial premium finance agreements (the "Premium Finance Agreements") with BankDirect Capital Finance, a division of Texas Capital Bank, N.A. ("BankDirect").   The aggregate outstanding amount owed by the Debtors under the Premium Finance Agreements as of the Petition Date is $111,584.16, and the monthly payments thereunder total $12,398.24.

65.     While I believe the Debtors are current on all of their insurance obligations as of the Petition Date, the Debtors have filed this motion (the "Insurance Motion") in an abundance of caution in order to obtain authority to (i) pay prepetition insurance premiums, if any remain unpaid or accrued under the Insurance Policies as of the Petition Date (including payments pursuant to the Premium Finance Agreements), (ii) continue their prepetition Insurance Policies and Insurance Programs; (iii) perform all prepetition obligations in respect thereof (the foregoing (i) – (iii) are collectively referred to herein as the "Insurance Obligations"); and (iv) enter into new insurance policies and premium finance agreements as may be necessary post-petition in the ordinary course of business and make any payments in connection therewith.

66.     In view of the importance of maintaining uninterrupted insurance coverage with respect to their business affairs and assets, I believe it is in the best interests of the Debtors, their estates and creditors for the Court to authorize the Debtors to honor any outstanding prepetition Insurance Obligations.  I further believe that any other alternative may require considerably higher cash expenditures by the Debtors to obtain similar insurance coverage or result in the Debtors obtaining insurance coverage on less desirable terms than their

current coverage, either of which would be detrimental to the Debtors' estates and creditors. Moreover, in light of their financial circumstances, I believe that alternative insurance premium finance companies may not be willing to provide insurance premium financing to the Debtors on attractive market terms on a post-petition basis. Therefore, I believe it is critical for the Debtors to continue to perform under their existing Premium Finance Agreements.

67. Accordingly, on behalf of the Debtors, I respectfully request that the relief requested in the Insurance Motion be granted.

(vii)    *Debtors' Motion for an Order Authorizing Rejection of Certain Unexpired Leases of Nonresidential Real Property as of the Petition Date*

68. By this motion (the "Lease Rejection Motion"), the Debtors request entry of an order, (a) rejecting the Huntsville Lease, the Huntsville Sublease, the Hanover Lease, the Farm Lease, and, to the extent executory, any agreements with the Hanover Subtenants (collectively, the "Leases"), effective as of the Petition Date, (b) authorizing the Debtors to abandon any assets with no or inconsequential value to the Debtors' estates, such as furniture and miscellaneous equipment, that may be in place at the Huntsville Property and/or the Hanover Property (any such property, the "Related Property"), (c) establishing a bar date, thirty calendar days after the date of entry of such order, by which the counterparties to the Leases must assert any and all claims arising from the rejection of the Leases or be forever barred from asserting any such claims, and (d) granting certain related relief.

69. I believe that the relief the Debtors seek through the Lease Rejection Motion is essential to stem the ongoing dissipation of value resulting from the Leases. Pursuant to those Leases under which the Debtors are the lessees (the Huntsville Lease and the Hanover Lease), the Debtors presently incur over $11.5 million of annual costs, which are only partially offset by sublease revenue from the remaining Leases. In addition, the Leases impose certain

other risks and liabilities on the Debtors and their estates, most notably the risk of being required to post more than $13 million of additional cash deposits in support of Leases that yield no net financial benefit.

70.     If each of the Leases is not rejected as of the Petition Date, the Debtors' estates will continue to incur significant financial and other burdens with no corresponding benefit (a clearly unsustainable situation).  The burdens imposed by the Leases, if they are not immediately rejected, will inure to the direct detriment of the Debtors' creditors.  Accordingly, I believe that immediate rejection of the Leases represents a sound exercise of the Debtors' business judgment and should be approved.

71.     Shortly before the commencement of the Chapter 11 Cases, CGI provided written notice to SIR Properties that it was surrendering the Huntsville Lease and the Hanover Lease (neither of which the Debtors occupy) effective immediately, and that the keys to the Hanover Property were mailed by overnight mail to SIR for delivery on March 18, 2017.  The Debtors are not in possession of the Huntsville Property, which, as noted above, is subleased to Technicolor Southeast.

72.     To avoid incurring any unnecessary administrative expenses related to the Leases, the Debtors seek to reject the Leases effective as of the Petition Date.  The Debtors submit, and I believe, that rejection of the Leases, effective as of the Petition Date, is appropriate under the circumstances and should be approved.

73.     I further believe that retaining the Related Property, if any, would be burdensome to the Debtors' estates, particularly given the massive carrying costs necessary to retain the Hanover Lease for even a matter of days to remove and relocate any Related Property. In addition, I believe that any Related Property has inconsequential value and provides no benefit

to the Debtors' estates.  Accordingly, the Debtors submit, and I believe, that abandoning the Related Property is appropriate and warranted under the circumstances.

**IV.     Conclusion**

74.     I believe that the relief sought in each of the First Day Motions will minimize the adverse effects of the Chapter 11 Cases on the Debtors and enable the Debtors to maximize the value of their estates for the benefit of their creditors and other parties in interest. Accordingly, for the reasons stated herein and in each of the First Day Motions, I, on behalf of the Debtors, respectfully request that each First Day Motion be granted in its entirety, together with such other and further relief as this Court deems just and proper.

*[Signature Page Follows]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:  March 17, 2017
Livingston, New Jersey

*/s/ Glenn R. Langberg*
Glenn R. Langberg
Chief Executive Officer
Cinram Group, Inc., *et al.*

## Exhibit A

### Organizational Chart



Note: Cinram Group, Inc. and non-Debtor CAI Holdings, Inc. are each the sole stockholder or member of other non-Debtor entities that are believed to no longer have any assets or operations.