**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Mary E. Seymour, Esq.
Michael Savetsky, Esq.
Michael Papandrea, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Counsel to the Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re: | Chapter 11 |
| Cinram Group, Inc., *et al.*,[1] | Case No. 17-15258 (VFP) |
| Debtors. | (Jointly Administered) |

**DEBTORS' FOURTH AMENDED DISCLOSURE STATEMENT FOR THE DEBTORS'**
**FOURTH AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11**
**OF THE BANKRUPTCY CODE**

Dated: October 4, 2018

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Cinram Group, Inc. (0588), Cinram Property Group, LLC (9738), and Cinram Operations, Inc. (7377). The Debtors conduct all of their business affairs out of offices located at 220 South Orange Avenue, Livingston, New Jersey 07039.

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................2

    A.    OVERVIEW ..........................................................................................2

    B.    SUMMARY OF THE PLAN AND CLASSIFICATION OF
CLAIMS AND INTERESTS.................................................................2

    C.    VOTING AND CONFIRMATION PROCEDURES ..............................4

        1.    Who May Vote.............................................................................5

        2.    Voting Instructions and Voting Deadline ....................................5

        3.    Whom to Contact for More Information........................................6

        4.    Acceptance or Rejection of the Plan............................................6

        5.    Time and Place of the Confirmation Hearing...............................6

        6.    Objections to the Plan .................................................................7

II. HISTORY OF THE DEBTORS AND
        CIRCUMSTANCES SURROUNDING THEIR CHAPTER 11 FILING..............7

    A.    HISTORY, PROPERTY AND PREPETITION DEBTS OF THE
DEBTORS ............................................................................................7

        1.    History of the Debtors.................................................................7

        2.    Debtors' Property and Leases ....................................................8

        3.    Prepetition Debt ......................................................................10

    B.    CIRCUMSTANCES SURROUNDING THE CHAPTER 11
FILING ...............................................................................................10

III. CORPORATE GOVERNANCE OF THE DEBTORS .........................................11

IV. SIGNIFICANT DEVELOPMENTS IN THE CHAPTER 11 CASES...................11

    A.    "FIRST DAY" ORDERS AND DEBTORS' RETENTION OF
PROFESSIONALS...............................................................................11

    B.    REJECTION OF NONRESIDENTIAL REAL PROPERTY
LEASES...............................................................................................12

C.    APPOINTMENT OF COMMITTEE; RETENTION OF
COMMITTEE PROFESSIONALS ........................................................13

D.    DISSEMINATION OF INFORMATION ABOUT THE
BANKRUPTCY CASES ...................................................................13

E.    POST-PETITION FINANCIAL PERFORMANCE ............................13

F.    CLAIMS BAR DATE AND CLAIMS SUMMARY ...........................14

G.    CLAIMS MEDIATION AND RESOLUTION OF THE CLAIMS
OF SIR PROPERTIES TRUST AND TECHNICOLOR ....................16

V.  SUMMARY OF THE PLAN.............................................................................17

A.    CLASSIFICATION OF CLAIMS AND INTERESTS ........................18

1.    Introduction.............................................................18

2.    Classification...........................................................18

3.    No Waiver of Defenses .................................................21

B.    TREATMENT OF UNCLASSIFIED CLAIMS..................................21

1.    Summary ................................................................21

2.    Administrative Expense Claims......................................21

3.    Bar Date for Filing Administrative Expense Claims; Final
Fee Applications .......................................................22

4.    The Professional Fee Escrow.................................................22

5.    Tax Claims...............................................................23

6.    Post-Effective Date Fees and Expenses....................................23

VI.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...............23

A.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.............................23

B.    CLAIMS BASED ON REJECTION OF EXECUTORY
CONTRACTS OR UNEXPIRED LEASES.........................................23

C.    CURE OF DEFAULTS FOR EXECUTORY CONTRACTS OR
UNEXPIRED LEASES ASSUMED BY THE DEBTORS ..................24

D.      PREEXISTING OBLIGATIONS TO THE DEBTORS UNDER
EXECUTORY CONTRACTS AND UNEXPIRED LEASES.............................25

E.      SURVIVAL OF CERTAIN INDEMNIFICATION
OBLIGATIONS...............................................................................................25

F.      MODIFICATIONS, AMENDMENTS, SUPPLEMENTS,
RESTATEMENTS, OR OTHER AGREEMENTS..............................................25

G.      CONTRACTS AND LEASES ENTERED INTO AFTER THE
PETITION DATE.............................................................................................25

H.      RESERVATION OF RIGHTS ..........................................................................25

VII.  MEANS FOR IMPLEMENTATION OF THE PLAN ..........................................................26

A.      GENERAL SETTLEMENT OF CLAIMS.........................................................26

B.      SUBSTANTIVE CONSOLIDATION...............................................................26

C.      CONTINUED CORPORATE EXISTENCE.......................................................26

D.      REVESTING OF ASSETS................................................................................27

E.      EXIT FINANCING ...........................................................................................27

F.      OLYPHANT SECOND MORTGAGE AND OLYPHANT
SUBORDINATION AGREEMENT ..................................................................27

G.      TUSCALOOSA SECOND MORTGAGE ..........................................................28

H.      THE OLYPHANT EXIT, TECHNICOLOR OLYPHANT
DISTRIBUTION, AND THE ESCROW AGREEMENT....................................29

I.      THE OLYPHANT TERMINATION AGREEMENT..........................................30

J.      RELEASES BETWEEN THE DEBTORS, THE REORGANIZED
DEBTORS, THE RELEASED PARTIES, TECHNICOLOR AND
TECHNICOLOR SOUTHEAST RELATING TO THE
OLYPHANT PREMISES...................................................................................31

K.      RELEASES BETWEEN SIR PROPERTIES TRUST AND THE
DEBTORS ........................................................................................................32

L.      RELEASES BETWEEN SIR PROPERTIES TRUST AND
TECHNICOLOR ..............................................................................................32

M.      RELEASES BETWEEN THE DEBTORS, THE REORGANIZED
DEBTORS, THE RELEASED PARTIES, TECHNICOLOR AND

|       | TECHNICOLOR SOUTHEAST RELATING TO THE HUNTSVILLE PREMISES | 33 |
| N.    | RELEASES BETWEEN THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES, TECHNICOLOR AND TECHNICOLOR SOUTHEAST | 34 |
| O.    | COOPERATION BETWEEN TECHNICOLOR AND THE REORGANIZED DEBTORS | 36 |
| P.    | SOURCES OF DISTRIBUTIONS | 36 |
| Q.    | OPERATION OF THE REORGANIZED DEBTORS | 37 |
| R.    | CONTINUANCE OF CERTAIN NON-DEBTOR GUARANTEES | 37 |
| S.    | LIMITATION ON DISTRIBUTIONS TO HOLDERS OF INTERCOMPANY CLAIMS AND INTERESTS | 37 |
| T.    | MAINTENANCE OF BANK ACCOUNTS | 37 |
| U.    | BOOKS AND RECORDS | 37 |
| V.    | DIRECTORS, MANAGERS, AND OFFICERS OF THE REORGANIZED DEBTORS | 38 |
| W.    | CORPORATE ACTION | 38 |
| X.    | DIRECTOR AND OFFICER LIABILITY INSURANCE | 38 |
| Y.    | PRESERVATION OF CAUSES OF ACTION | 38 |
| Z.    | EFFECTUATING DOCUMENTS; FURTHER TRANSACTIONS | 39 |
| AA.   | EXEMPTION FROM CERTAIN TRANSFER TAXES AND RECORDING FEES | 39 |
| BB.   | FURTHER AUTHORIZATION | 40 |
| CC.   | AMENDMENT OF CHARTERS | 40 |
| VIII. | PROVISIONS REGARDING DISTRIBUTIONS | 40 |
| A.    | DISBURSING AGENT | 40 |
| B.    | DISTRIBUTIONS | 40 |
| C.    | NO INTEREST ON CLAIMS | 40 |

D.    UNDELIVERABLE DISTRIBUTIONS AND UNCLAIMED
PROPERTY .................................................................................41

E.    DISTRIBUTIONS TO HOLDERS AS OF THE RECORD DATE .....................41

F.    REQUIRED TAX INFORMATION .................................................................41

G.    DE MINIMIS DISTRIBUTIONS ......................................................................42

H.    FRACTIONAL DOLLARS ...............................................................................42

I.    WITHHOLDING TAXES ..................................................................................42

IX.  PROCEDURES FOR TREATING AND RESOLVING DISPUTED CLAIMS ..................42

A.    OBJECTIONS TO CLAIMS .............................................................................42

B.    AUTOMATIC DISALLOWANCE OF CERTAIN CLAIMS ............................42

C.    ADJUSTMENT TO CLAIMS WITHOUT OBJECTION ..................................43

D.    NO DISTRIBUTIONS PENDING ALLOWANCE............................................43

E.    ESTIMATION OF CLAIMS .............................................................................43

F.    RESOLUTION OF CLAIMS AND CLAIM OBJECTIONS...............................43

G.    MEDIATION OF CLAIM OBJECTIONS .........................................................43

H.    DISTRIBUTIONS ON INSURED CLAIMS .....................................................43

X.  CONDITIONS PRECEDENT ....................................................................................44

A.    CONDITIONS TO CONFIRMATION ..............................................................44

B.    CONDITIONS TO EFFECTIVE DATE .............................................................44

C.    WAIVER OF CONDITIONS TO CONFIRMATION AND THE
EFFECTIVE DATE...........................................................................45

XI.  EFFECT OF PLAN ON CLAIMS AND INTERESTS................................................45

A.    DISCHARGE OF THE DEBTORS....................................................................45

B.    RELEASE OF LIENS.........................................................................................46

C.    RELEASE BY DEBTORS OF CERTAIN PARTIES.........................................46

D.    THIRD PARTY RELEASE................................................................................47

E.      EXCULPATION AND LIMITATION OF LIABILITY ......................................48

F.      INJUNCTION......................................................................................................48

G.      SETOFF AND RECOUPMENT ..........................................................................49

H.      BINDING EFFECT ..............................................................................................49

I.      AUTOMATIC STAY ...........................................................................................49

XII.  MISCELLANEOUS PLAN PROVISIONS.............................................................49

A.      MODIFICATION OF THE PLAN ......................................................................49

B.      RETENTION OF JURISDICTION .....................................................................50

C.      DISSOLUTION OF CREDITORS' COMMITTEE..............................................50

D.      NO BAR TO SUITS ............................................................................................50

XIII.  CONFIRMATION AND CONSUMMATION PROCEDURE .........................................50

A.      GENERAL INFORMATION ..............................................................................50

B.      SOLICITATION OF ACCEPTANCES ..............................................................51

C.      ACCEPTANCES NECESSARY TO CONFIRM THE PLAN ............................51

XIV.  ALTERNATIVES TO CONFIRMATION AND
        CONSUMMATION OF THE PLAN ....................................................................51

XV.  CERTAIN RISK FACTORS TO CONSIDER ......................................................52

XVI.  UNITED STATES FEDERAL INCOME TAX CONSEQUENCES ................................53

XVII.  RECOMMENDATION...................................................................................................53

**DISCLAIMER**

THIS DISCLOSURE STATEMENT (THE "<u>DISCLOSURE STATEMENT</u>") UNDER SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE (THE "<u>BANKRUPTCY CODE</u>") WITH RESPECT TO THE DEBTORS' FOURTH AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (AS THE SAME MAY BE FURTHER AMENDED FROM TIME TO TIME, THE "<u>PLAN</u>"), CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN. WHILE THE DEBTORS BELIEVE THAT THESE SUMMARIES PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE PLAN, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE PLAN.  IF ANY INCONSISTENCIES EXIST BETWEEN THE TERMS AND PROVISIONS OF THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR OTHER DOCUMENTS DESCRIBED THEREIN, THE TERMS AND PROVISIONS OF THE PLAN OR OTHER DOCUMENTS ARE CONTROLLING.  EACH HOLDER OF AN IMPAIRED CLAIM SHOULD REVIEW THE ENTIRE PLAN AND ALL RELATED DOCUMENTS AND SEEK THE ADVICE OF ITS OWN COUNSEL BEFORE VOTING WHETHER TO ACCEPT OR REJECT THE PLAN. [THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY ORDER OF THE BANKRUPTCY COURT AS CONTAINING INFORMATION OF A KIND, AND IN SUFFICIENT DETAIL, TO ENABLE HOLDERS OF CLAIMS TO MAKE AN INFORMED JUDGMENT IN VOTING TO ACCEPT OR REJECT THE PLAN.]

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN, UNLESS SO SPECIFIED.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW.  PERSONS OR ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST OR INTERESTS IN THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

IN ACCORDANCE WITH THE BANKRUPTCY CODE, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "<u>SEC</u>"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

# I.

# INTRODUCTION

## A.    OVERVIEW

Cinram Group, Inc. ("CGI"), Cinram Property Group, LLC ("CPG"), and Cinram Operations, Inc. ("COI"), debtors and debtors-in-possession in the above-captioned cases (each a "Debtor" and collectively, the "Debtors"), hereby submit this Disclosure Statement pursuant to section 1125(b) of the Bankruptcy Code and Rule 3017 of the Federal Rules of Bankruptcy Procedure, in connection with the Debtors' Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated October 4, 2018 (as the same may be further amended from time to time, the "Plan").  A copy of the Plan is attached hereto as Exhibit A.  All capitalized terms used but not defined in this Disclosure Statement shall have the respective meanings ascribed to such terms in the Plan, unless otherwise noted.  In the event of any inconsistency between this Disclosure Statement and the Plan, the terms of the Plan shall govern and control.

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is Impaired under the Plan, to make an informed decision in exercising your right to vote to accept or reject the Plan.

**[By order dated [_____] [__], 2018 (the "Disclosure Statement Order"), the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") has found that this Disclosure Statement provides adequate information to enable Holders of Claims that are impaired under the Plan to make an informed judgment in exercising their right to vote to accept or reject the Plan.]**

## B.    SUMMARY OF THE PLAN AND CLASSIFICATION OF CLAIMS AND INTERESTS

The Plan classifies all Claims against and Interests in the Debtors into eight (8) separate Classes. The Plan is premised on the substantive consolidation each of the Debtors' Estates into a single consolidated Estate solely for the purposes of voting and Distributions under the Plan. Accordingly, Holders of Allowed Claims in each Class shall be entitled to their share of Distributions made to such Class without regard to which Debtor was originally liable for such Claim.

Certain of the Debtors may not have Holders of Claims in a particular Class or Classes. Any Class of Claims that does not have at least one Holder eligible to vote as of the Voting Deadline shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

A brief summary of the Classes of Claims and Interests under the Plan, including the treatment of each Class, the estimated aggregate Allowed amount of Claims in each Class, the voting rights of each Class, and the estimated projected Distributions to each Holder of an

Allowed Claim in each Class, is set forth in the table below.[2]  A complete description of the treatment of each Class is set forth in Article III of the Plan and Section V of this Disclosure Statement.  Parties in interest should refer to those portions of the Plan and this Disclosure Statement for a complete description of the proposed treatment of each Class.

| Class | Description | Estimated Aggregate Allowed Amount | Treatment | Status | Voting Rights | Estimated Distribution |
|---|---|---|---|---|---|---|
| Class 1 | Secured Claims | $0 - $95,000 | Secured Claims, if any, shall be paid in full in Cash, paid with the proceeds of the sale or disposition of the collateral securing such Claim(s), receive the return of collateral, or receive such other treatment rendering such Claims Unimpaired. | Unimpaired | Deemed to accept Plan; not entitled to vote | 100% |
| Class 2 | Priority Claims | $0 | Priority Claims, if any, shall be paid in full in Cash or receive such other treatment rendering such Claims Unimpaired. | Unimpaired | Deemed to accept Plan; not entitled to vote | N/A |
| Class 3 | SIR Rejection Damage Claims | $8,500,000 | The SIR Rejection Damage Claims shall be Allowed in an aggregate amount equal to the SIR Settlement Amount and paid in accordance with the terms of the Plan. | Impaired | Entitled to vote | Approximately 17.0%[3] |
| Class 4 | Technicolor Indemnification Claims | $1,500,000 | The Technicolor Indemnification Claims shall be Allowed in the aggregate amount of the Technicolor Allowed Claim Amount and paid in accordance with the terms of the Plan. | Impaired | Entitled to vote | Approximately 10.7%[4] |
| Class 5 | General Unsecured Claims | $2,360,000 | Each Holder of an Allowed General Unsecured Claim shall receive such Holder's Pro Rata share of Cash in the amount of the GUC Distribution Amount. | Impaired | Entitled to vote | Approximately 10.6% |

---

[2] The estimated Allowed amounts of Claims in each Class set forth in the table below are subject to ongoing review and reconciliation by the Debtors and, therefore, remain subject to change.

[3] This estimate represents the SIR Settlement Amount of $8,500,000 (without any interest thereon) as a percentage of the claims of SIR Properties against the Debtors as amended (or to be amended) consistent with an expert report that was submitted by SIR Properties in connection with the Debtors' objection to its proofs of claim. The expert report alleges that SIR Properties' claims against the Debtors total not less than $50,013,514.84 in the aggregate.

[4] This estimate represents the Technicolor Allowed Claim Amount as a percentage of the claims of Technicolor against the Debtors (asserted in an amount of not less than $14,029,900).

| Class | Description | Estimated Aggregate Allowed Amount | Treatment | Status | Voting Rights | Estimated Distribution |
|---|---|---|---|---|---|---|
| Class 6 | Workers' Compensation Insurance Claims | $0 - $325,000[5] | All Allowed Workers' Compensation Insurance Claims shall be Reinstated. | Unimpaired | Deemed to accept Plan; not entitled to vote | 100% |
| Class 7 | Intercompany Claims | $0 | On the Effective Date, all net Allowed Intercompany Claims shall, at the election of the Reorganized Debtors, be either (i) Reinstated, or (ii) released, waived, and discharged without any Distribution on account of such Claims. | Unimpaired | Deemed to accept Plan; not entitled to vote | N/A |
| Class 8 | Interests | N/A | On the Effective Date, Allowed Interests shall be Reinstated and shall not be discharged, canceled, released, extinguished or otherwise altered as a result of or by the Plan. | Unimpaired | Deemed to accept Plan; not entitled to vote | N/A |

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Tax Claims against the Debtors are not classified for purposes of voting on, or receiving Distributions under, the Plan. Holders of such Claims are not entitled to vote on the Plan. All such Claims are instead treated separately in accordance with Article IV of the Plan and in accordance with the requirements set forth in sections 1129(a)(9)(A) and (C) of the Bankruptcy Code. A more complete description of the treatment of Administrative Expense Claims and Tax Claims is set forth in Article IV of the Plan and Section V.B of this Disclosure Statement.

## C.    VOTING AND CONFIRMATION PROCEDURES

Accompanying this Disclosure Statement is a copy of the Plan, which is annexed to this Disclosure Statement as Exhibit A, and, if applicable, an appropriate ballot (each, a "Ballot") together with voting instructions to be completed by Holders of Claims in Class 3, Class 4 and Class 5, as applicable, to vote to accept or reject the Plan.

This Disclosure Statement, the appropriate Ballot, and the Disclosure Statement Order (collectively, the "Solicitation Package") is being furnished to Holders of Claims in Class 3, Class 4 and Class 5 for the purpose of soliciting votes on the Plan.

If you did not receive a Ballot in your Solicitation Package, but you are the Holder of a Claim in a Class entitled to vote on the Plan and believe that you should have received a Ballot, please contact counsel to the Debtors, in writing to Lowenstein Sandler LLP, Attn: Mary E.

---

[5] This amount is based on actuarial estimates and is subject to adjustment and further review by the Debtors.

Seymour, Esq. or Michael Savetsky, Esq., One Lowenstein Drive, Roseland, NJ 07068; or by telephone at (973) 597-2500.

## 1.    Who May Vote

Pursuant to the provisions of the Bankruptcy Code, only classes of Claims or Interests that are "impaired" and that are not deemed as a matter of law to have rejected a plan of reorganization under section 1126(g) of the Bankruptcy Code are entitled to vote to accept or reject the plan. Any class that is "unimpaired" is not entitled to vote to accept or reject a plan of reorganization and is conclusively presumed to have accepted the Plan. As set forth in section 1124 of the Bankruptcy Code, a class is "impaired" if legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified or altered by the plan. For purposes of the Plan, Holders of Claims in Class 3, Class 4 and Class 5 are Impaired and are entitled to vote on the Plan.

A Claim must be "allowed" for purposes of voting in order for the Holder of that Claim to have the right to vote on the Plan. Generally, for voting purposes a Claim is deemed "allowed" absent an objection to the Claim if (i) a Proof of Claim was timely filed, or (ii) if no Proof of Claim was filed, the Claim is identified in the Debtors' Schedules as other than "disputed," "contingent," or "unliquidated," and an amount of the Claim is specified in the Schedules, in which case the Claim will be deemed allowed for the specified amount. In either case, when an objection to a Claim is filed, the creditor holding the Claim cannot vote unless the Bankruptcy Court, after notice and a hearing, either overrules the objection or allows the Claim for voting purposes. Accordingly, if you did not receive a Ballot and believe that you are entitled to vote on the Plan, you must file a motion pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure with the Bankruptcy Court seeking the temporary allowance of your Claim for voting purposes by no later than the deadline set forth in the Disclosure Statement Order, or you will not be entitled to vote to accept or reject the Plan.

THE DEBTORS AND REORGANIZED DEBTORS IN ALL CASES RESERVE THE RIGHT TO OBJECT TO ALLOWANCE OF ANY CLAIM FOR DISTRIBUTION PURPOSES UNDER THE PLAN REGARDLESS OF WHETHER THE CLAIM IS ALLOWED FOR PURPOSES OF VOTING ON THE PLAN.

## 2.    Voting Instructions and Voting Deadline

All votes to accept or reject the Plan must be cast by using the Ballot enclosed with this Disclosure Statement. No votes other than those using the enclosed Ballot will be counted, except to the extent the Bankruptcy Court orders otherwise. In the Disclosure Statement Order, the Bankruptcy Court has fixed [_____] [__], 2018 as the date (the "Voting Record Date") for the determination of the Holders of Claims who are entitled to (a) receive a copy of this Disclosure Statement and related materials and (b) vote to accept or reject the Plan. After carefully reviewing the Plan and this Disclosure Statement, including any annexed exhibits, please indicate your acceptance or rejection of the Plan on the Ballot and return such Ballot to counsel for the Debtors in the enclosed envelope by no later than **[_____] [__], 2018** to:

Lowenstein Sandler LLP
Attn: Mary E. Seymour and Michael Savetsky
One Lowenstein Drive
Roseland, NJ 07068

**BALLOTS MUST BE COMPLETED AND RECEIVED BY COUNSEL FOR THE DEBTORS BY NO LATER THAN [_____] [__], 2018 (THE "<u>VOTING DEADLINE</u>"). ANY BALLOT THAT IS NOT EXECUTED BY A DULY AUTHORIZED PERSON SHALL NOT BE COUNTED.  ANY BALLOT THAT IS EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL BE DEEMED TO BE AN ACCEPTANCE OF THE PLAN.  ANY BALLOT THAT IS FAXED OR SENT BY EMAIL SHALL NOT BE COUNTED IN THE VOTING TO ACCEPT OR REJECT THE PLAN, UNLESS THAT BALLOT IS ACCEPTED IN THE DEBTORS' DISCRETION AFTER CONSULTATION WITH THE COMMITTEE.**

**3.      Whom to Contact for More Information**

If you have any questions about the procedure for voting your Claim or the packet of materials you received, please contact Lowenstein Sandler LLP at the address indicated above or by telephone at (973) 597-2500.  If you wish to obtain additional copies of the Plan or this Disclosure Statement at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact Lowenstein Sandler LLP, One Lowenstein Drive, Roseland, NJ 07068, Attn: Diane Claussen; or by electronic mail at dclaussen@lowenstein.com.

**4.      Acceptance or Rejection of the Plan**

The Bankruptcy Code defines "acceptance" of a plan by a class of Claims as acceptance by Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in that class that cast ballots for acceptance or rejection of the plan.  The Bankruptcy Code defines "acceptance" of a plan by a class of interests as acceptance by Holders of at least two-thirds in amount of the Allowed Interests in that class that cast ballots for acceptance or rejection of the plan.  If all Impaired Classes entitled to vote on the Plan do not accept the Plan, but least one Impaired Class votes to accept the Plan, the Debtors will seek to confirm the Plan under section 1129(b) of the Bankruptcy Code, which permits the confirmation of a plan notwithstanding the non-acceptance by one or more Impaired Classes of Claims or Interests.  Under section 1129(b) of the Bankruptcy Code, a plan may be confirmed if (a) the plan has been accepted by at least one Impaired Class of Claims and (b) the Bankruptcy Court determines that the plan does not discriminate unfairly and is "fair and equitable" with respect to the non-accepting classes.

**5.      Time and Place of the Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan.

Pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled the Confirmation Hearing to commence on [_____] [__], 2018 at [_:___] [__].m. (ET), before the Honorable Vincent F. Papalia of the United States Bankruptcy Court for the District of New Jersey, Courtroom 3B, 50 Walnut Street, 3rd Floor, Newark, New Jersey. A notice setting forth the time and date of the Confirmation Hearing has been included along with this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned hearing date and time by the Bankruptcy Court in open court at such hearing.

### 6.    Objections to the Plan

Any objection to confirmation of the Plan must be in writing; must comply with the Bankruptcy Code and the Bankruptcy Rules; must be filed with the Clerk of the United States Bankruptcy Court for the District of New Jersey, 50 Walnut Street, 3rd Floor, Newark, New Jersey 07102, and must be served upon the following parties, so as to be received no later than [_____] [__], 2018 at 4:00 p.m. (ET): (a) Lowenstein Sandler LLP, Attn: Mary E. Seymour, Esq. and Michael Savetsky, Esq., One Lowenstein Drive, Roseland, NJ 07068; (b) Office of the United States Trustee, Attn: Peter J. D'Auria, Esq.; One Newark Center, 1085 Raymond Boulevard, Suite 2100, Newark, NJ 07102; and (c) Cole Schotz P.C., Attn: Warren A. Usatine, Esq. and Ryan T. Jareck, Esq., 25 Main Street, Hackensack, NJ 07601.

## II.

## HISTORY OF THE DEBTORS AND
## CIRCUMSTANCES SURROUNDING THEIR CHAPTER 11 FILING

### A.    HISTORY, PROPERTY AND PREPETITION DEBTS OF THE DEBTORS

### 1.    History of the Debtors

CGI is a Delaware corporation that was formed as part of a 2012 acquisition of substantially all of the assets and businesses of Cinram International Income Fund in the United States, Canada, the United Kingdom, France, and Germany. CGI and its Debtor and non-Debtor affiliates (collectively, "Cinram") were once one of the world's largest providers of media development and delivery services. Located in North America and Europe, Cinram worked with some of the biggest names in home entertainment and retail. With a full range of supply chain services, including pre-recorded media product manufacturing, packaging, distribution and business solutions, Cinram guaranteed the flow of products smoothly and profitably to consumers around the world.

As consumer demand rapidly shifted away from physical media for audio and video over the past several years, Cinram exited the manufacturing and supply chain services business, selling or winding down substantially all of its operations and operating assets, including those of the Debtors. As a result, as of March 17, 2017 (the "Petition Date"), the Debtors no longer had any active business operations, and the Debtors' remaining assets consisted primarily of approximately four million square feet of owned and leased industrial property and undeveloped land located in Pennsylvania and Alabama, which is further described below.

## 2.    Debtors' Property and Leases

As of the Petition Date, CGI and CPG were parties to a number of leases.  CGI leased a 1.4 million square foot industrial facility and undeveloped land on approximately 161 acres (or 7 million square feet of land), located at 4905 Moores Mill Road in Huntsville, Alabama (the "Huntsville Property"), from SIR Properties Trust, a Maryland real estate investment trust ("SIR Properties"), pursuant to a lease dated August 31, 2012 (together with all amendments, exhibits, and/or supplements thereto, the "Huntsville Lease").  The Base Rent due from CGI to SIR Properties under the Huntsville Lease was $642,934.71 per month, subject to an annual increase of three percent (3%) on August 31 of each year.  The Huntsville Lease was to expire by its terms on August 31, 2032.

On November 12, 2015, CGI consummated the sale (the "Technicolor Sale") of its North American optical disc (DVD and Blu-ray) manufacturing and distribution assets to Technicolor Home Entertainment Services, Inc. ("Technicolor").  In connection with the Technicolor Sale, CGI, with the consent of SIR Properties, entered into a sublease of the Huntsville Property (together with all amendments, exhibits, and/or supplements thereto, the "Huntsville Sublease") to CT Acquisition Holdco, LLC n/k/a Technicolor Home Entertainment Services Southeast, LLC ("Technicolor Southeast").  The Huntsville Sublease was to expire by its terms on August 29, 2032.  The Monthly Base Rent due from Technicolor Southeast to CGI under the Huntsville Sublease was equal to the Base Rent under the Huntsville Lease.  In addition, pursuant to the Huntsville Sublease, Technicolor Southeast agreed to assume all of CGI's obligations under the Huntsville Lease with respect to the Huntsville Property, including, without limitation, the obligation for payment of all monetary obligations of CGI under the Lease.  As a pure pass-through, however, the Huntsville Sublease did not generate any income for CGI, but instead, only created additional administrative overhead.

Pursuant to a first amendment to the Huntsville Lease, dated as of November 12, 2015, if CGI's Tangible Net Worth (as defined therein) fell below $20,000,000, CGI would have been required to provide SIR Properties with a security deposit equal to the Base Rent payable under the Huntsville Lease for the following eighteen months.  For example, if the deposit requirement were triggered on or about the Petition Date, CGI could have become obligated to post a security deposit under the Huntsville Lease in excess of $11.8 million.

On November 12, 2015, Bookspan LLC (as tenant) assigned to CGI a lease dated September 24, 2008 (together with all amendments, exhibits, and/or supplements thereto, the "Hanover Lease"), for a 500,000 square foot industrial facility and undeveloped land on approximately 120 acres (or 5 million square feet of land), including approximately 75 acres of undeveloped land, located at 501 Ridge Avenue in Hanover, Pennsylvania (the "Hanover Property").  SIR Properties was also the landlord under the Hanover Lease and consented to the assignment of the Hanover Lease to CGI.  The Base Rent due under the Hanover Lease was $286,430.10 per month, subject to an annual increase of four percent (4%) on September 24 of each year.  In addition, CGI paid annual real estate taxes for the Hanover Property of approximately $300,000, as well as insurance, maintenance, utilities, and security costs totaling approximately $25,000 per month.  The Hanover Lease was to expire by its terms on September 24, 2028, subject to certain options to extend the term at CGI's election.

As of the Petition Date, the Debtors did not occupy any portion of the Hanover Property although certain subtenants (the "Hanover Subtenants") occupied a small portion of the Hanover Property on a month to month basis (the "Hanover Subleases"). The income received by CGI from the Hanover Subtenants varied from month to month depending upon the amount of space occupied by the Hanover Subtenants, but was relatively insignificant, particularly in comparison to the substantial rent due to SIR Properties under the Hanover Lease. In addition, upon information and belief, a 60 acre portion of the Hanover Property was subject to a farm lease dated October 2, 1987 (together with all amendments, exhibits, and/or supplements thereto, the "Farm Lease"), that predated the assignment of the Hanover Lease to CGI. CGI received only $175 per month in rent on account of the Farm Lease.

As of the Petition Date, SIR Properties was holding a cash security deposit under the Hanover Lease in the amount of $3,739,382.00 (the "Hanover Deposit"). Pursuant to an amendment to the Hanover Lease dated November 12, 2015, if CGI's Tangible Net Worth (as defined therein) fell below $20,000,000, CGI would have been required to increase the Hanover Deposit to an amount equal to the Base Rent payable under the Hanover Lease for the following eighteen months. For example, if this provision were triggered on or about the Petition Date, CGI could have been required to increase the Hanover Deposit to approximately $5.3 million, a cash outlay of more than $1.5 million.

As of the Petition Date, after taking into account the minimal income from existing subleases, CGI was still *incurring approximately $300,000 in losses per month* associated with the Hanover Lease due to its high base rent, real estate taxes, insurance and other costs and expenses due under the Hanover Lease.

As described below, in the exercise of their business judgment, the Debtors sought—and obtained the Bankruptcy Court's approval—to reject the Huntsville Lease, the Huntsville Sublease, the Hanover Lease, the Hanover Subleases and the Farm Lease, as part of their "first day" motions in the Bankruptcy Cases.

CPG owns a one million square foot manufacturing plant on approximately 103 acres of property located at 1400 East Lackawanna Avenue in Olyphant, Pennsylvania (the "Olyphant Property"). In connection with the Technicolor Sale, the Olyphant Property was leased to Technicolor Southeast pursuant to a lease dated November 12, 2015 (the "Olyphant Lease"). While Technicolor Southeast is responsible for payment of all expenses associated with the Olyphant Property, including all real estate taxes, insurance, maintenance and security costs, Technicolor Southeast is required to pay just $100 per month in Base Rent to CPG. Thus, CPG derives only *nominal* income from the Olyphant Property. Unless sooner terminated in accordance with its terms, the Olyphant Lease will expire on August 29, 2032.

COI owns two manufacturing plants that are approximately 240,000 and 230,000 square feet in size, respectively, on approximately 100 acres of property located at 1 JVC Road and 2 JVC Road in Cottondale, Alabama, an unincorporated community that is part of Tuscaloosa, Alabama (the "Tuscaloosa Property"). The Debtors acquired the Tuscaloosa Property in 2014 as part of CGI's acquisition of JVC America, Inc., the games software division of JVC Americas Corp.

The Debtors most recently used the Tuscaloosa Property to produce and package compact discs, but the Debtors ceased operations entirely at the Tuscaloosa Property in 2015, and the Tuscaloosa Property has been vacant since that time.  CPG incurs approximately $33,000 per month in carrying costs associated with the Tuscaloosa Property, including real estate taxes, insurance, maintenance, utilities and security costs.

### 3.    Prepetition Debt

As of the Petition Date, the Debtors did not have any funded debt obligations on either a secured or unsecured basis, and to the best of the Debtors' knowledge, there were no valid and perfected liens against, or security interests in, any of the Debtors' assets.

As of the Petition Date, the Debtors had approximately $400,000 of aggregate accounts payable owed to various vendors and services providers in addition to the substantial future obligations under the Huntsville Lease and Hanover Lease described above.

In addition, in connection with the Technicolor Sale, Technicolor had asserted a claim for a $500,000 payment allegedly due from CGI pursuant to the Purchase and Sale Agreement between the parties, dated August 10, 2015 (the "PSA"), as well as certain other alleged claims for indemnification under the PSA in an unliquidated amount.

As of the Petition Date, the Debtors also had certain other potential contingent, unliquidated and/or disputed liabilities in connection with residual workers' compensation claims, although the Debtors had not quantified the amount, or determined the validity, of any such workers' compensation claims.

### B.    CIRCUMSTANCES SURROUNDING THE CHAPTER 11 FILING

As described above, prior to the Petition Date, CGI was lessee under two burdensome real property leases from which it derived virtually no income whatsoever and under which it had very significant future liabilities.  Due to these burdensome leases, the Debtors were experiencing mounting losses, and the Debtors believed that CGI's long term liabilities in connection with the Huntsville Lease and Hanover Lease were unsustainable.

The Huntsville Lease and Huntsville Sublease, together, amounted to a pass-through lease that did not benefit CGI in any way, while leaving CGI with tremendous financial exposure.  If Technicolor Southeast were to have exercised its rights to terminate the Huntsville Sublease, CGI could have remained liable for rent payments that amounted to $642,934.71 per month, plus real estate taxes and other charges, for a property that it did not occupy and for which the Debtors had no use.  Additionally, as described above, CGI could have potentially been required to post a security deposit in excess of $11.8 million under the Huntsville Lease.

CGI was also incurring continuing losses in connection with the Hanover Lease at a rate of approximately $300,000 per month.  CGI had not been able to find a long-term subtenant for the Hanover Lease for a variety of reasons, including but not limited to (1) the enormous size of the Hanover Lease and likelihood that it would need to be further demised to accommodate the

needs of potential subtenants, and (2) the age and layout of the building. Additionally, as described above, CGI could have potentially been required to increase the Hanover Deposit to $5,316,600.90, a cash outlay of more than $1.5 million, which would have further depleted the Debtors' resources.

After exploring all available options, the Debtors' Board of Directors determined that commencing the Bankruptcy Cases was the best means to preserve and maximize the value of the Debtors' assets for the benefit of their creditors and other parties in interest.

## III.

## <u>CORPORATE GOVERNANCE OF THE DEBTORS</u>

The board of directors of CGI consists of one member, Karen Kessler, who has served as the sole of director of CGI since September 2, 2016.

The board of directors of COI consists of one member, Karen Kessler, who has served as the sole of director of COI since September 2, 2016.

CPG is a member managed limited liability company managed by CGI.

Glenn Langberg is the CEO of each of the Debtors. Joseph Catalano is the Secretary of each of the Debtors. The Debtors have no other employees.

Mr. Langberg has communicated regularly and as needed with Ms. Kessler both before and during the pendency of the Bankruptcy Cases to discuss and evaluate the Debtors' financial position, to consider and assess the Debtors' strategic alternatives, to assess and determine how to maximize the value of the Debtors' assets for the benefit of their stakeholders, and to otherwise keep Ms. Kessler fully informed regarding the Debtors' business and liquidity position and developments in the Bankruptcy Cases.

## IV.

## <u>SIGNIFICANT DEVELOPMENTS IN THE CHAPTER 11 CASES</u>

### A.    "FIRST DAY" ORDERS AND DEBTORS' RETENTION OF PROFESSIONALS

On the Petition Date, the Debtors filed various "first day" motions (collectively, the "<u>First Day Motions</u>") with the Bankruptcy Court, seeking certain expedited relief to aid in the efficient administration of the Bankruptcy Cases and to facilitate the Debtors' transition to debtor-in-possession status. These motions were granted at a hearing held on March 23, 2017. The orders of the Bankruptcy Court granting the First Day Motions, among other things:

• authorized the joint administration of the Debtors' Bankruptcy Cases for procedural purposes only;

- granted an extension of the Debtors' time to file their Schedules of Assets and Liabilities and Statements of Financial Affairs;

- authorized the Debtors to continue and maintain their existing cash management system and bank accounts;

- prohibited the Debtors' utility companies from discontinuing, altering, or refusing service on account of prepetition invoices and approved the Debtors' proposed form of adequate protection to such utility companies;

- authorized, but did not direct, the Debtors to pay certain prepetition taxes, such as real property taxes; and

- authorized, but did not direct, the Debtors to continue their pre-existing insurance policies and programs, maintain insurance premium financing arrangements, and to pay prepetition insurance premiums.

By an order entered on April 26, 2017, the Debtors were authorized to retain Lowenstein Sandler LLP as counsel to the Debtors effective as of the Petition Date. By an order entered on June 22, 2017, the Debtors were authorized to retain JM Zell Partners, Ltd. as real estate consultant to the Debtors effective as of June 8, 2017. By an order entered on October 25, 2017, the Debtors were authorized to retain Greenman-Pedersen, Inc. and LBYD, Inc. to provide certain engineering services for the Debtors effective as of October 11, 2017.

## B.  REJECTION OF NONRESIDENTIAL REAL PROPERTY LEASES

On the Petition Date, the Debtors filed the *Debtors' Motion for an Order Authorizing Rejection of Certain Unexpired Leases of Nonresidential Real Property as of the Petition Date* (the "Lease Rejection Motion") [Docket No. 10]. By the Lease Rejection Motion, the Debtors sought, among other things, to (i) reject the Huntsville Lease, the Huntsville Sublease, the Hanover Lease, the Hanover Subleases, and the Farm Lease, effective as of the Petition Date, (ii) abandon any "related property" that may have been located at the Huntsville Property and/or the Hanover Property, and (iii) establish a bar date by which counterparties to the Leases must assert any and all claims arising from the rejection of the Leases.

Technicolor and SIR Properties each filed an objection to the Lease Rejection Motion. After a hearing held on March 29, 2017, the Bankruptcy Court entered an order on March 31, 2017, granting substantially all of the relief south in the Lease Rejection Motion (the "Lease Rejection Order") [Docket No. 55]. Among other things, the Lease Rejection Order approved (i) the rejection of the Huntsville Lease, the Huntsville Sublease, the Hanover Subleases and the Farm Lease, effective as of the Petition Date, and (ii) the rejection of the Hanover Lease effective as of March 29, 2017.

Pursuant to the Lease Rejection Order, the counterparties to the leases rejected by the Lease Rejection Order were required to file proofs of claim related to or arising out of the rejection of the leases on or before May 15, 2017. Technicolor Southeast timely filed a Proof of Claim against CGI, Claim No. 6, asserting rejection damages arising out of CGI's rejection of the Huntsville Sublease in an unliquidated amount. SIR Properties timely filed two (2) proofs of

claim against CGI, Claim Nos. 7 and 8, asserting rejection damages arising out of CGI's rejection of the Hanover Lease and the Huntsville Lease in the amounts of $8,426,930.94 and $32,837,560.41, respectively.[6]

On August 7, 2017, the Bankruptcy Court entered an order [Docket No. 197] granting a motion filed by SIR Properties for limited relief from the automatic stay of section 362 of the Bankruptcy Code, and terminating (i) the Huntsville Lease, effective as of the Petition Date, and (ii) the Hanover Lease, effective as of March 29, 2017.

### C.    APPOINTMENT OF COMMITTEE; RETENTION OF COMMITTEE PROFESSIONALS

On April 3, 2017, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a) of the Bankruptcy Code. The initial members of the Committee were as follows: SIR Properties, MPEG LA, LLC, Richter, LLP, and Technicolor.  By an order entered on April 26, 2017, the Committee was authorized to retain Cole Schotz P.C. as counsel to the Committee.  By an order entered on May 31, 2017, the Committee was authorized to retain and Eisner Amper LLP as financial advisor to the Committee.  On July 21, 2017, the Committee advised the Debtors through counsel that Richter, LLP had resigned from the Committee effective as of that date.

### D.    DISSEMINATION OF INFORMATION ABOUT THE BANKRUPTCY CASES

The Debtors have provided information about the Debtors' businesses and proceedings in these Bankruptcy Cases to various parties-in-interest, including the Committee. The Debtors provided extensive information about the Debtors' financial, corporate, and operational status to creditors in their Schedules of Assets and Liabilities and Statements of Financial Affairs filed with the Bankruptcy Court and at the initial meeting of creditors held pursuant to section 341 of the Bankruptcy Code.  In addition, the Debtors have provided formal and informal updates to various creditors in unscheduled telephone calls over the course of the Bankruptcy Cases.  The Debtors have also provided voluminous documents and other information relating to their historical operations, assets and liabilities, among other things, to the Committee's professionals in response to both formal and informal requests of the Committee.

### E.    POST-PETITION FINANCIAL PERFORMANCE

The Debtors' financial performance since the Petition Date is set forth in the monthly operating reports that the Debtors have filed with the Bankruptcy Court in CGI's Bankruptcy Case.

---

[6] As noted above, although SIR Properties has not sought to amend its proofs of claim, SIR Properties has informally alleged in an expert report that its claims against the Debtors total not less than $50,013,514.84 in the aggregate.

## F.    CLAIMS BAR DATE AND CLAIMS SUMMARY

On April 24, 2017, each of the Debtors filed with the Bankruptcy Court their Schedules of Assets and Liabilities and Statements of Financial Affairs.  On May 23, 2017, the Debtors filed a motion (the "Bar Date Motion") with the Bankruptcy Court seeking entry of an order pursuant to sections 105(a) and 501 of the Bankruptcy Code and Bankruptcy Rules 2002, 3003 and 9008: (a) establishing (i) July 25, 2017 as the deadline by which all creditors, including creditors asserting claims pursuant to section 503(b)(9) of the Bankruptcy Code, other than governmental units (as defined in section 101(27) of the Bankruptcy Code), must file proofs of claim (the "General Bar Date"), and (ii) establishing September 13, 2017 as the date by which governmental units must file proofs of claim (the "Governmental Bar Date," and together with the General Bar Date, collectively, the "Bar Dates"); (b) approving the form and manner of notice of the Bar Dates; (c) authorizing the Debtors to publish notice of the Bar Dates; and (d) granting related relief.  On June 15, 2017, the Bankruptcy Court entered an order granting the Bar Date Motion and establishing the Bar Dates.

A total of thirty-six (36) timely[7] proofs of claim (the "Proofs of Claim") were filed against the Debtors in the Bankruptcy Cases.  Excluding Proofs of Claim filed in an unspecified or unliquidated amount and Proofs of Claim that were subsequently withdrawn, the timely filed Proofs of Claim, including amendments thereto, asserted claims against the Debtors in the aggregate face amount of approximately $58 million.[8]  Of this amount, approximately $57.9 million was asserted against CGI, approximately $130,000 was asserted against COI, and approximately $7,000 was asserted against CPG.

In addition to the timely Proofs of Claim filed against the Debtors, the aggregate amount of non-contingent, undisputed and liquidated Claims against the Debtors listed in the Debtors' respective Schedules of Assets and Liabilities (but not asserted in a timely filed Proof of Claim), is approximately $13,000[9] in the aggregate.  Of this amount, approximately $12,000 is scheduled with respect to CGI, approximately $1,000 is scheduled with respect to COI, and $0 is scheduled with respect to CPG.

Notably, of the approximate $58 million in face amount of the Proofs of Claim filed against CGI, (1) approximately $41.2 million constitutes rejection damages claims asserted by SIR Properties in connection with CGI's rejection of the Hanover Lease and the Huntsville Lease, and (2) approximately $14 million constitutes claims asserted by Technicolor Southeast in connection with alleged indemnification rights under the PSA and CGI's rejection of the Huntsville Sublease.  It has been the Debtors' position throughout these Bankruptcy Cases that the rejection damages claims filed by SIR Properties in connection with CGI's rejection of the Hanover Lease and the Huntsville Lease and the claims asserted by Technicolor Southeast for

---

[7] This includes the proof of claim filed by MPEG LA, LLC on April 24, 2018, which was deemed timely pursuant to the *Consent Order Permitting the Late Filing of MPEG LA's Claim Pursuant to Rules 3003(c)(3) and 9006(b) of the Federal Rules of Bankruptcy Procedure* [Docket No. 434].

[8] Solely for purposes of this claims summary, Proofs of Claim filed by the same party against more than one Debtor for the same alleged liability were treated as filed against the principal Debtor allegedly liable for the Claim.

[9] This amount does not include the claim of RSM US LLP, which was waived in connection its retention as an ordinary course professional by the Debtors.

indemnification under the PSA and alleged damages resulting from CGI's rejection of the Huntsville Sublease are significantly overstated.

On August 15, 2017, the Debtors filed an objection to the rejection damages claims filed by SIR Properties (the "SIR Claim Objection") [Docket No. 218], and that objection remains pending. As set forth in the SIR Claim Objection, the Debtors believe that the rejection damages claims filed by SIR Properties are significantly overstated on a variety of legal and factual bases. Among other things, the Debtors dispute the validity of the alleged deferred maintenance and environmental and building cleanup costs asserted by SIR Properties. In addition, each of SIR Properties' rejection damages claims is subject to mitigation by SIR Properties in the exercise of its fiduciary duty to maximize value for its shareholders. Furthermore, the Debtors are not aware of any evidence that SIR Properties has actually suffered any loss arising from the rejection of the Huntsville Lease. Upon information and belief, Technicolor Southeast continues to pay all amounts due under the Huntsville Sublease, which are equal in amount to CGI's former obligations under the Huntsville Lease, to SIR Properties. In fact, SIR Properties, which is a publicly traded REIT listed on the Nasdaq Stock Market, has acknowledged this in its public filings after the Petition Date.[10] However, as set forth below, the Debtors have reached a settlement with SIR Properties that is embodied in the Plan and resolves the SIR Claim Objection.

On August 31, 2017, the Bankruptcy Court entered an Order [Docket No. 233] granting a motion filed by SIR Properties for limited relief from the automatic stay of section 362 of the Bankruptcy Code and authorizing SIR Properties' application and set off the Hanover Deposit against its claim filed on account of rejection of the Hanover Lease (the "Hanover Rejection Damages Claim"), without prejudice to the rights of the Debtors to seek the return of the Hanover Deposit to the extent such claim is disallowed in full or is allowed in an amount less than the amount of the Hanover Deposit. The Bankruptcy Court made no determination as to the allowance or disallowance of the Hanover Rejection Damages Claim, and the Bankruptcy Court's Order provided that it shall not have any res judicata or collateral estoppel effect as to the amount, validity, allowance or disallowance of any portion of the Hanover Rejection Damages Claim.

In the absence of a consensual resolution of the claims filed by Technicolor Southeast, the Debtors intended to object to such claims and to further assert affirmative claims for recovery against Technicolor Southeast relating to breaches of its maintenance and repair obligations under the Olyphant Lease and the Huntsville Sublease. The Debtors believe that Technicolor Southeast's failure to maintain the Olyphant Premises and the Huntsville Premises in first class condition as required by the lease documents has caused millions of dollars in damage to the Debtors. However, as set forth below, the Debtors have reached a settlement with Technicolor

---

[10] *See, e.g.*, SIR Properties' quarterly reports on Form 10-Q for (a) the period ending March 31, 2017, filed with the Securities and Exchange Commission on April 25, 2017, at Item 1, Note 3, p. 8, and (b) the period ending June 30, 2017, filed with the Securities and Exchange Commission on July 25, 2017, at Item 1, Note 13, p. 14, each of which are available at http://www.sirreit.com/investors/financial-information/quarterly-results/default.aspx ("The [Huntsville] property is occupied by a subtenant that continues to pay rent to us in an amount equal to the rent under the former tenant's lease.").

that is embodied in the Plan and resolves both the claims filed by Technicolor Southeast and the Debtors' claims against Technicolor Southeast.

Importantly, the ultimate Allowed amount of Claims against the Debtors will not be known until the Debtors and/or Reorganized Debtors complete their review and reconciliation of all filed Claims, prosecute any appropriate objections to Claims, and all such Claim objections are adjudicated and resolved and/or settled.

## G.  CLAIMS MEDIATION AND RESOLUTION OF THE CLAIMS OF SIR PROPERTIES TRUST AND TECHNICOLOR

At a case status conference held on December 5, 2017, the Bankruptcy Court, after discussion with the parties, suggested that the Debtors, SIR Properties, Technicolor and the Committee engage in a mediation of the claims asserted by SIR Properties and Technicolor (the Debtors' two largest creditors) and, to the extent those claims could be resolved, issues relating to the Debtors' previously proposed plan of reorganization. By agreement of the parties and with the permission of the Bankruptcy Court, The Honorable Michael B. Kaplan, U.S.B.J. agreed to serve as mediator.

In order to facilitate a consensual plan of reorganization (which was always the Debtors' goal), the claims mediation process necessarily focused on resolving the claims of SIR Properties and Technicolor. To that end, the mediation process included numerous in person and telephonic meetings and conference calls between the various parties and with Judge Kaplan, as well as the exchange of various written settlement proposals and communications between the parties, which were largely facilitated by Judge Kaplan and included his valuable input.

As a result of the mediation process and with the assistance of Judge Kaplan, the Debtors have reached a settlement of both SIR's and Technicolor's claims and the Debtors' potential counterclaims against Technicolor relating to the Olyphant Lease and Olyphant Premises. Each of those critically important settlements are embodied in the Plan and is subject to approval by the Bankruptcy Court pursuant to Bankruptcy Rule 9019 as part of the Plan confirmation process.

Among other things, the settlement between the Debtors and SIR Properties includes the following principal components:

- The SIR Rejection Damage Claims will be allowed in an amount equal to the SIR Settlement Amount[11] and paid in accordance with the terms of the Plan

- Upon payment in full of the SIR Settlement Amount, SIR Properties and the Debtors, on behalf of themselves and their related parties, will be deemed to have exchanged the global releases of claims set forth in Section 6.11 of the Plan.

---

[11] As set forth in the Plan, the "SIR Settlement Amount" means (1) if paid in full on or before October 1, 2018, $8,500,000, or (2) if paid in full after October 1, 2018, (a) $8,500,000, plus (b) simple interest at the rate of 8% per annum (computed based on the actual number of days elapsed in a year consisting of 365 days) solely on the portion of such amount that remains unpaid from time to time after October 1, 2018.

- Upon payment in full of the SIR Settlement Amount, SIR Properties, Technicolor and Technicolor Southeast, on behalf of themselves and their related parties, will be deemed to have exchanged the global releases of claims set forth in Section 6.12 of the Plan.

The proposed global release of claims by SIR Properties in favor of Technicolor and Technicolor Southeast (and the mutual release of SIR Properties by Technicolor and Technicolor Southeast) is a key element of the settlement between the Debtors and SIR Properties, and the Debtors believe that release helped to facilitate a consensual resolution of the claims of Technicolor Southeast against the Debtors, which were intertwined in certain key respects with the claims of SIR Properties.

The settlement between the Debtors and Technicolor includes the following principal components:

- The Technicolor Indemnification Claims will be allowed in the aggregate amount of $1,500,000 and paid in accordance with the terms of the Plan, subject to the terms and conditions set forth therein.

- The Debtors, Technicolor and Technicolor Southeast, on behalf of themselves and their related parties, will exchange various mutual releases of claims set forth in Sections 6.10, 6.13 and 6.14 of the Plan.

- Technicolor Southeast has agreed to vacate and surrender the Olyphant Premises and terminate the Olyphant Lease under an agreed timeframe and pursuant to certain conditions agreed to by the Debtors and Technicolor.

- The Debtors, with the consent of the Plan Sponsor, have agreed to grant Technicolor second mortgages on the Olyphant Property and the Tuscaloosa Property to secure certain contingent obligations of the LC Guarantor and the Parent (each as defined in the PSA) under section 4.15(b) of the PSA relating to the Technicolor Letters of Credit.

## V.

## SUMMARY OF THE PLAN

**THIS SECTION PROVIDES A SUMMARY OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT. ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL OF THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.  THE PLAN WILL CONTROL**

**THE TREATMENT OF CREDITORS AND INTEREST HOLDERS AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS AND UPON ALL OTHER PARTIES IN INTEREST.**

### A.    CLASSIFICATION OF CLAIMS AND INTERESTS

#### 1.    Introduction

The categories of Claims and Interests set forth below classify all Claims against and Interests in the Debtors for all purposes of the Plan.  A Claim or Interest is classified in a particular Class only to the extent the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. Unless otherwise provided by the Plan, the treatment with respect to each Class of Claims and Interests provided for in the Plan shall be in full and complete satisfaction, release and discharge of such Claims and Interests.

#### 2.    Classification

The classification of Claims and Interests under the Plan is as follows:

| Class | Description | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | SIR Rejection Damage Claims | Impaired | Entitled to Vote |
| Class 4 | Technicolor Indemnification Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 6 | Workers' Compensation Insurance Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 7 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 8 | Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

The treatment provided for each Class of Claims and Interests under the Plan is summarized as follows:

(a)    **Class 1—Secured Claims**.  Class 1 consists of all Secured Claims under section 506 of the Bankruptcy Code.  Except to the extent that a Holder of an Allowed Secured Claim agrees to a less favorable treatment of its Allowed Secured Claim or such Claim is satisfied pursuant to the SIR Setoff Order, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Secured Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, and (ii) the date such Secured Claim becomes

Allowed, each Holder of an Allowed Class 1 Secured Claim shall receive, at the option of the Reorganized Debtors, either: (A) Cash in an amount equal to such Allowed Secured Claim; (B) the proceeds of the sale or disposition of the collateral securing such Allowed Secured Claim to the extent of the value of the Holder's interest in such collateral; (C) the collateral securing such Allowed Secured Claim; or (D) such other treatment rendering such Holder's Allowed Secured Claim Unimpaired including, but not limited to, payment in the ordinary course of business in accordance with the terms of any agreement governing such Allowed Claim. In the event that the Reorganized Debtors elect to treat an Allowed Secured Claim under clause (A) or (B), the Liens securing such Claim shall be deemed released without the need for further action. Upon the occurrence of the Effective Date, SIR Properties Trust shall have an Allowed Secured Claim in the amount of $3,739,382.00, which shall be deemed fully satisfied by the exercise of its setoff rights pursuant to the SIR Setoff Order.

> *Voting*: Class 1 is an Unimpaired Class, and the Holders of Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

(b) **Class 2—Priority Claims**. Class 2 consists of all Priority Claims entitled to priority under section 507(a) of the Bankruptcy Code other than an Administrative Expense Claim or a Tax Claim. Except to the extent that a Holder of an Allowed Priority Claim agrees to a less favorable treatment of its Allowed Priority Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Claim, on or as soon as reasonably practicable after the later of (a) the Effective Date, or (b) the date such Priority Claim becomes Allowed, each Holder of an Allowed Priority Claim shall receive, at the option of the Reorganized Debtors, either: (i) Cash equal to the full amount of such Allowed Priority Claim; or (ii) such other treatment rendering such Holder's Allowed Priority Claim Unimpaired.

> *Voting*: Class 2 is an Unimpaired Class, and the Holders of Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

(c) **Class 3—SIR Rejection Damage Claims**. Class 3 consists of the SIR Rejection Damage Claims. The SIR Rejection Damage Claims shall be Allowed in an aggregate amount equal to the SIR Settlement Amount. The SIR Settlement Amount shall be paid in full within 60 days after the Effective Date in full and final satisfaction, settlement, release and discharge of and in exchange for the SIR Rejection Damage Claims.

> *Voting*: Class 3 is an Impaired Class. Pursuant to section 1126 of the Bankruptcy Code, SIR Properties Trust (the sole Holder of Claims in Class 3) is entitled to vote to accept or reject the Plan.

(d) **Class 4—Technicolor Indemnification Claims**. Class 4 consists of the Technicolor Indemnification Claims. In full and final satisfaction, settlement, release and discharge of and in exchange for the Technicolor Indemnification Claims, the Technicolor Allowed Claim Amount shall be paid as follows: (a) $1,000,000 shall be paid within 10 days

after the Effective Date to Technicolor, and (b) $500,000 shall be deposited no later than 30 days after the Effective Date in immediately available funds with the Escrow Agent (as defined in Section 6.8 of the Plan) and held and distributed in accordance with the terms of Section 6.8 of the Plan and the Escrow Agreement (as defined in Section 6.8 of the Plan). In addition, pursuant to Sections 6.6 and 6.7 of the Plan, on the Effective Date, the Olyphant Second Mortgage shall be executed by CPG and delivered to Technicolor, the Tuscaloosa Second Mortgage shall be executed by COI and delivered to Technicolor, and the Olyphant Subordination Agreement (as defined in Section 6.6 of the Plan) shall be executed by Technicolor and the Plan Sponsor. For the avoidance of doubt, notwithstanding execution and delivery of the Olyphant Second Mortgage and the Tuscaloosa Second Mortgage, under no circumstance shall the Technicolor Indemnification Claims be Allowed in an amount greater than the Technicolor Allowed Claim Amount.

> *Voting*: Class 4 is an Impaired Class. Pursuant to section 1126 of the Bankruptcy Code, Technicolor Southeast (the sole Holder of a Claim in Class 4) is entitled to vote to accept or reject the Plan.

(e)  **Class 5—General Unsecured Claims**.  Class 5 consists of all General Unsecured Claims.  Except to the extent a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed General Unsecured Claim, each Holder thereof shall receive such Holder's Pro Rata share of Cash in the amount of the GUC Distribution Amount, which shall be paid by the Debtors on or before the Effective Date into a segregated bank account for the benefit of Holders of Allowed General Unsecured Claims, and from which Distributions shall be made as soon as practicable after the date on which all General Unsecured Claims are either Allowed or Disallowed.

> *Voting*:  Class 5 is an Impaired Class.  Pursuant to section 1126 of the Bankruptcy Code, each Holder of a Claim in Class 5 is entitled to vote to accept or reject the Plan.

(f)  **Class 6—Workers' Compensation Insurance Claims**.  Class 6 consists of all Workers' Compensation Insurance Claims.  On the Effective Date, all Allowed Workers' Compensation Insurance Claims shall be Reinstated.

> *Voting*:  Class 6 is an Unimpaired Class, and the Holders of Workers' Compensation Insurance Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

(g)  **Class 7—Intercompany Claims**.  Class 7 consists of all Intercompany Claims.  On the Effective Date, all net Allowed Intercompany Claims (taking into account any setoffs of Intercompany Claims) shall, at the election of the Reorganized Debtors, be either (i) Reinstated, or (ii) released, waived, and discharged without any Distribution on account of such Claims.

-20-

*Voting*: Class 7 is an Unimpaired Class, and the Holders of Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  In addition, Holders of Intercompany Claims, as proponents of the Plan, are deemed to accept the Plan.  Therefore, the Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

(h)      **Class 8—Interests**.  Class 8 consists of all Interests in a Debtor.  On the Effective Date, Allowed Interests shall be Reinstated and shall not be discharged, canceled, released, extinguished or otherwise altered as a result of or by the Plan.

*Voting*: Class 8 is an Unimpaired Class, and the Holders of Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

**3.      No Waiver of Defenses**

Except as otherwise provided in the Plan, nothing in the Plan is intended to or shall affect the Debtors' or Reorganized Debtors' rights and defenses in respect of any Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against such Claims.

**B.      TREATMENT OF UNCLASSIFIED CLAIMS**

**1.      Summary**

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims (including Professional Fee Claims) and Tax Claims against the Debtors are not classified for purposes of voting on, or receiving Distributions under, the Plan. All such Claims are instead treated separately in accordance with Article IV of the Plan and in accordance with the requirements set forth in sections 1129(a)(9)(A) and (C) of the Bankruptcy Code.

**2.      Administrative Expense Claims**

Administrative expense claims are claims for payment of administrative expenses of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code.  Such claims include the actual, necessary costs and expenses of preserving the Debtors' Estates incurred on or after the Petition Date.  Unless otherwise agreed to by the Holder of an Allowed Administrative Expense Claim or Allowed Professional Fee Claim and the Debtors or Reorganized Debtors, as applicable, to the extent an Allowed Administrative Expense Claim or an Allowed Professional Fee Claim has not already been paid in full or otherwise satisfied during the Bankruptcy Cases, each Holder of an Allowed Administrative Expense Claim and/or Allowed Professional Fee Claim will receive, in full and final satisfaction of its Allowed Administrative Expense Claim and/or Allowed Professional Fee Claim, Cash equal to the amount of the unpaid portion of such Allowed Administrative Expense Claim and/or Allowed Professional Fee Claim either: (1) if such Administrative Expense Claim

and/or Professional Fee Claim is Allowed as of the Effective Date, no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter; (2) if such Administrative Expense Claim and/or Allowed Professional Fee Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which such Administrative Expense Claim is Allowed; or (3) if an Administrative Expense Claim (other than a Professional Fee Claim) is based on liabilities incurred by the Debtors' Estates in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Expense Claim, without any further action by the Holder of such Administrative Expense Claim.

### 3.    Bar Date for Filing Administrative Expense Claims; Final Fee Applications

**Except as otherwise provided in the Plan, any Person holding an Administrative Expense Claim (other than a Professional Fee Claim) shall File a request for payment of such Administrative Expense Claim and serve a copy thereof upon the Reorganized Debtors no later than the Administrative Expense Claims Bar Date. Any Person who is required but fails to timely File and serve a request for payment of an Administrative Expense Claim on or before the Administrative Expense Claims Bar Date shall be forever barred from seeking payment of such Administrative Expense Claim by the Debtors, their Estates or the Reorganized Debtors, and such Administrative Expense Claim shall be deemed discharged as of the Effective Date. Any objection to a request for payment of an Administrative Expense Claim must be Filed and served on the requesting party on or before the Claims Objection Deadline.**

Any Person seeking allowance by the Bankruptcy Court of a Professional Fee Claim shall File a final application for allowance of such Professional Fee Claim within sixty (60) days after the Effective Date. The provisions of this paragraph shall not apply to any Person providing services to the Debtors as an "ordinary course professional" that, pursuant to a Final Order, is not required to File fee applications.

### 4.    The Professional Fee Escrow

As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors or Reorganized Debtors shall establish and fund the Professional Fee Escrow.  The Debtors or Reorganized Debtors shall fund the Professional Fee Escrow with Cash equal to the Professional Fee Claims Estimate.  Funds held in the Professional Fee Escrow shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors, but shall revert to the Reorganized Debtors only after all Professional Fee Claims allowed by the Bankruptcy Court have been irrevocably paid in full.  The Professional Fee Escrow shall be held in trust for Professionals retained by the Committee or the Debtors and for no other parties until all Professional Fee Claims Allowed by the Bankruptcy Court have been paid in full. Professional Fees owing to the applicable Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; provided, that obligations with respect to Professional Fee Claims shall not be limited nor deemed limited to the balance of funds held in the Professional Fee Escrow. No Liens, claims, or interests shall encumber the Professional Fee Escrow in any way.

### 5.    Tax Claims

Except to the extent that a Holder of an Allowed Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Tax Claim, each Holder of such Allowed Tax Claim shall receive Cash in an amount equal to such Allowed Tax Claim as soon as reasonably practicable after the later of the Effective Date and the date such Claim becomes Allowed. Notwithstanding the foregoing, the Reorganized Debtors reserve the right to treat any Allowed Tax Claim in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### 6.    Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Reorganized Debtors may employ and pay the reasonable fees and expenses of any professional or advisor in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court.  Upon the Effective Date, any requirement that Professionals engaged by the Debtors comply with sections 327 through 331 of the Bankruptcy Code or any order governing interim compensation of Professionals in the Bankruptcy Cases in seeking retention or compensation for services rendered after such date will terminate.

## VI.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

On the Effective Date, all Executory Contracts or Unexpired Leases of the Debtors will be deemed rejected in accordance with sections 365 and 1123(b)(2) of the Bankruptcy Code, except those Executory Contracts or Unexpired Leases that (a) have been previously rejected or assumed by a Debtor pursuant to an order of the Bankruptcy Court, (b) are the subject of a motion to assume Filed by the Debtors which is pending on the Effective Date, (c) are designated by the Debtors in an Assumption Notice as Executory Contracts or Unexpired Leases that are to be assumed by the Debtors effective as of the Effective Date, or (d) are director and officer liability insurance policies that are to be assumed by the Debtors pursuant to Section 6.24 of the Plan.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections or assumptions, as applicable, pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code.

### B.    CLAIMS BASED ON REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES

**All Proofs of Claim with respect to Claims arising from the rejection pursuant to the Plan of any Executory Contracts or Unexpired Leases, if any, must be Filed and served upon the Reorganized Debtors within thirty (30) days after the Effective Date.  Any Claims arising from the rejection of Executory Contracts or Unexpired Leases that become Allowed Claims are classified and shall be treated as Class 5 General Unsecured Claims. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan not Filed within the time required by this section will be automatically**

**disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates and property of the Debtors and Reorganized Debtors unless otherwise ordered by the Bankruptcy Court or provided in the Plan. Notwithstanding the foregoing, a Claim for damages arising from the rejection of an Executory Contract or Unexpired Lease rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date must be Filed prior to any deadline set forth in such order.**

### C.    CURE OF DEFAULTS FOR EXECUTORY CONTRACTS OR UNEXPIRED LEASES ASSUMED BY THE DEBTORS

Any monetary defaults under each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount specified in an Assumption Notice in Cash within 30 days after the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding: (1) the amount of any payments to cure such a default; (2) the ability of the Debtors or Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption, the cure amount required by section 365(b)(1) of the Bankruptcy Code shall be paid following the entry of a Final Order or orders resolving the dispute and approving the assumption; provided, that the Debtors or Reorganized Debtors, as applicable, may settle any dispute regarding assumption of an Executory Contract or Unexpired Lease without any further notice to any other party or any action, order, or approval of the Bankruptcy Court; provided, further, that, notwithstanding anything to the contrary in the Plan, prior to the entry of a Final Order resolving any dispute and approving the assumption and assignment of an Executory Contract or Unexpired Lease, the Debtors or Reorganized Debtors, as applicable, reserve the right to reject any such Executory Contract or Unexpired Lease which is subject to dispute, whether by amending an Assumption Notice to remove any such Executory Contract or Unexpired Lease or withdrawing an Assumption Notice. The Debtors shall serve a copy of any Assumption Notice on the applicable counterparties to any Executory Contract or Unexpired Lease designated for assumption therein. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served, and actually received by the Debtors or Reorganized Debtors, as applicable, no later than thirty (30) days after service of the Assumption Notice. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to a proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount. Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan shall constitute the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of such assumption. **Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice, action, order, or approval of the Bankruptcy Court.**

**D.    PREEXISTING OBLIGATIONS TO THE DEBTORS UNDER EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such Executory Contract or Unexpired Lease.

**E.    SURVIVAL OF CERTAIN INDEMNIFICATION OBLIGATIONS**

Notwithstanding any other provision of the Plan, the obligations of the Debtors pursuant to their certificates or articles of incorporation, bylaws and other organizational documents to indemnify persons serving after the Petition Date as officers, directors, agents, or employees of the Debtors with respect to actions, suits and proceedings against the Debtors or such officers, directors, agents, or employees, based upon any act or omission for, on behalf of, or relating to the Debtors and occurring prior to or after the Petition Date, shall not be discharged or impaired by Confirmation of the Plan and shall continue to be obligations of the Debtors and Reorganized Debtors, as applicable, from and after the Confirmation Date.

**F.    MODIFICATIONS, AMENDMENTS, SUPPLEMENTS, RESTATEMENTS, OR OTHER AGREEMENTS**

Modifications, amendments, supplements, and restatements to a prepetition Executory Contract or Unexpired Lease that have been executed by the Debtors during the Bankruptcy Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

**G.    CONTRACTS AND LEASES ENTERED INTO AFTER THE PETITION DATE**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contract or Unexpired Lease assumed by such Debtor, will be performed by the applicable Debtor or Reorganized Debtor in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contract or Unexpired Lease) will survive and remain unaffected by entry of the Confirmation Order.

**H.    RESERVATION OF RIGHTS**

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on an Assumption Notice, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Debtors has any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Effective Date.

## VII.

## MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    GENERAL SETTLEMENT OF CLAIMS

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, allowance of Claims, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.

### B.    SUBSTANTIVE CONSOLIDATION.

The Plan shall serve as a motion by the Debtors seeking entry of an order substantively consolidating each of the Estates of the Debtors into a single consolidated Estate solely for the purposes of voting and Distributions under the Plan.  On and after the Effective Date, solely for the purpose of Distributions under the Plan, (1) all assets and liabilities of the substantively consolidated Debtors will be deemed to be merged, (2) the obligations of each Debtor will be deemed to be the obligation of the substantively consolidated Debtors, (3) any Claims filed or to be filed in connection with any such obligations will be deemed Claims against the substantively consolidated Debtors, (4) each Claim filed in the Bankruptcy Case of any Debtor will be deemed filed against the Debtors in the consolidated Bankruptcy Cases in accordance with the substantive consolidation of the assets and liabilities of the Debtors, (5) all transfers, disbursements and distributions made under the Plan will be deemed to be made by the substantively consolidated Debtors, and (6) all guarantees by a Debtor of the obligations of any other Debtor and any joint or several liability of any of the Debtors shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the substantively consolidated Debtors. Holders of Allowed Claims in each Class shall be entitled to their share of Distributions to such Class without regard to which Debtor was originally liable for such Claim.

The substantive consolidation effected pursuant to the Plan shall not (other than for purposes related to funding Distributions under the Plan) result in the merger or otherwise affect the separate legal existence of each Debtor, and shall not affect (1) defenses to any Claims and/or Causes of Action or requirements for any third party to establish mutuality in order to assert a right to setoff under section 553 of the Bankruptcy Code, (2) distributions out of any insurance policies or proceeds of such policies, (3) executory contracts or unexpired leases that were entered into during the Bankruptcy Cases or that have been or will be assumed or rejected, or (4) the Reorganized Debtors' ability to subordinate or otherwise challenge Claims on an entity by entity basis.

### C.    CONTINUED CORPORATE EXISTENCE

Each Debtor, as reorganized, will continue to exist after the Effective Date as a separate corporate entity with all the powers of a corporation under applicable law in the jurisdiction in

which it is incorporated or otherwise formed and pursuant to its certificate or articles of incorporation and bylaws or other organizational documents in effect prior to the Effective Date, except to the extent such articles of incorporation and bylaws or other organizational documents are amended by the Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Consummation Date.

## D.    REVESTING OF ASSETS

Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, all assets and property of the respective Debtors and their Estates (including all Causes of Action unless otherwise released pursuant to the Plan, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall automatically vest in each respective Reorganized Debtor, free and clear of all Claims, Liens, encumbrances, charges and other interests.

## E.    EXIT FINANCING

On the Effective Date, the Debtors shall be authorized to borrow the Plan Funding Amount from the Plan Sponsor, and CPG and COI, as applicable, shall be authorized to execute and deliver the Olyphant First Mortgage and the Tuscaloosa First Mortgage to the Plan Sponsor. On the Effective Date, the Debtors shall be further authorized to execute and deliver any related loan documents, and to execute, deliver, file, record and issue any other notes, guarantees, deeds of trust, security agreements, documents, amendments to the foregoing, or agreements in connection therewith, in each case without further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Substantially final forms of the Olyphant First Mortgage and the Tuscaloosa First Mortgage shall be included in the Plan Supplement. The Plan Funding Amount shall accrue simple interest from and after the Effective Date at the rate of 8% per annum (computed based on the actual number of days elapsed in a year consisting of 365 days) on the outstanding balance and shall be repayable to the Plan Sponsor upon, and from the net proceeds of, any sale of Owned Real Property. The accrued interest shall be paid to the Plan Sponsor on a monthly basis in arrears on the first Business Day of each month commencing with the first Business Day occurring subsequent to the first full calendar month after the Effective Date. In the event of a default in payment of interest when due, the interest rate on the outstanding balance of the Plan Funding Amount shall increase to 12% per annum (computed based on the actual number of days elapsed in a year consisting of 365 days) until such time as the default is cured.

## F.    OLYPHANT SECOND MORTGAGE AND OLYPHANT SUBORDINATION AGREEMENT

On the Effective Date, CPG and the Reorganized Debtors, as applicable, shall be authorized to execute and deliver the Olyphant Second Mortgage to Technicolor, and to execute, deliver, file, record and issue any other notes, guarantees, deeds of trust, security agreements, documents, amendments to the foregoing, or agreements in connection therewith, including the Olyphant Subordination Agreement (as defined below), in each case without further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the

vote, consent, authorization or approval of any Entity. A substantially final form of the Olyphant Second Mortgage shall be included in the Plan Supplement, which Olyphant Second Mortgage shall be acceptable to Technicolor, the Debtors and the Plan Sponsor, and so approved by Technicolor, the Debtors and the Plan Sponsor at least 3 days prior to the Voting Deadline. The Olyphant Second Mortgage shall be in an amount equal to the aggregate sum of the face amount of the Technicolor Letters of Credit that remain outstanding as of the Effective Date and shall be automatically reduced, dollar for dollar, if, as, and when the face amount of any of the Technicolor Letters of Credit outstanding is reduced or cancelled (in each case, other than as the result of a draw on a letter of credit by the beneficiary thereof).

The Olyphant First Mortgage shall be subject and subordinate in all respects to the liens and terms of the Olyphant Second Mortgage with respect to an amount equal to, but not to exceed, the lesser of (i) $250,000, and (ii) the aggregate sum of the face amount of the Technicolor Letters of Credit that remain outstanding at any time, in accordance with the terms of a subordination agreement between Technicolor and the Plan Sponsor (the "Olyphant Subordination Agreement"). A substantially final form of the Olyphant Subordination Agreement shall be included in the Plan Supplement, which Olyphant Subordination Agreement shall be acceptable to Technicolor and the Plan Sponsor, and so approved by Technicolor and the Plan Sponsor at least 3 days prior to the Voting Deadline. The Olyphant Subordination Agreement shall be self-operative and no further instrument of subordination shall be required. If requested, however, CPG, the Reorganized Debtors or the Plan Sponsor shall execute, deliver, file, record and issue such further instruments as are reasonably necessary to effectuate this subordination. In the event of a draw on a Technicolor Letter of Credit on or after the Effective Date, Technicolor shall provide notice and evidence thereof to the Reorganized Debtors, the Plan Sponsor and Najafi Companies, LLC at least forty-five (45) days prior to taking any action seeking to exercise or enforce any rights or remedies under the Olyphant Second Mortgage and/or the Olyphant Subordination Agreement.

## G.    TUSCALOOSA SECOND MORTGAGE

On the Effective Date, COI and the Reorganized Debtors, as applicable, shall be authorized to execute and deliver the Tuscaloosa Second Mortgage to Technicolor, and to execute, deliver, file, record and issue any other notes, guarantees, deeds of trust, security agreements, documents, amendments to the foregoing, or agreements in connection therewith, in each case without further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. A substantially final form of the Tuscaloosa Second Mortgage shall be included in the Plan Supplement, which Tuscaloosa Second Mortgage shall be acceptable to Technicolor, the Debtors and the Plan Sponsor, and so approved by Technicolor, the Debtors and the Plan Sponsor at least 3 days prior to the Voting Deadline. The Tuscaloosa Second Mortgage shall be in an amount equal to the aggregate sum of the face amount of the Technicolor Letters of Credit that remain outstanding as of the Effective Date and shall be automatically reduced, dollar for dollar, if, as, and when the face amount of any of the Technicolor Letters of Credit outstanding is reduced or cancelled (in each case, other than as the result of a draw on a letter of credit by the beneficiary thereof). In the event of a draw on a Technicolor Letter of Credit on or after the Effective Date, Technicolor shall provide notice and evidence thereof to the Reorganized Debtors, the Plan

Sponsor and Najafi Companies, LLC at least forty-five (45) days prior to taking any action seeking to exercise or enforce any rights or remedies under the Tuscaloosa Second Mortgage

### H.    THE OLYPHANT EXIT, TECHNICOLOR OLYPHANT DISTRIBUTION, AND THE ESCROW AGREEMENT

Technicolor Southeast shall vacate the Olyphant Premises and surrender the Olyphant Premises to CPG solely in accordance with the Olyphant Premises Surrender Conditions (the "Olyphant Exit Obligations") on or before June 30, 2019 or such later date as may be agreed upon by Technicolor Southeast and the Debtors or Reorganized Debtors (the "Olyphant Exit Deadline"); provided, however, that in the event the Effective Date occurs after March 31, 2019, the Olyphant Exit Deadline shall be automatically extended to the date that is 90 days after occurrence of the Effective Date. The Olyphant Exit Obligations are contingent upon the deposit of the Technicolor Olyphant Distribution with the Escrow Agent as set forth in section 3.4.2 of the Plan. The Technicolor Olyphant Distribution shall be deposited no later than 30 days after the Effective Date in immediately available funds with an escrow agent acceptable to the Debtors and Technicolor Southeast (the "Escrow Agent"), to be held in an interest bearing account in accordance with the terms of the Escrow Agreement (the "Escrow Agreement") to be entered into by and among the Escrow Agent, Technicolor Southeast and the Debtors no later than 30 days after the Effective Date. A substantially final form of the Escrow Agreement shall be included in the Plan Supplement, which Escrow Agreement shall be acceptable to Technicolor Southeast and the Debtors, and so approved by Technicolor Southeast and the Debtors at least 3 days prior to the Voting Deadline. The Technicolor Olyphant Distribution shall be released in accordance with the terms of the Plan and the Escrow Agreement, which shall provide (without other conditions) for immediate release of the full Technicolor Olyphant Distribution to Technicolor Southeast upon the date that a certification (the "Olyphant Exit Certification") signed by a duly-authorized representative of Technicolor Southeast is delivered to the Escrow Agent and the Debtors or Reorganized Debtors stating that Technicolor Southeast has complied with the Olyphant Exit Obligations on or before the Olyphant Exit Deadline. The Escrow Agreement shall further provide that if (a) the Technicolor Olyphant Distribution is deposited in escrow as provided for herein, (b) the Debtors and Reorganized Debtors have not intentionally impeded Technicolor Southeast's exit of the Olyphant Premises, and (c) the Olyphant Exit Certification is not delivered to the Escrow Agent and the Debtors or Reorganized Debtors on or before the Olyphant Exit Deadline, the Technicolor Olyphant Distribution shall be forfeited and forever waived by Technicolor Southeast and instead irrevocably released to the Reorganized Debtors. If the Olyphant Exit Deadline is extended by agreement of Technicolor Southeast and the Debtors or Reorganized Debtors, Technicolor Southeast and the Debtors or Reorganized Debtors shall jointly notify the Escrow Agent of such extension. The Debtors and the Reorganized Debtors shall provide reasonable cooperation in connection with any reasonable request for assistance made by Technicolor Southeast in connection with Technicolor Southeast's exit of the Olyphant Premises and shall not intentionally impede such exit; provided, however, that compliance with any such request by Technicolor Southeast for assistance shall not include the expenditure or incurrence of any out-of-pocket costs by the Debtors or Reorganized Debtors, unless otherwise reasonably agreed upon by Technicolor Southeast and the Debtors or Reorganized Debtors. Technicolor Southeast shall continue to permit CPG and its authorized representatives access to the Olyphant Premises in accordance with the terms of

Paragraph 13 of the Olyphant Lease, or as otherwise agreed between the parties, until the Olyphant Lease Termination Date (as defined in Section 6.9 of the Plan).

## I.    THE OLYPHANT TERMINATION AGREEMENT

The form of an agreement terminating the Olyphant Lease (the "Olyphant Lease Termination Agreement") shall be agreed to by and between Technicolor Southeast and CPG at least 3 days prior to the Voting Deadline and shall be executed by Technicolor Southeast and CPG and delivered to the Escrow Agent no later than 30 days after the Effective Date and held in accordance with the Escrow Agreement. The Olyphant Lease Termination Agreement shall be released from escrow and made effective immediately upon the earlier of (i) the Escrow Agent's and the Debtors or Reorganized Debtors receipt of the Olyphant Exit Certification and Technicolor Southeast's receipt of the Technicolor Olyphant Distribution, or (ii) occurrence of the Olyphant Exit Deadline without delivery of the Olyphant Exit Certification to the Escrow Agent and the Debtors or Reorganized Debtors; provided the Technicolor Olyphant Distribution was previously deposited in escrow as provided for herein (in either case the "Olyphant Lease Termination Date"). For clarification, the Escrow Agreement shall reflect the foregoing. The Olyphant Lease Termination Agreement shall provide that CPG shall accept the Olyphant Premises, and Technicolor Southeast's surrender thereof, on the Olyphant Lease Termination Date in its "as is" and "where is" condition without warranty of any kind, express or implied, including, without limitation, any warranty as to title or physical condition. This Section shall negate any lease termination notice required under the Olyphant Lease. From and after the date the Plan is filed with the Bankruptcy Court and until the Olyphant Lease Termination Date, Technicolor Southeast shall (i) bring current (to the extent unpaid) and continue to pay all costs of insurance, taxes, utilities, regular rubbish removal, lawn maintenance, snow removal, and rent as required by the Olyphant Lease, (ii) maintain existing alarm and/or security systems at the Olyphant Premises, (iii) use commercially reasonable efforts to mitigate (on a temporary basis until the Olyphant Lease Termination Date) any condition of the Olyphant Premises causing significant physical damage to the Olyphant Premises that comes to Technicolor Southeast's attention during such period, and (iv) promptly notify the Debtors or Reorganized Debtors of any such condition and Technicolor Southeast's commercially reasonable efforts to mitigate such condition during such period (collectively the "Interim Olyphant Obligations"). Technicolor Southeast's share of taxes for the Olyphant Premises for the year in which the Olyphant Lease is terminated shall be prorated based on the portion of the tax year that the Olyphant Lease is in effect, and Technicolor Southeast shall be credited or charged, as the case may be, consistent with the foregoing (the "Olyphant Tax Proration"). In the event the Olyphant Lease Termination Agreement is made effective as a result of occurrence of the Olyphant Exit Deadline without delivery of the Olyphant Exit Certification to the Escrow Agent, Technicolor Southeast shall be deemed to be holding over beyond the term of the Olyphant Lease and shall be subject to eviction or ejectment from the Olyphant Premises under applicable law.

Technicolor Southeast shall provide the Debtors or Reorganized Debtors sixty (60) days' prior written notice of its intention to vacate and surrender the Olyphant Premises. Technicolor Southeast shall have the option to vacate the Olyphant Premises and surrender the Olyphant Premises to CPG solely in accordance with the Olyphant Premises Surrender Conditions by providing the Debtors or Reorganized Debtors sixty (60) days' prior written notice of its intention to vacate and surrender the Olyphant Premises, in which case the Olyphant Lease

Termination Date shall occur effective upon the later of (i) the date that is sixty (60) days after such written notice is provided to the Debtors or Reorganized Debtors, and (ii) the date Technicolor Southeast delivers the Olyphant Exit Certification to CPG or the Reorganized Debtors; provided, however, that in no event shall the Olyphant Lease Termination Date occur prior to March 1, 2019.    The Olyphant Lease Termination Agreement and the Escrow Agreement shall reflect the foregoing.  If Technicolor Southeast exercises the foregoing option, the Technicolor Olyphant Distribution shall nevertheless be deposited with the Escrow Agent no later than 30 days after the Effective Date and held in accordance with the Escrow Agreement.

J.   **RELEASES BETWEEN THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES, TECHNICOLOR AND TECHNICOLOR SOUTHEAST RELATING TO THE OLYPHANT PREMISES**

Upon Technicolor Southeast's receipt of the Technicolor Olyphant Distribution in accordance with the Plan or Technicolor Southeast's forfeiture and waiver thereof (if applicable) in accordance with Section 6.8 of the Plan, Technicolor and Technicolor Southeast, on behalf of themselves and each of their respective Affiliates, parents, subsidiaries, predecessors, successors and assigns, shall release, and shall be deemed to have released without further action, the Debtors, their Estates, the Reorganized Debtors, the Released Parties, and each of their respective Insiders, parents, subsidiaries, predecessors, successors and assigns, current and former stockholders, shareholders, equity holders, members, limited partners, general partners, partners, principals, managed funds, employees, agents, officers, directors, secretaries, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, solely from any and all claims (as defined in section 101(5) of the Bankruptcy Code), obligations and liabilities relating in any way to the Olyphant Premises (and Olyphant Property) arising under the Olyphant Lease or otherwise, including but not limited to matters related to the maintenance, repair or physical condition of the Olyphant Premises (and Olyphant Property) or any other obligation of the Debtors, the Reorganized Debtors or the Released Parties related to the Olyphant Premises (and Olyphant Property), whether asserted in a Proof of Claim filed by Technicolor, Technicolor Southeast or otherwise, from the beginning of time through the Olyphant Lease Termination Date; except, with respect to the claims, obligations and liabilities related to the Olyphant Tax Proration.

Upon the later of (i) Technicolor Southeast's delivery of the Olyphant Exit Certification in accordance with the Plan on or before the Olyphant Exit Deadline, and (ii) the Effective Date, the Debtors, their Estates, the Reorganized Debtors and the Released Parties, on behalf of themselves and each of their respective Affiliates, parents, subsidiaries, predecessors, successors and assigns, shall release, and shall be deemed to have released without further action, Technicolor and Technicolor Southeast, and each of their respective Insiders, parents, subsidiaries, predecessors, successors and assigns, current and former stockholders, shareholders, equity holders, members, limited partners, general partners, partners, principals, managed funds, employees, agents, officers, directors, secretaries, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, solely from any and all claims (as defined in section 101(5) of the Bankruptcy Code), obligations and liabilities relating in any way to the Olyphant Premises (and Olyphant Property) arising under the Olyphant Lease or otherwise, including but not limited to matters related to the maintenance, repair or physical condition of the Olyphant Premises (and Olyphant

Property) or any other obligation of Technicolor or Technicolor Southeast related to the Olyphant Premises (and Olyphant Property),  whether asserted in a Proof of Claim filed by Technicolor, Technicolor Southeast or otherwise, from the beginning of time through the Olyphant Lease Termination Date; except, with respect to the claims, obligations and liabilities related to (i) the Olyphant Premises Surrender Conditions, (ii) the Interim Olyphant Obligations, and (iii) the Olyphant Tax Proration.

The foregoing releases provided for in Section 6.10 of the Plan shall be referred to as the "Olyphant Mutual Releases".

## K.    RELEASES BETWEEN SIR PROPERTIES TRUST AND THE DEBTORS

Upon payment in full of the SIR Settlement Amount in accordance with the Plan, SIR Properties Trust, on behalf of itself and its Affiliates, parents, subsidiaries, predecessors, successors and assigns, shall release, and shall be deemed to have released without further action, all causes of action, obligations liabilities, Claims and administrative expenses under section 503(b) of the Bankruptcy Code against the Debtors and their Affiliates, and their respective Insiders, parents, subsidiaries, predecessors, successors and assigns, current and former stockholders, shareholders, equity holders, members, limited partners, general partners, partners, principals, managed funds, employees, agents, officers, directors, secretaries, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, including but not limited to CAI Holdings, Inc., JCIN Holdings, Inc., Najafi Companies, LLC, the Plan Sponsor, Jahm Najafi, Tina Rhodes-Hall, Glenn R. Langberg, Karen Kessler and Joseph Catalano based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date.

Upon payment in full of the SIR Settlement Amount in accordance with the Plan, the Debtors, on behalf of themselves and their Affiliates, parents, subsidiaries, predecessors, successors and assigns, shall release, and shall be deemed to have released without further action, all causes of action, obligations liabilities and claims (as defined in section 101(5) of the Bankruptcy Code)  against SIR Properties Trust and its Affiliates, and their respective Insiders, parents, subsidiaries, predecessors, successors and assigns, current and former stockholders, shareholders, equity holders, members, limited partners, general partners, partners, principals, managed funds, employees, agents, officers, directors, secretaries, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants based on, relating to, or arising from, in whole or in part, in any manner whatsoever, the Hanover Premises, the Hanover Lease, the Huntsville Premises, the Huntsville Lease, the Consent to Sublease, the Huntsville Sublease, the Debtors, the assets, liabilities, operations or business of the Debtors, or the Bankruptcy Cases, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date.

## L.    RELEASES BETWEEN SIR PROPERTIES TRUST AND TECHNICOLOR

Upon payment in full of the SIR Settlement Amount in accordance with the Plan, SIR Properties Trust, Technicolor, Technicolor Southeast, and each of their respective Affiliates, shall release and forever discharge each other, and shall be deemed to have released and forever

discharged each other without further action, from any and all claims (as defined in section 101(5) of the Bankruptcy Code), obligations and liabilities relating in any way to the Huntsville Premises arising under the Huntsville Lease, the Huntsville Sublease, the Consent to Sublease or otherwise, including but not limited to matters related to the maintenance, repair or physical condition of the Huntsville Premises or any other obligation of Technicolor or Technicolor Southeast related to the Huntsville Premises, whether asserted in a Proof of Claim filed by SIR Properties Trust, Technicolor, Technicolor Southeast or otherwise, from the beginning of time through the Effective Date.  Nothing in this Section requires SIR Properties Trust, Technicolor or Technicolor Southeast to release each other from, nor does anything in the Section constitute a release of, any claims (as defined in section 101(5) of the Bankruptcy Code), obligations or liabilities first arising, and solely relating to the period of time, *after* the Effective Date, nor does anything in this Section, except as expressly set forth herein, terminate, modify or alter any term or condition set forth in the Huntsville Sublease by and between Technicolor Southeast and SIR Properties Trust by attornment pursuant to the attornment provision contained in the Huntsville Sublease and the Consent to Sublease, which attornment has been recognized by letter dated August 18, 2017 from SIR Properties Trust to Technicolor, nor does anything in this Section, except as expressly set forth herein, terminate, modify or alter any of the representations set forth in the letter dated September 19, 2018 from SIR Properties Trust to Technicolor.

### M.    RELEASES BETWEEN THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES, TECHNICOLOR AND TECHNICOLOR SOUTHEAST RELATING TO THE HUNTSVILLE PREMISES

Upon payment in full of the Technicolor Initial Distribution in accordance with the Plan, Technicolor and Technicolor Southeast, on behalf of themselves and each of their respective Affiliates, parents, subsidiaries, predecessors, successors and assigns, shall release, and shall be deemed to have released without further action, the Debtors, their Estates, the Reorganized Debtors, the Released Parties, and each of their respective Insiders, parents, subsidiaries, predecessors, successors and assigns, current and former stockholders, shareholders, equity holders, members, limited partners, general partners, partners, principals, managed funds, employees, agents, officers, directors, secretaries, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, solely from any and all claims (as defined in section 101(5) of the Bankruptcy Code), obligations and liabilities relating in any way to the Huntsville Premises arising under the Huntsville Lease, the Huntsville Sublease, the Consent to Huntsville Sublease or otherwise, including but not limited to matters related to the maintenance, repair or physical condition of the Huntsville Premises or any other obligation of the Debtors, the Reorganized Debtors or the Released Parties related to the Huntsville Premises, whether asserted in a Proof of Claim filed by Technicolor, Technicolor Southeast, SIR Properties Trust or otherwise, from the beginning of time through the Effective Date.

Upon payment in full of the Technicolor Initial Distribution in accordance with the Plan, the Debtors, their Estates, the Reorganized Debtors and the Released Parties, on behalf of themselves and each of their respective Affiliates, parents, subsidiaries, predecessors, successors and assigns, shall release, and shall be deemed to have released without further action, Technicolor and Technicolor Southeast, and each of their respective Insiders, parents, subsidiaries, predecessors, successors and assigns, current and former stockholders, shareholders,

equity holders, members, limited partners, general partners, partners, principals, managed funds, employees, agents, officers, directors, secretaries, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, solely from any and all claims (as defined in section 101(5) of the Bankruptcy Code), obligations and liabilities relating in any way to the Huntsville Premises arising under the Huntsville Lease, the Huntsville Sublease, the Consent to Huntsville Sublease or otherwise, including but not limited to matters related to the maintenance, repair or physical condition of the Huntsville Premises or any other obligation of Technicolor or Technicolor Southeast related to the Huntsville Premises, whether asserted in a Proof of Claim filed by Technicolor, Technicolor Southeast, SIR Properties Trust or otherwise, from the beginning of time through the Effective Date.

### N.    RELEASES BETWEEN THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES, TECHNICOLOR AND TECHNICOLOR SOUTHEAST

On and after and subject to the occurrence of the Effective Date and payment in full of the Technicolor Initial Distribution in accordance with section 3.4.2 of the Plan and deposit of the Technicolor Olyphant Distribution with the Escrow Agent in accordance with sections 3.4.2 and 6.8 of the Plan, Technicolor and Technicolor Southeast, on behalf of themselves and each of their respective Affiliates, parents, subsidiaries, predecessors, successors and assigns, shall release and forever discharge, and shall be deemed to have released and forever discharged without further action, each of the Debtors, their Estates,  the Reorganized Debtors, and the Released Parties from any and all claims (as defined in section 101(5) of the Bankruptcy Code), obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of any of the Debtors or their Estates), whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the PSA, the Debtors, the Debtors' restructuring, the Bankruptcy Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any claim (as defined in section 101(5) of the Bankruptcy Code) that is treated in the Plan, the business or contractual arrangements between any Debtor and Technicolor or Technicolor Southeast, the restructuring of claims (as defined in section 101(5) of the Bankruptcy Code) prior to or in the Bankruptcy Cases, the negotiation, formulation, or preparation of the Plan, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event or other occurrence relating to the Debtors or the Bankruptcy Cases taking place on and before the later of payment in full of the Technicolor Initial Distribution in accordance with section 3.4.2 of the Plan and deposit of the Technicolor Olyphant Distribution with the Escrow Agent in accordance with sections 3.4.2 and 6.8 of the Plan; except, with respect to (a) the obligations of the LC Guarantor (as defined in the PSA) under the LC Guarantee (as defined in the PSA), and (b) the obligations of the Parent (as defined in the PSA) solely with respect to its guarantee of CGI's obligations under section 4.15(b) of the PSA to reimburse Technicolor for any amounts that are actually drawn on any of the Technicolor Letters of Credit, each of which obligations described under subpart (a) and (b) of this section

6.14 of the Plan shall not be released until each of the Technicolor Letters of Credit are cancelled and/or terminated or those obligations are otherwise satisfied; and except, with respect to the claims (as defined in section 101(5) of the Bankruptcy Code), obligations and liabilities related to the Olyphant Premises and the Olyphant Lease as set forth in the Olyphant Mutual Releases (as defined in section 6.10 of the Plan), which Olyphant Mutual Releases shall only become effective as provided in section 6.10 of the Plan. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing release and, further, shall constitute the Bankruptcy Court's finding that the foregoing release is: (1) in exchange for good and valuable consideration; (2) a good faith settlement and compromise of the Claims released by Technicolor and Technicolor Southeast; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to Technicolor and/or Technicolor Southeast asserting any claim or Cause of Action released hereunder.

On and after and subject to the occurrence of the Effective Date and payment in full of the Technicolor Initial Distribution in accordance with section 3.4.2 of the Plan and deposit of the Technicolor Olyphant Distribution with the Escrow Agent in accordance with sections 3.4.2 and 6.8 of the Plan, the Debtors, their Estates, the Reorganized Debtors, and the Released Parties, on behalf of themselves and each of their respective Affiliates, parents, subsidiaries, predecessors, successors and assigns, shall release and forever discharge, and shall be deemed to have released and forever discharged without further action, each of Technicolor and Technicolor Southeast from any and all claims (as defined in section 101(5) of the Bankruptcy Code), obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of any of the Debtors or their Estates), whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the PSA, the Debtors, the Debtors' restructuring, the Bankruptcy Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any claim (as defined in section 101(5) of the Bankruptcy Code) that is treated in the Plan, the business or contractual arrangements between any Debtor and Technicolor or Technicolor Southeast, the restructuring of claims (as defined in section 101(5) of the Bankruptcy Code) prior to or in the Bankruptcy Cases, the negotiation, formulation, or preparation of the Plan, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event or other occurrence relating to the Debtors or the Bankruptcy Cases taking place on and before the later of payment in full of the Technicolor Initial Distribution in accordance with section 3.4.2 of the Plan and deposit of the Technicolor Olyphant Distribution with the Escrow Agent in accordance with sections 3.4.2 and 6.8 of the Plan; except, with respect to the claims (as defined in section 101(5) of the Bankruptcy Code), obligations and liabilities related to the Olyphant Premises and the Olyphant Lease as set forth in the Olyphant Mutual Releases (as defined in section 6.10 of the Plan), which Olyphant Mutual Releases shall only become effective as provided in section 6.10 of the Plan. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing release and, further, shall constitute the Bankruptcy Court's finding that the foregoing release is: (1) in exchange for good and valuable consideration; (2) a good

faith settlement and compromise of the Claims released by the Debtors, their Estates, the Reorganized Debtors, and the Released Parties; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to the Debtors, their Estates, the Reorganized Debtors, and/or the Released Parties asserting any claim or Cause of Action released hereunder.

### O.    COOPERATION BETWEEN TECHNICOLOR AND THE REORGANIZED DEBTORS

Within seven (7) Business Days of the filing of the Plan, Technicolor and Technicolor Southeast shall perform a diligent search and, at the election of the Debtors or Reorganized Debtors, as applicable, make available for inspection and copying, turn over and/or provide copies (either electronic or physical) to the Debtors or Reorganized Debtors, as applicable, of any existing building plans, site plans, drawings, surveys, blueprints and any other reports of the Debtors relating to the Owned Real Property (collectively the "Property Plans") in their respective possession, custody or control (it being understood that the Property Plans were "Excluded Assets" under the PSA and that Technicolor and Technicolor Southeast do not believe that they have any Property Plans related to the Tuscaloosa Property).    Technicolor and Technicolor Southeast shall have no liability with respect to the content or substance of the Property Plans.    Unless the Debtors or Reorganized Debtors otherwise agree, Technicolor Southeast shall not remove any Property Plans from the Olyphant Premises.

Technicolor and Technicolor Southeast shall provide reasonable cooperation to the Debtors or Reorganized Debtors in responding to requests by the Debtors or Reorganized Debtors for documents and/or information in their respective possession, custody or control relating to the reconciliation of Claims against the Debtors to the extent such documents and/or information is not reasonably deemed by Technicolor or Technicolor Southeast to be business sensitive to Technicolor or Technicolor Southeast or their Affiliates (*e.g.*, is protected from disclosure by a pre-existing confidentiality agreement).    If requested by the Debtors or Reorganized Debtors, Technicolor or Technicolor Southeast and the Debtors of Reorganized Debtors shall discuss any specific request for any such information, consistent with the foregoing, and if requested by Technicolor or Technicolor Southeast, the Debtors or Reorganized Debtors shall execute a reasonable and customary confidentiality agreement with respect to any such responsive documents and/or information prior to receipt thereof.    Nothing in the Plan shall limit or impair the Debtors' or Reorganized Debtors' legal rights and remedies to obtain any such documents and/or information from Technicolor or Technicolor Southeast.

### P.    SOURCES OF DISTRIBUTIONS

The Reorganized Debtors shall fund Distributions and satisfy Allowed Claims under the Plan from (1) the Plan Funding Amount, (2) Cash on hand, including any Cash from operations or from the lease of Owned Real Property, (3) the proceeds of any asset sales, including sales of Owned Real Property, (4) the proceeds of any additional secured or unsecured financing, and (5) capital contributions, if any, received from Najafi Companies, LLC, CAI Holdings, Inc. and/or its parent, affiliates, partners or designees.    For the avoidance of doubt, nothing in the Plan shall require Najafi Companies, LLC, CAI Holdings, Inc., its parent, affiliates, partners or designees to make any capital contributions to the Reorganized Debtors.    Upon the Effective Date, the

Reorganized Debtors shall set aside and hold in a reserve funds in an amount that the Reorganized Debtors believe, in their reasonable discretion, may be necessary to satisfy their obligations under the Plan with respect to Workers' Compensation Insurance Claims that the Reorganized Debtors anticipate may become Allowed until all such Claims are either Allowed and satisfied or Disallowed.  The amount of this reserve may be adjusted from time to time in the Reorganized Debtors' reasonable discretion as Workers' Compensation Insurance Claims are Allowed and satisfied or Disallowed.

### Q.     OPERATION OF THE REORGANIZED DEBTORS

From and after the Effective Date, the Reorganized Debtors may operate their business, use, lease, acquire, sell or dispose of any asset, including Owned Real Property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

### R.     CONTINUANCE OF CERTAIN NON-DEBTOR GUARANTEES

The PSA shall remain in effect solely with respect to (i) the obligations of the LC Guarantor (as defined in the PSA) under the LC Guarantee (as defined in the PSA), and (ii) the obligations of the Parent (as defined in the PSA), in each case  solely with respect to its guarantee of CGI's obligations under section 4.15(b) of the PSA to reimburse Technicolor for any amounts that are actually drawn on any of the Technicolor Letters of Credit, until each of the Technicolor Letters of Credit are cancelled and/or terminated or those obligations are otherwise satisfied.

### S.     LIMITATION ON DISTRIBUTIONS TO HOLDERS OF INTERCOMPANY CLAIMS AND INTERESTS

Notwithstanding any other provision of the Plan to the contrary, the Reorganized Debtors shall not make any Distribution to any Holder of a Class 7 Intercompany Claim or Class 8 Interest unless and until each Holder of an Allowed Claim in Classes 1, 2, 3, 4, 5 and 6 shall have received all Distributions such Holder is entitled to receive under Article III of the Plan.

### T.     MAINTENANCE OF BANK ACCOUNTS

The Reorganized Debtors shall be authorized to continue to use the Debtors' bank accounts that are in existence as of the Effective Date and to open such bank or other depository accounts as may be necessary or appropriate in their discretion to enable them to carry out the provisions of the Plan.

### U.     BOOKS AND RECORDS

The Reorganized Debtors shall maintain an adequate set of books, records or databases that will allow the Reorganized Debtors to accurately track the Claims asserted against the Estates and the amounts paid to each Holder of an Allowed Claim pursuant to the terms of the Plan.

## V.      DIRECTORS, MANAGERS, AND OFFICERS OF THE REORGANIZED DEBTORS

As of the Effective Date, the current officers, directors and managers of the Debtors, as applicable, shall each continue to serve in such capacities for the Reorganized Debtors.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors shall disclose the nature of any compensation to be paid to such Persons in the Plan Supplement.

## W.      CORPORATE ACTION

All matters provided for in the Plan involving the legal or corporate structure of each Debtor or Reorganized Debtor, as applicable, and any legal or corporate action required by each Debtor or Reorganized Debtor, as applicable, in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or Reorganized Debtors or any other Person.

All matters provided for in the Plan that would otherwise require approval of the stockholders, directors, managers or members of any Debtor will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, managers or members of such Debtor, or the need for any approvals, authorizations, actions or consents of any Person.

## X.      DIRECTOR AND OFFICER LIABILITY INSURANCE

Notwithstanding anything contained in the Plan to the contrary, all director and officer liability insurance policies of the Debtors in effect on the Effective Date shall be continued. To the extent that such insurance policies are deemed to be executory contracts, then, notwithstanding anything in the Plan to the contrary, the Debtors shall be deemed to have assumed such insurance policies pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of each such unexpired director and officer liability insurance policy. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity or other obligations of the insurers under such policies.

## Y.      PRESERVATION OF CAUSES OF ACTION

In accordance with section 1123(b)(3) of the Bankruptcy Code, except to the extent a Cause of Action is expressly waived, relinquished or released pursuant to the Plan or a Final Order, the Debtors and Reorganized Debtors shall retain and may (but are not required to) enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Debtors' and Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  After the Effective Date, the Reorganized Debtors, in their sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce

such Causes of Action (or decline to do any of the foregoing), without further approval of the Bankruptcy Court.  The failure of the Debtors to specifically list any claim, right of action, suit, proceeding or other Cause of Action in the Plan does not, and shall not be deemed to, constitute a waiver or release by the Estates or the Debtors of such claim, right of action, suit, proceeding or other Cause of Action, and the Debtors and Reorganized Debtors shall retain the right to pursue such claims, rights of action, suits, proceedings and other Causes of Action in their sole discretion and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such claim, right of action, suit, proceeding or other Cause of Action upon, after, or as a consequence of the Confirmation or consummation of the Plan.

**No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against such Entity as any indication that the Debtors and Reorganized Debtors will not pursue any and all available Causes of Action against such Entity. Without limiting the foregoing, except to the extent a Causes of Action is expressly waived, relinquished or released pursuant to the Plan or a Final Order, the Debtors and Reorganized Debtors expressly reserve the right to pursue any and all Causes of Action they may have against any party that has asserted or asserts a Claim against the Debtors, or who may be liable for a Claim asserted against the Debtors by reason of any cross-claim, third party claim, claim for indemnification, reimbursement or contribution, or other Claim of the Debtors against such party on any contractual, legal or equitable grounds.**

## Z.    EFFECTUATING DOCUMENTS; FURTHER TRANSACTIONS

Each of the Debtors and Reorganized Debtors and their respective officers and designees are authorized to issue, execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents, and to take such actions as may be necessary, desirable or appropriate to effectuate or further evidence the provisions of the Plan or to otherwise comply with applicable law, in each case without further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval, consent or authorization by the security holders, officers or directors of the Debtors or Reorganized Debtors or any other Person.

## AA.    EXEMPTION FROM CERTAIN TRANSFER TAXES AND RECORDING FEES

Pursuant to and to the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers from a Debtor or Reorganized Debtor to any other Person or any agreement regarding the transfer of title to or ownership of any of the Debtors' or Reorganized Debtors' real or personal property pursuant to or in furtherance of the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, use tax, privilege tax, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order shall direct and be deemed to direct the appropriate federal, state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other

documents without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) any sale of an asset by the Debtors or Reorganized Debtors in furtherance of the Plan, including but not limited to any sale of personal or real property; (2) the creation or recording of any mortgage, deed of trust, lien or other security interest in or against any asset of the Debtors or Reorganized Debtors in furtherance of the Plan, including, but not limited to, the Olyphant First Mortgage, the Olyphant Second Mortgage, the Tuscaloosa First Mortgage and the Tuscaloosa Second Mortgage; (3) the assumption of any contract, lease or sublease by the Debtors; and (4) any other transaction contemplated or authorized by the Plan.

## BB.    FURTHER AUTHORIZATION

The Reorganized Debtors shall be entitled to seek such orders, judgments, injunctions and rulings as they deem necessary or desirable to carry out the intentions and purposes, and to give full effect to the provisions, of the Plan.

## CC.    AMENDMENT OF CHARTERS

On and as of the Effective Date, the charters of each of the Debtors shall be deemed to have been amended to prohibit the issuance of nonvoting equity securities in accordance with section 1123(a)(6) of the Bankruptcy Code.  After the Effective Date, the Reorganized Debtors may amend and restate their respective certificates or articles of incorporation, bylaws and other organizational documents as permitted by the laws of their respective states of incorporation and such organizational documents.

## VIII.

## PROVISIONS REGARDING DISTRIBUTIONS

## A.    DISBURSING AGENT

Unless otherwise provided for in the Plan, all Distributions under the Plan shall be made by the Disbursing Agent.

## B.    DISTRIBUTIONS

The Disbursing Agent shall make Distributions to the Holders of Allowed Claims in accordance with the terms of the Plan.  All Distributions pursuant to the Plan shall, in the Disbursing Agent's discretion, be made by check drawn on a domestic bank or by wire transfer from a domestic bank.

## C.    NO INTEREST ON CLAIMS

Except as otherwise specifically provided for in the Plan with respect to the SIR Settlement Amount or in the Confirmation Order, post-petition interest shall not accrue or be paid on Claims and no Holder shall be entitled to interest accruing on or after the Petition Date on any Claim.

## D.     UNDELIVERABLE DISTRIBUTIONS AND UNCLAIMED PROPERTY

Distributions to a Holder of an Allowed Claim shall be made by the Disbursing Agent (a) at the address set forth on the Proof of Claim Filed by such Holder, (b) at the address set forth in any written notices of address change delivered to the Debtors or Reorganized Debtors, as applicable, after the date of any related Proof of Claim, (c) at the address set forth in any Filed notice of transfer of Claim, (d) at the address reflected in the Schedules if no Proof of Claim has been Filed and the Debtors have not received a written notice of a change of address, or (e) if the Holder's address is not listed in the Schedules, at the last known address of such Holder according to the Debtors' books and records. If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until the Disbursing Agent is notified of such Holder's then-current address. Amounts in respect of undeliverable or uncashed (in the case of a check) Distributions shall be retained by the Disbursing Agent in a reserve  (the "Unpaid Claims Reserve") until such Distributions are claimed or cashed, as the case may be; provided, however, that any Distribution returned as undeliverable to the Disbursing Agent, or not cashed, as the case may be, and not claimed by the Holder entitled to such Distribution within six (6) months after such Distribution is made shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and irrevocably revert to the Reorganized Debtors automatically and without need for further order of the Bankruptcy Court (and any funds held in the Unpaid Claims Reserve on account of such Distribution shall be released to the Reorganized Debtors) notwithstanding any federal or state escheat, abandoned, or unclaimed property laws to the contrary, and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

## E.     DISTRIBUTIONS TO HOLDERS AS OF THE RECORD DATE

All Distributions on Allowed Claims or Interests shall be made to the Record Holders of such Claims or Interests unless otherwise agreed by the Debtors or Reorganized Debtors and a Record Holder. The Debtors or Reorganized Debtors may, but shall have no obligation to, recognize any transfer of any Claim or Interest occurring after the Record Date. The Debtors or Reorganized Debtors shall instead be entitled to recognize and deal for all purposes under the Plan with the Record Holders as of the Record Date.

## F.     REQUIRED TAX INFORMATION

To the extent that the Disbursing Agent is required by applicable law to file information returns regarding payments to creditors with taxing authorities including, but not limited to, the Internal Revenue Service, the Disbursing Agent shall request an executed Internal Revenue Service Form W-9 (W-8 for non-US entities and individuals) from each Holder of an Allowed Claim as a condition to making any Distribution with respect such Allowed Claim.  Should any Holder of a Claim not provide the Disbursing Agent with such document within 60 days of a request for a W-9 or W-8, as applicable, then the Disbursing Agent shall provide written notice to such Holder of the failure to provide a W-9 or W-8, as applicable, and 30 additional days to provide such information. Should any Holder of a Claim not timely provide an executed W-9 or W-8, as applicable, within the 90 day period referenced above, the Reorganized Debtors may File an objection to the Claim of such non-responding Holder based on the non-responding Holder's failure to provide the W-9 or W-8 (with all required information) and shall serve the

objection on such non-responding Holder via first class mail. If the non-responding Holder of the Claim fails to respond to the objection or fails to provide to the Disbursing Agent the W-9 or W-8, as applicable (with all required information), the Bankruptcy Court may disallow such Claim for all purposes and any Distribution that would have otherwise been made to such Holder shall revert to the Reorganized Debtors. The Holder of such a Disallowed Claim shall be forever barred from pursuing the Reorganized Debtors for payment of such Claim.

### G.    DE MINIMIS DISTRIBUTIONS

The Disbursing Agent shall have no obligation to make any Distribution to the Holder of an Allowed Claim if the amount to be distributed to such Holder is less than Fifty Dollars ($50.00).

### H.    FRACTIONAL DOLLARS

Notwithstanding any other provision of the Plan, the Disbursing Agent shall not be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment may, in the discretion of the Disbursing Agent, reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

### I.    WITHHOLDING TAXES

The Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under the Plan shall be subject to any such withholding and reporting requirements.

### IX.

### PROCEDURES FOR TREATING AND RESOLVING DISPUTED CLAIMS

### A.    OBJECTIONS TO CLAIMS

The Reorganized Debtors shall have the exclusive right to File objections to any Claim that has not been Allowed by a Final Order or the express terms of the Plan. Any objections to Claims must be Filed by the Claims Objection Deadline.

### B.    AUTOMATIC DISALLOWANCE OF CERTAIN CLAIMS

Any Claim that (a) has been or is hereafter listed in any of the Debtors' respective Schedules at zero or as contingent, unliquidated, or disputed, or (b) is not listed in any of the Debtors' respective Schedules, and, in each case, as to which a Claims Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed pursuant to any Final Order of the Bankruptcy Court, shall be deemed disallowed without further action by the Debtors or Reorganized Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Nothing herein shall preclude a party from Filing a motion seeking entry of an order of the Bankruptcy Court deeming timely Filed a Proof of Claim that is

Filed after an applicable Claims Bar Date on notice to the Reorganized Debtors and without prejudice to the Reorganized Debtors' rights to oppose any such request.

### C.      ADJUSTMENT TO CLAIMS WITHOUT OBJECTION

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors to the maximum extent provided by applicable law without a Claims objection having to be Filed and without any further notice or action, order, or approval of the Bankruptcy Court.

### D.      NO DISTRIBUTIONS PENDING ALLOWANCE

Except as otherwise provided in the Plan, no Distributions will be made with respect to any portion of a Claim unless and until such Claim has been Allowed.

### E.      ESTIMATION OF CLAIMS

The Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502 of the Bankruptcy Code regardless of whether the Debtors or Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the Claims objection, estimation and resolution procedures set forth in the Plan are cumulative and not exclusive of one another.

### F.      RESOLUTION OF CLAIMS AND CLAIM OBJECTIONS

On and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, or otherwise resolve any Claim or objection to a Claim, whether or not a formal objection is Filed, or to withdraw any objection to a Claim, without prior approval or further order of the Bankruptcy Court.

### G.      MEDIATION OF CLAIM OBJECTIONS

The Reorganized Debtors reserve the right to request that the Bankruptcy Court refer any objection to a Claim to mediation pursuant to D.N.J. LBR 9019-2 or any other mediation procedure approved by the Bankruptcy Court.

### H.      DISTRIBUTIONS ON INSURED CLAIMS

If any Holder has asserted a Claim that is covered as to liability, in whole or in part, by an insurance policy that is assumed or otherwise remains in effect pursuant to the terms of the

Plan, such Holder will have a Claim entitled to a Distribution under the Plan only to the extent of any deductible or self-insured retention under the applicable insurance policy that was unpaid or otherwise unexhausted as of the Petition Date. Notwithstanding the foregoing, the Holder shall be entitled to pursue recovery of any amount in excess of such unpaid deductible or self-insured retention from the applicable insurance carrier and, in connection therewith, notwithstanding the discharge of the balance of such Claim provided pursuant to the Plan, such Holder may continue to pursue the balance of such Claim against the Reorganized Debtors solely for the purposes of liquidating such Claim and obtaining payment of the balance of such liquidated Claim from any otherwise applicable policy of insurance. Except as otherwise provided in the applicable insurance policy, the applicable insurance carrier may, at its expense, employ counsel, direct the defense, and determine whether and on what terms to settle any Claim for the purposes of determining the amount of insurance proceeds that will be paid on account of such Claim. If after liquidation of a Claim pursuant to this Section, it is determined that there are insufficient insurance proceeds available to satisfy the amount of such Claim that is in excess of any unpaid deductible or self-insured retention, then the Holder of such Claim shall have a Claim in the amount of such insufficiency. Notwithstanding any other provision of the Plan, after the Effective Date the Bankruptcy Court shall be authorized to enter one or more orders in the Bankruptcy Cases modifying and amending the provisions of this Section, provided that any such modifications shall not be material and adverse to the interests of Holders of insured Claims.

## X.

## CONDITIONS PRECEDENT

### A.    CONDITIONS TO CONFIRMATION

The following are conditions precedent to Confirmation of the Plan that may be satisfied or waived to the extent provided by section 11.3 of the Plan: (i) the Bankruptcy Court shall have approved the Disclosure Statement with respect to the Plan in form and substance that is acceptable to the Debtors in their sole and absolute discretion, and (ii) the Confirmation Order shall have been signed by the Bankruptcy Court and entered on the docket of the Bankruptcy Cases.

### B.    CONDITIONS TO EFFECTIVE DATE

The following are conditions precedent to the occurrence of the Effective Date that may be satisfied or waived to the extent provided by section 11.3 of the Plan:

(i)    The Confirmation Order shall be in all material respects reasonably acceptable to the Debtors, shall not have been vacated, reversed or modified and, as of the Effective Date, shall not be stayed;

(ii)    The Debtors shall have borrowed the Plan Funding Amount from the Plan Sponsor;

(iii)    The Professional Fee Escrow shall have been established and funded in accordance with Section 4.2.4 of the Plan;

(iv)    All documents and agreements to be executed on the Effective Date or otherwise necessary to implement the Plan shall be in form and substance that is acceptable to the Debtors, in their reasonable discretion;

(v)    The Debtors shall have received any authorization, consent, regulatory approval, ruling, letter, opinion, or document that may be necessary to implement the Plan and that is required by law, regulation, or order; and

(vi)    The Confirmation Order shall have become a Final Order.

## C.    WAIVER OF CONDITIONS TO CONFIRMATION AND THE EFFECTIVE DATE

Under Section 11.3 of the Plan, the Debtors may waive the conditions precedent to Confirmation of the Plan and the occurrence of the Effective Date set forth in sections 11.1.1, 11.2.1, 11.2.4, 11.2.5 and 11.2.6 of the Plan (X.A.(i) and X.B.(i) and (iv)-(vi) above), in whole or in part, without any notice to any other parties in interest or the Bankruptcy Court and without a hearing or order of the Bankruptcy Court.  The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Debtors in their sole discretion regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors). The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

## XI.

## EFFECT OF PLAN ON CLAIMS AND INTERESTS

## A.    DISCHARGE OF THE DEBTORS

Except as otherwise expressly provided in the Plan or the Confirmation Order, pursuant to section 1141(d) of the Bankruptcy Code, and effective as of the Effective Date: (a) the Distributions and rights that are provided in the Plan, if any, and the treatment of all Claims under the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Causes of Action that arose or are deemed to have arisen prior to the Effective Date, whether known or unknown, including any interest accrued on such Claims and Causes of Action from and after the Petition Date, against, liabilities of, Liens on, obligations of, and rights against the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and rights, including, but not limited to, Claims and debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such Claim, debt, or right is Filed or deemed Filed under section 501 of the Bankruptcy Code, (ii) a Claim based upon such Claim, debt, or right is Allowed under section 502 of the Bankruptcy Code, or (iii) the Holder of such a Claim, debt or right accepted the Plan; (b) the Plan shall bind all Holders of Claims and Interests; (c) all Claims shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all

-45-

Entities shall be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other Claims based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date. This Section of the Plan shall not affect any release set forth in Article 6 of the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims against the Debtors, subject to the occurrence of the Effective Date.

## B.    RELEASE OF LIENS

Except as otherwise provided in the Plan, on the Effective Date and concurrently with the commencement of Distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, terminated, extinguished and discharged, in each case without further notice  or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor. Any Entity holding such mortgages, deeds of trust, Liens, pledges, or other security interests shall pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors, at the sole cost and expense of the Reorganized Debtors. This Section of the Plan shall not affect any mortgages and/or liens set forth in Article 6 of the Plan.

## C.    RELEASE BY DEBTORS OF CERTAIN PARTIES

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after and subject to the occurrence of the Effective Date, the Debtors and their Estates shall release each of the Released Parties, and each Released Party is deemed released by the Debtors, the Estates, and the Reorganized Debtors from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates or the Reorganized Debtors, as applicable) whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Estates, or the Reorganized Debtors would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Bankruptcy Cases, the purchase, sale, transfer, or rescission of the purchase, sale, or transfer of any security, asset, right, or interest of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Bankruptcy**

Cases, the negotiation, formulation, or preparation of the Plan or related agreements, instruments, or other documents, and any other act or omission, transaction, agreement, event, or other occurrence taking place on and before the Petition Date; provided, however, that the foregoing release shall not operate to waive or release (a) any Claim or Cause of Action of the Debtors against any party that has asserted or asserts a Claim against the Debtors, or who may be liable for a Claim asserted against the Debtors by reason of any cross-claim, third party claim, claim for indemnification, reimbursement or contribution, or other Claim of the Debtors against such party on any contractual, legal or equitable grounds, or (b) any obligations of any party under the Plan or any other document, instrument, or agreement executed to implement the Plan.   Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing release, and further, shall constitute the Bankruptcy Court's finding that such release is: (1) in exchange for good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or their Estates asserting any claim or Cause of Action released pursuant to such release.

### D.   THIRD PARTY RELEASE

On and after and subject to the occurrence of the Effective Date as to each of the Releasing Parties, the Releasing Parties shall release each of the Released Parties, and each of the Debtors, their Estates, and the Released Parties shall be deemed released from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of any of the Debtors or their Estates), whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Bankruptcy Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims prior to or in the Bankruptcy Cases, the negotiation, formulation, or preparation of the Plan, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event or other occurrence taking place on and before the Effective Date; provided, however, that the foregoing release shall not operate to waive or release any Claim or Cause of Action of the Debtors against any party that has asserted or asserts a Claim against the Debtors, or who may be liable for a Claim asserted against the Debtors by reason of any cross-claim, third party claim, claim for indemnification, reimbursement or contribution, or other Claim of the Debtors against such party on any contractual, legal or equitable grounds; and provided further, however, that the foregoing release shall not become binding on SIR Properties Trust until payment in full of the SIR Settlement Amount has been made in accordance with the Plan. Notwithstanding anything to the

contrary in the foregoing release, nothing in the Plan shall release any obligations of any party under the Plan or any other document, instrument, or agreement executed to implement the Plan.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing release and, further, shall constitute the Bankruptcy Court's finding that the foregoing release is: (1) in exchange for good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim or Cause of Action released under the Plan.

### E.      EXCULPATION AND LIMITATION OF LIABILITY

Except to the extent expressly provided otherwise in the Plan, the Exculpated Parties shall neither have nor incur any liability to any Entity for any Exculpated Claim; **provided**, **however**, that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct. The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code and, therefore, are not and shall not be liable at any time for the violation of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or Distributions made pursuant to the Plan.  This Section of the Plan shall not affect any release set forth in Article 6 of the Plan.

### F.      INJUNCTION

Except as otherwise expressly provided in the Plan, the Confirmation Order, or a separate Final Order of the Bankruptcy Court, all Persons who have held, hold, or may hold Claims against any of the Debtors are permanently enjoined, on and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or Reorganized Debtors or their property with respect to any such Claim; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Debtors or Reorganized Debtors or their property on account of any such Claim; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against the Debtors or Reorganized Debtors or their property on account of any such Claim; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any such Claim; or (e) taking any action that is inconsistent with or interferes with the implementation or consummation of the Plan; **provided**, **however**, that nothing in the Plan shall prevent any Person from taking action in the Bankruptcy Court to enforce their rights under and in accordance with the Plan.

### G.    SETOFF AND RECOUPMENT

Pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, the Debtors or Reorganized Debtors may, but shall not be required to, set off against or recoup from any Allowed Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Allowed Claim, any Claims, rights or Causes of Action of any nature whatsoever that the Debtors may have against the Holder of such Allowed Claim; but neither the Debtors' or Reorganized Debtors' failure to do so nor the allowance of any Claim shall constitute a waiver or release by the Debtors, the Reorganized Debtors or the Estates of any such Claims, rights or Causes of Action that the Debtors or Reorganized Debtors may have against such Holder.  Any dispute related to setoff or recoupment rights of the Debtors or Reorganized Debtors shall be determined by the Bankruptcy Court.  In no event shall any Holder of a Claim be entitled to setoff or recoup any Claim against any Claim, right, or Cause of Action of any of the Debtors or Reorganized Debtors unless such Holder has Filed a motion requesting the authority to perform such setoff or recoupment on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff or recoupment pursuant to section 553 or otherwise.

### H.    BINDING EFFECT

On the Confirmation Date, the provisions of the Plan shall be binding on the Debtors, the Estates, the Reorganized Debtors, all Holders of Claims against or Interests in the Debtors, and all other parties-in-interest whether or not such Holders are Impaired and whether or not such Holders have accepted the Plan.

### I.    AUTOMATIC STAY

The automatic stay arising out of section 362(a) of the Bankruptcy Code shall continue in full force and effect until the Consummation Date and the Debtors, Reorganized Debtors and the Estates shall be entitled to all of the protections afforded thereby.

**XII.**

**MISCELLANEOUS PLAN PROVISIONS**

### A.    MODIFICATION OF THE PLAN

The Debtors expressly reserve their rights to modify the Plan, whether such modification is material or immaterial, at any time before the Confirmation Date, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate and unless otherwise ordered by the Bankruptcy Court, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors and Reorganized Debtors, as applicable, further expressly reserve their rights  to alter, amend or modify the Plan at any time after the Confirmation Date and before substantial consummation of the Plan, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in

such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Section. A Holder of a Claim that has accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, such Holder changes its previous acceptance or rejection.

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127 of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

## B.   RETENTION OF JURISDICTION

The Plan provides that subsequent to the Effective Date, the Bankruptcy Court shall have or retain jurisdiction for various purposes set forth in Article XII thereof.

## C.   DISSOLUTION OF CREDITORS' COMMITTEE

On the Effective Date, the Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be released from any further duties and responsibilities in the Bankruptcy Cases and under the Bankruptcy Code, provided that, after the Effective Date, the Committee shall be deemed to continue to exist solely with respect to the filing of applications pursuant to sections 330 and 331 of the Bankruptcy Code and objections thereto.

## D.   NO BAR TO SUITS

Except as otherwise provided in Article X of the Plan, neither the Plan nor Confirmation thereof shall operate to bar or estop the Debtors or Reorganized Debtors from commencing any Cause of Action or any other legal action against any Holder of a Claim or Interest or any other Person, whether such Cause of Action or other legal action arose prior to or after the Confirmation Date and whether or not the existence of such Cause of Action or any other legal action was disclosed in any disclosure statement Filed by the Debtors in connection with the Plan or whether or not any payment was made or is made on account of any Claim or Interest.

**XIII.**

**<u>CONFIRMATION AND CONSUMMATION PROCEDURE</u>**

## A.   GENERAL INFORMATION

All Holders of Claims that are impaired by the Plan may cast their votes for or against the Plan. As a condition to confirmation of the Plan, the Bankruptcy Code requires that one Class of Impaired Claims votes to accept the Plan. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a Class of Impaired Claims as acceptance by Holders of at least two-thirds of the dollar amount *and* by more than one-half in number of Claims in the Class of those creditors who exercise their right to vote. Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan. Voting is accomplished by completing, dating,

signing and returning the Ballot form by the Voting Deadline.  Ballots will be distributed to all creditors entitled to vote on the Plan as part of the Solicitation Package accompanying this Disclosure Statement.  *See* Section I.C. of this Disclosure Statement for a more detailed explanation of who will receive Ballots and the voting procedures.

## B.    SOLICITATION OF ACCEPTANCES

This Disclosure Statement has been approved by the Bankruptcy Court as containing "adequate information" to permit creditors to make an informed decision whether to accept or reject the Plan.  Under the Bankruptcy Code, your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement prior to, or concurrently with, such solicitation.

## C.    ACCEPTANCES NECESSARY TO CONFIRM THE PLAN

At the Confirmation Hearing, the Bankruptcy Court shall determine, among other things, whether the Plan has been accepted by the Debtors' creditors.  Class 3, Class 4 and Class 5 will be deemed to accept the Plan if at least two-thirds in amount and more than one-half in number of the Claims in such Classes actually voting vote to accept the Plan.  Furthermore, unless there is unanimous acceptance of the Plan by all members of the Classes entitled to vote on the Plan, the Bankruptcy Court must also determine that any non-accepting Class members will receive property with a value, as of the Effective Date of the Plan, that is not less than the amount that such Class member would receive or retain if the Debtors were liquidated as of the Effective Date of the Plan under Chapter 7 of the Bankruptcy Code.

If all Classes of Claims entitled to vote on the Plan do not accept the Plan, the Debtors will seek to confirm the Plan under section 1129(b) of the Bankruptcy Code, which permits the confirmation of a plan notwithstanding the non-acceptance by one or more Impaired Classes of Claims or Interests.  Under section 1129(b) of the Bankruptcy Code, a plan may be confirmed if (a) the plan has been accepted by at least one Impaired Class of Claims and (b) the Bankruptcy Court determines that the plan does not discriminate unfairly and is "fair and equitable" with respect to the non-accepting classes.

## XIV.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors have considered whether a liquidation of their assets by a Chapter 7 trustee would result in a higher recovery to creditors than that contemplated by the Plan.  The Debtors believe that the distributions to creditors contemplated by the Plan and facilitated by the Plan Sponsor's financing of the Plan Funding Amount will provide a substantially greater recovery to creditors than creditors are likely to receive in a liquidation of the Debtors' assets by a Chapter 7 trustee.

The Debtors further believe that a conversion of the Bankruptcy Cases to Chapter 7 would delay distributions to creditors and increase costs to the detriment of the Debtors' estates and creditors.

In a Chapter 7 case, a trustee would be appointed or elected and would require additional time to become familiar with the Debtors' assets and financial affairs. Under section 326(a) of the Bankruptcy Code, a Chapter 7 trustee would be entitled to compensation based upon a percentage of all funds distributed in the case to parties in interest.  In addition, the Chapter 7 trustee would be authorized to hire professionals to assist the trustee in the administration of the chapter 7 estates and the costs and expenses of such professionals that are Allowed would be additional Administrative Expense Claims against the Debtors' estates.  The Debtors believe that a Chapter 7 liquidation would result in delay and a diminution in value because of the substantial additional administrative expenses that will be required to compensate the Chapter 7 trustee and new attorneys, accountants and/or other professionals who are unfamiliar with the Debtors' assets, the Bankruptcy Cases and the Claims against the Estates.

The Debtors further believe that a conversion of the Bankruptcy Cases to Chapter 7 would likely fail to maximize the value of the Debtors' assets for the benefit of all of their stakeholders, including equity holders, because a Chapter 7 trustee would likely list the Debtors' Owned Real Property for an immediate and expedited sale and obtain only liquidation value.  By contrast, the Debtors believe that the Plan, which provides for the management of the Debtors' assets by existing management who are familiar with those assets will reduce costs and maximize value for the benefit of all parties in interest.

The Debtors' recommendation that all creditors in voting Classes vote to accept the Plan is based on the Debtors' view that the Plan is preferable to other alternatives for reorganization or liquidation of the Debtors' Estates.  If the Plan is not accepted and confirmed, there is a risk that the interests of all creditors and equity holders will be diminished.

## XV.

## CERTAIN RISK FACTORS TO CONSIDER

The following disclosures are not intended to be exclusive and should be read in connection with the other disclosures contained in this Disclosure Statement.  You should consult your legal, financial, and tax advisors regarding the risks associated with the Plan and the distributions you may receive thereunder.

*Claims Estimation*: There can be no assurance that the estimated Claim amounts assumed for the purposes of preparing the Plan are correct.  The actual amount of Allowed Claims likely will differ in some respect from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated for the purpose of preparing the Plan.  In addition, the actual amount of Allowed Claims against the Debtors will not be known until after the Debtors complete their review and reconciliation of all filed Claims, the Debtors prosecute objections to Claims, and all such Claim objections are adjudicated and resolved and/or settled. However, the Debtors do not believe that the estimated recovery percentages provided in this Disclosure Statement will be materially different than the actual recoveries that are realized under the Plan.

*Certain Risks of Nonconfirmation*: There can be no assurance that the requisite acceptances to confirm the Plan will be received.  In addition, even if the requisite acceptances of the Plan are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. The Bankruptcy Court could deny confirmation of the Plan if it were to find that any of the statutory requirements for confirmation are not met.

## XVI.

## UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

**THE DEBTORS HAVE NOT SOUGHT OR OBTAINED ANY RULING FROM THE INTERNAL REVENUE SERVICE OR FROM ANY OTHER TAXING AUTHORITY WITH RESPECT TO ANY OF THE TAX CONSEQUENCES OF THE PLAN, NOR HAVE THE DEBTORS SOUGHT OR OBTAINED AN OPINION OF COUNSEL WITH RESPECT TO ANY SUCH TAX CONSEQUENCES.  NO REPRESENTATIONS OR ASSURANCES ARE MADE WITH RESPECT TO THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.  BECAUSE THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND MAY VARY BASED ON INDIVIDUAL CIRCUMSTANCES, EACH CREDITOR SHOULD CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF ANY ASPECT OF THE PLAN WITH RESPECT TO SUCH CREDITOR.**

## XVII.

## RECOMMENDATION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that confirmation and consummation of the Plan is preferable to all other alternatives.  Consequently, the Debtors urge all Holders of Claims in Classes entitled to vote on the Plan to vote to ACCEPT the Plan, and to complete and return their ballots so that they will be RECEIVED on or before **[_____ __], 2018**.

Dated: October 4, 2018

Respectfully submitted,

CINRAM GROUP, INC., CINRAM
PROPERTY GROUP, LLC, and CINRAM
OPERATIONS, INC., DEBTORS

By: */s/ Glenn R. Langberg*
    Name: Glenn R. Langberg
    Title:   CEO

## Exhibit A

Fourth Amended Joint Plan of Reorganization

**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Mary E. Seymour, Esq.
Michael Savetsky, Esq.
Michael Papandrea, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Counsel to the Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| Cinram Group, Inc., *et al.*,[1] | Case No. 17-15258 (VFP) |
| Debtors. | (Jointly Administered) |

**DEBTORS' FOURTH AMENDED JOINT PLAN OF REORGANIZATION**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Dated: October 4, 2018

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Cinram Group, Inc. (0588), Cinram Property Group, LLC (9738), and Cinram Operations, Inc. (7377). The Debtors conduct all of their business affairs out of offices located at 220 South Orange Avenue, Livingston, New Jersey 07039.

## <u>TABLE OF CONTENTS</u>

<u>PAGES</u>

ARTICLE I        Definitions and General Provisions ......................................................1
    1.1      Definitions.......................................................................................1
    1.2      Time ...............................................................................................12

ARTICLE II       Classification of Claims and Interests...............................................13
    2.1      Classification of Claims and Interests...............................................13
    2.2      Deemed Acceptance of Plan .............................................................13
    2.3      Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.................13

ARTICLE III      Treatment of Claims and Interests ....................................................13
    3.1      Class 1—Secured Claims..................................................................13
    3.2      Class 2—Priority Claims ..................................................................14
    3.3      Class 3—SIR Rejection Damage Claims............................................15
    3.4      Class 4—Technicolor Indemnification Claims.....................................15
    3.5      Class 5—General Unsecured Claims .................................................15
    3.6      Class 6—Workers' Compensation Insurance Claims...........................16
    3.7      Class 7—Intercompany Claims .........................................................16
    3.8      Class 8—Interests ...........................................................................16
    3.9      No Waiver of Defenses.....................................................................17

ARTICLE IV       Treatment of Unclassified Claims ....................................................17
    4.1      Summary ........................................................................................17
    4.2      Administrative Expense Claims.........................................................17
    4.3      Tax Claims .....................................................................................18
    4.4      Post-Effective Date Fees and Expenses .............................................18

ARTICLE V        Treatment of Executory Contracts and Unexpired Leases ..................18
    5.1      Executory Contracts and Unexpired Leases .......................................18
    5.2      Claims Based on Rejection of Executory Contracts or Unexpired Leases.........19
    5.3      Cure of Defaults for Executory Contracts or Unexpired Leases Assumed
           by the Debtors ................................................................................19
    5.4      Preexisting Obligations to the Debtors under Executory Contracts and
           Unexpired Leases.............................................................................20
    5.5      Survival of Certain Indemnification Obligations..................................20
    5.6      Modifications, Amendments, Supplements, Restatements, or Other
           Agreements .....................................................................................20
    5.7      Contracts and Leases Entered Into After the Petition Date ..................20
    5.8      Reservation of Rights.......................................................................20

ARTICLE VI       Means for Implementation of the Plan................................................21
    6.1      General Settlement of Claims ...........................................................21
    6.2      Substantive Consolidation ...............................................................21
    6.3      Continued Corporate Existence .......................................................21

| 6.4 | Revesting of Assets | 22 |
| 6.5 | Exit Financing | 22 |
| 6.6 | Olyphant Second Mortgage and Olyphant Subordination Agreement | 22 |
| 6.7 | Tuscaloosa Second Mortgage | 23 |
| 6.8 | The Olyphant Exit, Technicolor Olyphant Distribution, and the Escrow Agreement | 23 |
| 6.9 | The Olyphant Termination Agreement | 24 |
| 6.10 | Releases Between the Debtors, the Reorganized Debtors, the Released Parties, Technicolor and Technicolor Southeast Relating to the Olyphant Premises | 25 |
| 6.11 | Releases Between SIR Properties Trust and the Debtors | 26 |
| 6.12 | Releases Between SIR Properties Trust and Technicolor | 27 |
| 6.13 | Releases Between the Debtors, the Reorganized Debtors, the Released Parties, Technicolor and Technicolor Southeast Relating to the Huntsville Premises | 28 |
| 6.14 | Releases Between the Debtors, the Reorganized Debtors, the Released Parties, Technicolor and Technicolor Southeast | 28 |
| 6.15 | Cooperation Between Technicolor and the Reorganized Debtors | 30 |
| 6.16 | Sources of Distributions | 31 |
| 6.17 | Operation of the Reorganized Debtors | 31 |
| 6.18 | Continuance of Certain Non-Debtor Guarantees | 31 |
| 6.19 | Limitation on Distributions to Holders of Intercompany Claims and Interests | 31 |
| 6.20 | Maintenance of Bank Accounts | 32 |
| 6.21 | Books and Records | 32 |
| 6.22 | Directors, Managers, and Officers of the Reorganized Debtors | 32 |
| 6.23 | Corporate Action | 32 |
| 6.24 | Director and Officer Liability Insurance | 32 |
| 6.25 | Preservation of Causes of Action | 32 |
| 6.26 | Effectuating Documents; Further Transactions | 33 |
| 6.27 | Exemption From Certain Transfer Taxes and Recording Fees | 33 |
| 6.28 | Further Authorization | 34 |

| ARTICLE VII | Provisions Regarding Corporate Governance of Debtors | 34 |
| 7.1 | Amendment of Charters | 34 |

| ARTICLE VIII | Distributions | 34 |
| 8.1 | Disbursing Agent | 34 |
| 8.2 | Distributions | 34 |
| 8.3 | No Interest on Claims | 34 |
| 8.4 | Undeliverable Distributions and Unclaimed Property | 34 |
| 8.5 | Distributions to Holders as of the Record Date | 35 |
| 8.6 | Required Tax Information | 35 |
| 8.7 | De Minimis Distributions | 35 |
| 8.8 | Fractional Dollars | 36 |
| 8.9 | Withholding Taxes | 36 |

ARTICLE IX    Procedures for Treating and Resolving Disputed Claims ....................36
   9.1    Objections to Claims ............................................................................36
   9.2    Automatic Disallowance of Certain Claims ..........................................36
   9.3    Adjustment to Claims Without Objection ..............................................36
   9.4    No Distributions Pending Allowance .....................................................36
   9.5    Estimation of Claims ............................................................................36
   9.6    Resolution of Claims and Claim Objections .........................................37
   9.7    Mediation of Claim Objections .............................................................37
   9.8    Distributions on Insured Claims ...........................................................37

ARTICLE X    Effect of Plan on Claims and Interests ...................................................37
   10.1    Discharge of the Debtors .....................................................................37
   10.2    Release of Liens ..................................................................................38
   10.3    Release by Debtors of Certain Parties .................................................38
   10.4    Third Party Release .............................................................................39
   10.5    Exculpation and Limitation of Liability .................................................40
   10.6    Injunction .............................................................................................40
   10.7    Setoff and Recoupment .......................................................................41
   10.8    Binding Effect ......................................................................................41
   10.9    Automatic Stay .....................................................................................41

ARTICLE XI    Conditions Precedent ............................................................................41
   11.1    Conditions to Confirmation ..................................................................41
   11.2    Conditions to the Effective Date ..........................................................41
   11.3    Waiver of Conditions to Confirmation or Effective Date .......................42

ARTICLE XII    Retention and Scope of Jurisdiction of the Bankruptcy Court ...........42
   12.1    Retention of Jurisdiction ......................................................................42
   12.2    Alternative Jurisdiction ........................................................................44
   12.3    Final Decree ........................................................................................44

ARTICLE XIII    Miscellaneous Provisions ....................................................................45
   13.1    Modification of this Plan ......................................................................45
   13.2    Effect of Confirmation on Modifications ...............................................45
   13.3    Allocation of Plan Distributions Between Principal and Interest ...........45
   13.4    Dissolution of Creditors' Committee ....................................................45
   13.5    Applicable Law .....................................................................................45
   13.6    Preparation of Tax Returns and Resolution of Tax Claims ...................45
   13.7    Headings ..............................................................................................46
   13.8    Revocation of Plan ..............................................................................46
   13.9    Confirmation of Plans for Separate Debtors .........................................46
   13.10    No Admissions; Objection to Claims ..................................................46
   13.11    No Bar to Suits ..................................................................................46
   13.12    Exhibits/Schedules ............................................................................46
   13.13    Conflicts .............................................................................................46
   13.14    Notices ...............................................................................................46
   13.15    Section 1125 of the Bankruptcy Code ................................................47

13.16   Severability ........................................................................................................47
13.17   Designated Notice.............................................................................................47
13.18   Payment of Statutory Fees ................................................................................47
13.19   Notice of the Effective Date ............................................................................47

# INTRODUCTION

Cinram Group, Inc., Cinram Property Group, LLC, and Cinram Operations, Inc., the debtors and debtors-in-possession in the above-captioned cases (each, a "Debtor" and, collectively, the "Debtors") propose this Plan for the resolution of the outstanding Claims against and Interests in the Debtors.  The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code. Reference is made to the Disclosure Statement, distributed contemporaneously herewith, for a discussion of the Debtors' history, business, assets, and events leading up to commencement of these Bankruptcy Cases, and for a summary of this Plan and the treatment of Claims and Interests provided for herein. Subject to the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan.

ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

## ARTICLE I
## Definitions and General Provisions

For the purposes of this Plan, except as otherwise expressly provided, all capitalized terms not otherwise defined shall have the meanings ascribed to them in section 1.1 of this Plan. Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules. Whenever the context requires, terms shall include the plural as well as the singular in number, and the masculine shall include the feminine and the feminine shall include the masculine in gender.

1.1    *Definitions*.  The following terms shall have the following meanings when used in this Plan:

1.1.1    "Administrative Expense Claim" means a Claim for payment of the costs and expenses of administration of the Estates pursuant to section 503(b) and 507(a)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the business of the Debtors; (b) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code, including, but not limited to, U.S. Trustee Fees; and (c) Professional Fee Claims.

1.1.2    "Administrative Expense Claims Bar Date" means the first Business Day following the date that is thirty (30) days after the Debtors serve notice by mail or by publication of the occurrence of the Effective Date.

1.1.3    "Affiliate" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

1.1.4    "Allowed" means: (a) when used in reference to an Interest, that such an Interest is reflected in the stock transfer ledger, similar register or other books and records of the

applicable Debtor on the Record Date; and (b) when used in reference to a Claim, such Claim or any portion thereof that (i) has been allowed by a Final Order of the Bankruptcy Court, (ii) is agreed to by the Debtors or Reorganized Debtors, as applicable; (iii) is listed in any of the Debtors' respective Schedules and for which no contrary Proof of Claim has been timely Filed, other than a Claim that is listed in any of the Debtors' Schedules at zero or as disputed, contingent, or unliquidated; (iv) is evidenced by a Proof of Claim that has been timely Filed on or before the applicable Claims Bar Date or deemed to be timely Filed pursuant to any Final Order of the Bankruptcy Court or under applicable law, and as to which (A) no objection to its allowance or request for estimation has been Filed on or before the Claims Objection Deadline, or (B) any objection to its allowance has been settled or withdrawn, or has been overruled by a Final Order; or (v) is allowed pursuant to the terms of this Plan (regardless of whether such Claim has been listed by the Debtors in their Schedules and regardless of whether a Proof of Claim has been Filed in respect thereof); provided, however, that Claims allowed solely for the purpose of voting to accept or reject this Plan pursuant to an order of the Bankruptcy Court shall not be considered Allowed Claims for the purposes of Distribution under this Plan.  Except as otherwise specified in this Plan or any Final Order, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date.  For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law.

1.1.5  "Assumption Notice" means a notice Filed by the Debtors at least seven (7) days prior to the Confirmation Hearing designating Executory Contracts or Unexpired Leases that are to be assumed by the Debtors effective as of the Effective Date and the amount of any monetary defaults under each such Executory Contract or Unexpired Lease to be cured by the Debtors or Reorganized Debtors pursuant to section 365(b)(1) of the Bankruptcy Code.

1.1.6  "Avoidance Action" means any and all actual or potential claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors and its recovery, subordination or other remedies that may be brought by and on behalf of the Debtors and their Estates arising out of or maintainable pursuant to sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under any other similar applicable law, regardless of whether or not such action has been commenced prior to the Effective Date.

1.1.7  "Bankruptcy Case" means, with respect to each Debtor, the chapter 11 case initiated by such Debtor's filing on the Petition Date of a voluntary petition for relief in the Bankruptcy Court under chapter 11 of the Bankruptcy Code. The Bankruptcy Cases are being jointly administered in the Bankruptcy Court under Bankruptcy Case No. 17-15258 (VFP) pursuant to the *Order Directing Joint Administration of the Debtors' Chapter 11 Cases* dated March 24, 2017 and entered by the Bankruptcy Court on March 28, 2017.

1.1.8  "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. § 101, *et seq*.

1.1.9  "Bankruptcy Court" means the United States Bankruptcy Court for the District of New Jersey or, in the event such court ceases to exercise jurisdiction over any

Bankruptcy Case, such court or adjunct thereof that exercises jurisdiction over such Bankruptcy Case in lieu of the United States Bankruptcy Court for the District of New Jersey.

1.1.10 "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as applicable to the Bankruptcy Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, as applied to the Bankruptcy Cases or proceedings therein, as the case may be.

1.1.11 "Business Day" means any day on which commercial banks are required to be open for business in New Jersey.

1.1.12 "Cash" means legal tender of the United States of America and equivalents thereof.

1.1.13 "Causes of Action" means any and all actions, claims, claims for indemnification, reimbursement or contribution, proceedings, causes of action, suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payments and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and whether asserted or assertable directly or derivatively, in law, equity or otherwise, including actions brought prior to the Petition Date, actions under chapter 5 of the Bankruptcy Code, including any Avoidance Action, and actions against any Entity for failure to pay for products or services provided or rendered by the Debtors, all claims, suits or proceedings relating to enforcement of the Debtors' intellectual property rights, including patents, copyrights and trademarks, and all claims or causes of action seeking recovery of the Debtors' accounts receivable or other receivables or rights to payment created or arising in the ordinary course of the Debtors' business, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Bankruptcy Cases, including through the Effective Date. For the avoidance of doubt, Causes of Action include: (a) all rights of setoff, counterclaim, cross-claim, or recoupment, and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims; and (c) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

1.1.14 "CGI" means Cinram Group, Inc., a Delaware corporation.

1.1.15 "COI" means Cinram Operations, Inc., an Alabama corporation

1.1.16 "CPG" means Cinram Property Group, LLC, a Delaware limited liability company.

1.1.17 "Claim" means a "claim" as defined in section 101(5) of the Bankruptcy Code against any of the Debtors, whether or not asserted.

1.1.18 "Claims Bar Date" means, with respect to any Claim, the applicable date established by the Bankruptcy Court by which a Proof of Claim must be Filed with respect to

such Claim pursuant to (a) the Claims Bar Date Order, or (b) any other Final Order of the Bankruptcy Court.

1.1.19  "Claims Bar Date Order" means the *Order (A) Establishing Deadlines to File Proofs of Claim Against the Debtors, Including but not Limited to Claims Arising under Section 503(b)(9) of the Bankruptcy Code, (B) Approving the Form and Manner of Notice of the Bar Dates, (C) Authorizing Publication of the Bar Dates, and (D) Granting Related Relief*, entered by the Bankruptcy Court on June 15, 2017 [Docket No. 128].

1.1.20  "Claims Objection Deadline" means the later of: (a) the first Business Day that is at least 180 days after the Effective Date; and (b) such later date as may be fixed by the Bankruptcy Court, after Designated Notice, upon a motion Filed by the Reorganized Debtors on or before the then existing Claims Objection Deadline.

1.1.21  "Class" means a category of Claims or Interests as set forth in Article II of this Plan pursuant to section 1123(a)(1) of the Bankruptcy Code.

1.1.22  "Committee" means the Official Committee of Unsecured Creditors appointed in the Debtors' Bankruptcy Cases pursuant to section 1102(a) of the Bankruptcy Code.

1.1.23  "Confirmation" means the entry of the Confirmation Order on the docket of the Bankruptcy Cases.

1.1.24  "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order.

1.1.25  "Confirmation Hearing" means the hearing before the Bankruptcy Court held to consider Confirmation of this Plan and related matters under section 1128 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.1.26  "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

1.1.27  "Consent to Sublease" means that certain Consent to Sublease Agreement between SIR Properties Trust, CGI and Technicolor Southeast, dated November 12, 2015.

1.1.28  "Consummation Date" means the date on which the Disbursing Agent makes the Final Distribution in accordance with this Plan.

1.1.29  "Designated Notice" means notice and an opportunity for a hearing as defined in section 102(1) of the Bankruptcy Code, with notice limited to the Debtors or Reorganized Debtors, as applicable, the United States Trustee, and other parties in interest who, after entry of the Confirmation Order, File a request for such notice and serve a copy of same on counsel for the Debtors.

1.1.30  "Disallowed" means a Claim or any portion thereof that (i) has been disallowed by a Final Order or pursuant to the terms of this Plan, (ii) has been or is hereafter listed in any of the Debtors' Schedules at zero or as disputed, contingent, or unliquidated and as

to which no Proof of Claim has been timely Filed on or before the applicable Claims Bar Date or deemed timely Filed pursuant to any Final Order of the Bankruptcy Court, or (iii) is not listed in any of the Debtors' Schedules and as to which no Proof of Claim has been timely Filed on or before the applicable Claims Bar Date or deemed timely Filed pursuant to any Final Order of the Bankruptcy Court.

1.1.31 "Disclosure Statement" means the *Debtors' Fourth Amended Disclosure Statement for the Debtors' Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, dated as of October 4, 2018, as it may be further amended, supplemented, or modified from time to time, that relates to this Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017.

1.1.32 "Disclosure Statement Order" means the Order of the Bankruptcy Court approving the Disclosure Statement, as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code and solicitation procedures related thereto.

1.1.33 "Disbursing Agent" means the Reorganized Debtors, their agent, or any other person or entity designated by the Debtors or Reorganized Debtors to make or facilitate Distributions under this Plan.

1.1.34 "Distribution" means any distribution of Cash by the Disbursing Agent to a Holder of an Allowed Claim or Interest on account of such Claim or Interest.

1.1.35 "District Court" means the United States District Court for the District of New Jersey.

1.1.36 "Effective Date" means the date specified by the Debtors in a Filed notice as the date on which this Plan shall take effect, which date shall be not more than ten (10) Business Days after the date on which the conditions to the Effective Date provided for in this Plan have been satisfied or waived by the Debtors.

1.1.37 "Entity" means "entity" as defined in section 101(15) of the Bankruptcy Code.

1.1.38  "Estate" means, with regard to each Debtor, the estate that was created by the commencement by a Debtor of a Bankruptcy Case pursuant to section 541 of the Bankruptcy Code, and shall be deemed to include any and all rights, powers, and privileges of such Debtor and any and all interests in property, whether real, personal or mixed, rights, Causes of Action, avoidance powers or extensions of time that such Debtor or such Estate shall have had as of the commencement of the Bankruptcy Case, or which such Estate acquired after the commencement of the Bankruptcy Case.

1.1.39 "Exculpated Claim" means any Claim related to any act or omission in connection with, relating to, or arising out of the Debtors' restructuring, the Bankruptcy Cases, formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the settlement of Claims or renegotiation of any Executory Contract or Unexpired Lease, the negotiation of the Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or Plan, the filing of the

Bankruptcy Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration, consummation, and implementation of the Plan, the distribution of property under the Plan, or any transaction contemplated by the Plan or Disclosure Statement, or in furtherance thereof.

1.1.40 "Exculpated Parties" means, collectively, each of the following in their respective capacities as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Plan Sponsor; and (d) with respect to each of the Entities identified in subsections (a)-(c) herein, such Entity's respective predecessors, successors and assigns, and current and former stockholders, shareholders, equity holders, members, limited partners, general partners, equity holders, principals, partners, managed funds, parents, members, employees, agents, officers, directors, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants.

1.1.41 "Executory Contract or Unexpired Lease" means all executory contracts and unexpired leases to which any of the Debtors are a party.

1.1.42 "File," "Filed," or "Filing" means file, filed, or filing with the Bankruptcy Court in the Bankruptcy Cases.

1.1.43 "Final Distribution" means the Distribution by the Disbursing Agent upon which each Holder of an Allowed Claim in Classes 1, 2, 3, 4, 5 and 6 under this Plan shall have received all Distributions each such Holder is entitled to receive under Article III of this Plan.

1.1.44 "Final Order" means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, is in full force and effect, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order; provided, further, that the Debtors or Reorganized Debtors, as applicable, reserve their right to waive any appeal period for an order or judgment to become a Final Order.

1.1.45 "General Unsecured Claim" means any Unsecured Claim other than (a) a SIR Rejection Damage Claim, (b) a Technicolor Indemnification Claim, (c) a Workers' Compensation Insurance Claim, or (d) an Intercompany Claim.

1.1.46 "GUC Distribution Amount" means $250,000.

1.1.47 "Hanover Lease" means that certain Lease dated September 24, 2008 (together with all amendments, assignments, consents to assignment, exhibits, and/or

supplements thereto) between CGI (as successor in interest of the "Lessee" under the Lease) and SIR Properties Trust (as successor in interest of the "Lessor" under the Lease), for the Hanover Premises.

1.1.48 "Hanover Premises" means the "Premises" as defined in the Hanover Lease.

1.1.49  "Holder" means a holder of a Claim or Interest, as applicable.

1.1.50 "Huntsville Lease" means that certain Lease dated August 31, 2012 (together with all amendments, assignments, consents to assignment, exhibits, and/or supplements thereto) between CGI, as "Lessee," and SIR Properties Trust, as "Lessor," for the Huntsville Premises.

1.1.51 "Huntsville Premises" means the "Premises" as defined in the Huntsville Lease.

1.1.52 "Huntsville Sublease" means that certain Sublease between CGI and Technicolor Southeast, dated November 12, 2015.

1.1.53 "Impaired" or "Impairment" shall have the meaning ascribed to such term in section 1124 of the Bankruptcy Code.

1.1.54 "Insider" shall have the meaning set forth in section 101(31) of the Bankruptcy Code.

1.1.55 "Intercompany Claim" means a Claim (a) held by any Debtor against another Debtor or (b) any non-Debtor Affiliate against any of the Debtors, including in each case, for the avoidance of doubt, all prepetition and post-petition Claims.

1.1.56 "Interest" means common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in a Debtor (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in such Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, including any claims against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

1.1.57 "Lien" has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.1.58 "Olyphant First Mortgage" means a mortgage on the Olyphant Property to be granted by CPG to the Plan Sponsor on the Effective Date to secure repayment of the Plan Funding Amount to the Plan Sponsor.

1.1.59 "Olyphant Lease" means that certain Lease dated November 12, 2015 (together with all amendments, assignments, consents to assignment, exhibits, and/or

supplements thereto) between CPG, as "Lessor," and Technicolor Southeast, as "Lessee," for the Olyphant Premises.

1.1.60 "Olyphant Premises" means the "Premises" as defined in the Olyphant Lease.

1.1.61 "Olyphant Premises Surrender Conditions" means:

Technicolor Southeast shall peaceably and quietly surrender the Olyphant Premises to CPG free of all personal property of Technicolor Southeast (except as expressly set forth herein) and any Lessee Representative (as defined in the Olyphant Lease), meaning solely that Technicolor Southeast shall remove all personal property including, but not limited to, manufacturing, mastering, replication, printing and/or packaging equipment of Technicolor Southeast and any Lessee Representative located at the Olyphant Premises. With respect to removal of such equipment, Technicolor Southeast's obligation shall be only to (in addition to physically removing the equipment): (a) disconnect the electrical cabling and wires therefrom, turn off power to such equipment at the nearest breaker and pull such cabling and wires into ceiling void, and (b) disconnect the plumbing, tubing and hoses therefrom, shut-off at the nearest shutoff valve and terminate such plumbing, tubing and hoses above the drop-ceiling. Without limitation, Technicolor Southeast shall have no obligation whatsoever to remove or restore any alterations, improvements, additions, fixtures, walls, mezzanines and/or doors.

1.1.62 "Olyphant Property" means that certain real property owned by CPG located at 1400 East Lackawanna Avenue, Olyphant, Pennsylvania, and all plants, buildings, structures, improvements, appurtenances and fixtures (including fixed machinery and fixed equipment) thereon, forming part thereof or benefitting such real property.

1.1.63 "Olyphant Second Mortgage" means a mortgage on the Olyphant Property, which shall be subordinate to the Olyphant First Mortgage except as otherwise provided in Section 6.6 of this Plan, to be granted by CPG or the Reorganized Debtors as applicable to Technicolor on the Effective Date to secure the contingent obligations of (1) the LC Guarantor (as defined in the PSA) under the LC Guarantee (as defined in the PSA), and (2) the Parent (as defined in the PSA), but in the case of the Parent, solely with respect to its guarantee of CGI's obligations under section 4.15(b) of the PSA to reimburse Technicolor for any amounts that are actually drawn on any of the Technicolor Letters of Credit.

1.1.64 "Owned Real Property" means the Olyphant Property and the Tuscaloosa Property.

1.1.65 "Person" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code) or other entity.

1.1.66  "Petition Date" means March 17, 2017.

1.1.67  "Plan" means this *Debtors' Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, as it may be further amended, supplemented or modified from and after the date hereof.

1.1.68  "Plan Funding Amount" means $12,500,000.

1.1.69  "Plan Sponsor" means Com Real Estate 918 LLC, a Delaware limited liability company, which is an Affiliate of the Debtors.

1.1.70  "Plan Supplement" means the compilation of documents, forms of documents, schedules, notices and/or exhibits to this Plan, which the Debtors shall File at least five days prior to commencement of the Confirmation Hearing, as the same may be amended, supplemented, or modified from time to time through and including the Effective Date.

1.1.71  "Priority Claim" means a Claim against any Debtor entitled to priority under the provisions of section 507(a) of the Bankruptcy Code other than an Administrative Expense Claim or a Tax Claim.

1.1.72  "Pro Rata" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class.

1.1.73  "Professional" means any Person retained in the Bankruptcy Cases pursuant to and in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

1.1.74  "Professional Fee Claims" means all Claims for accrued fees and expenses for services rendered and expenses incurred by a Professional from the Petition Date through and including the Effective Date to the extent such fees and expenses have not previously been paid pursuant to an order of the Bankruptcy Court.

1.1.75  "Professional Fee Claims Estimate" means the amount of Professional Fee Claims that are estimated by each Professional retained by the Committee or the Debtors, as applicable, in good faith to be accrued but unpaid as of the Effective Date.

1.1.76  "Professional Fee Escrow" means an escrow account to be funded on the Effective Date in an amount equal to the Professional Fee Claims Estimate.

1.1.77  "Proof of Claim" means a proof of Claim Filed against any of the Debtors in the Bankruptcy Cases.

1.1.78  "PSA" means that certain Purchase and Sale Agreement dated August 10, 2015 by and among Technicolor, as "Buyer," CGI, as "Seller", CAI Holdings, Inc., as "Parent," and Najafi Companies, LLC, as "LOC Guarantor", as amended by that certain Amendment No. 1, dated November 11, 2015.

1.1.79 "Record Date" means the date established in the Confirmation Order or any other Final Order of the Bankruptcy Court for determining the identity of Holders of Allowed Claims and Interests entitled to Distributions under this Plan. If no Record Date is established in the Confirmation Order or any other order of the Bankruptcy Court, then the Record Date shall be the Confirmation Date.

1.1.80 "Reinstated" or "Reinstatement" means: (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest so as to leave such Claim or Interest Unimpaired; or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensating the Holder of such Claim or Interest (other than a Debtor or an Insider) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Interest entitles the Holder.

1.1.81 "Record Holder" means the Holder of a Claim or Interest as of the Record Date.

1.1.82 "Released Parties" means, collectively, in each case solely in their capacity as such: (a) each Debtor, each Debtor's Estate and each Reorganized Debtor; (b) each of the Debtors' current and former officers, directors, and managers; (c) all Affiliates of the Debtors; (d) the Plan Sponsor; and (e) with respect to each of the Entities identified in subsections (a) through (d) herein, each of such Entities' respective predecessors, successors and assigns, and respective current and former stockholders, shareholders, equity holders, members, partners, subsidiaries, principals, managed funds, parents, employees, agents, officers, directors, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, including but not limited to CAI Holdings, Inc., JCIN Holdings, Inc., Najafi Companies, LLC, Jahm Najafi, Tina Rhodes-Hall, Daniel Shum, John Gamero, Emily Tadano, Glenn R. Langberg, Karen Kessler and Joseph Catalano.

1.1.83 "Releasing Parties" means, collectively, in each case solely in their capacity as such: (a) each Debtor, each Debtor's Estate and each Reorganized Debtor; (b) all Holders of Claims against or Interests in the Debtors who are deemed to accept the Plan; (c) all other Holders of Claims who are entitled to vote on the Plan and who do not opt out of the release provided by Section 10.4 of the Plan pursuant to a duly completed ballot submitted prior to the Voting Deadline (except for Technicolor and Technicolor Southeast and each of their respective Affiliates who are not Releasing Parties); (d) SIR Properties Trust; and (e) with respect to each of the Entities identified in subsections (a)-(d) herein, each of such Entities'

respective predecessors, successors and assigns, and respective current and former stockholders, shareholders, equity holders, members, partners, subsidiaries, principals, managed funds, parents, employees, agents, officers, directors, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants.

1.1.84 "Reorganized Debtors" means each of the Debtors, as reorganized pursuant to and under this Plan or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

1.1.85 "Schedules" means the schedules of assets and liabilities Filed in the Bankruptcy Cases by each Debtor, respectively, pursuant to section 521 of the Bankruptcy Code, which incorporate by reference the *Global Notes, Methodology and Specific Disclosures Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs*, as such schedules have been or may be further modified, amended or supplemented from time to time in accordance with Bankruptcy Rule 1009 or Final Orders of the Bankruptcy Court.

1.1.86 "Secured Claim" means a Claim against any Debtor to the extent secured by a Lien on any property of such Debtor to the extent of the value of said property as provided in section 506(a) of the Bankruptcy Code.

1.1.87 "SIR Rejection Damage Claims" means, collectively, all Unsecured Claims of SIR Properties Trust against one or more of the Debtors.

1.1.88 "SIR Setoff Order" means the *Order Granting SIR Properties Trust Relief From the Automatic Stay Pursuant to 11 U.S.C. § 362(d)(1) and Fed. R. Bankr. P. 4001 to Apply and Setoff Security Deposit Pursuant to 11 U.S.C. § 553 and Applicable Non-Bankruptcy Law and Granting Related Relief* [Docket. No. 233].

1.1.89 "SIR Settlement Amount" means (1) if paid in full on or before October 1, 2018, $8,500,000, or (2) if paid in full after October 1, 2018, (a) $8,500,000, plus (b) simple interest at the rate of 8% per annum (computed based on the actual number of days elapsed in a year consisting of 365 days) solely on the portion of such amount that remains unpaid from time to time after October 1, 2018.

1.1.90 "Tax Claim" means any Claim entitled to priority under section 507(a)(8) of the Bankruptcy Code.

1.1.91 "Technicolor" means Technicolor Home Entertainment Services, Inc.

1.1.92 "Technicolor Allowed Claim Amount" means $1,500,000.

1.1.93 "Technicolor Indemnification Claims" means, collectively, all Claims of Technicolor Southeast, Technicolor or their respective Affiliates against one or more of the Debtors, whether on account of indemnification rights, rejection of any Executory Contract or Unexpired Lease or any other matter.

1.1.94 "Technicolor Letters of Credit" means the "Employment-Related Letters of Credit" as defined in the PSA.

1.1.95 "Technicolor Southeast" means Technicolor Home Entertainment Services Southeast, LLC f/k/a CT Acquisition Holdco, LLC.

1.1.96 "Tuscaloosa First Mortgage" means a mortgage or deed of trust on the Tuscaloosa Property to be granted by COI to the Plan Sponsor on the Effective Date to secure repayment of the Plan Funding Amount to the Plan Sponsor.

1.1.97 "Tuscaloosa Property" means that certain real property owned by COI located at 1 JVC Road, Tuscaloosa, Alabama and 2 JVC Road, Tuscaloosa, Alabama, and all plants, buildings, structures, improvements, appurtenances and fixtures (including fixed machinery and fixed equipment) thereon, forming part thereof or benefitting such real property.

1.1.98 "Tuscaloosa Second Mortgage" means a mortgage on the Tuscaloosa Property, which shall be subordinate to the Tuscaloosa First Mortgage, to be granted by COI or the Reorganized Debtors, as applicable, to Technicolor on the Effective Date to secure the contingent obligations of (1) the LC Guarantor (as defined in the PSA) under the LC Guarantee (as defined in the PSA), and (2) the Parent (as defined in the PSA), but in the case of the Parent, solely with respect to its guarantee of CGI's obligations under section 4.15(b) of the PSA to reimburse Technicolor for any amounts that are actually drawn on any of the Technicolor Letters of Credit.

1.1.99 "Unimpaired" means, with respect to a Class of Claims or Interests, any Class that is not Impaired.

1.1.100 "Unpaid Claims Reserve" shall have the meaning ascribed to such term in section 8.4 hereof.

1.1.101 "Unsecured Claim" means a Claim against any Debtor that is not a Secured Claim, Priority Claim, Tax Claim, or Administrative Expense Claim.

1.1.102 "U.S. Trustee Fees" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

1.1.103 "Voting Deadline" means the deadline established by the Bankruptcy Court in the Disclosure Statement Order for voting on the Plan.

1.1.104 "Workers' Compensation Insurance Claim" means a Claim of a workers' compensation insurance carrier, state authority or agency, or third party administrator of workers' compensation claims arising from or relating to workers' compensation claims against, or liabilities of, a Debtor.

1.2 *Time*. Whenever the time for the occurrence or happening of an event as set forth in this Plan falls on a day which is a Saturday, Sunday, or legal holiday under the laws of the United States of America or the State of New Jersey, then the time for the occurrence or happening of said event shall be extended to the next day that is not a Saturday, Sunday, or legal holiday.

## ARTICLE II
### Classification of Claims and Interests

2.1 *Classification of Claims and Interests.* Pursuant to section 1123(a)(1) of the Bankruptcy Code, the classification of Claims and Interests against the Debtors for all purposes of this Plan is set forth below. A Claim or Interest is classified in a particular Class only to the extent the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. Any Class of Claims that does not have at least one Holder eligible to vote as of the Voting Deadline shall be considered vacant, deemed eliminated from this Plan for purposes of voting to accept or reject this Plan, and disregarded for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

| Class | Description | Status | Voting Rights |
|-------|-------------|--------|---------------|
| Class 1 | Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | SIR Rejection Damage Claims | Impaired | Entitled to Vote |
| Class 4 | Technicolor Indemnification Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 6 | Workers' Compensation Insurance Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 7 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 8 | Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

2.2 *Deemed Acceptance of Plan.* Classes 1, 2, 6, 7 and 8 are Unimpaired under this Plan. Accordingly, pursuant to section 1126(f) of the Bankruptcy Code, Classes 1, 2, 6, 7 and 8 are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan.

2.3 *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.* The Debtors will request Confirmation of this Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code with respect to any Class that is Impaired and votes to reject this Plan. The Debtors reserve the right to modify this Plan in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

## ARTICLE III
### Treatment of Claims and Interests

3.1 *Class 1—Secured Claims*

3.1.1 Classification: Class 1 consists of all Secured Claims.

3.1.2    Treatment: Except to the extent that a Holder of an Allowed Secured Claim agrees to a less favorable treatment of its Allowed Secured Claim or such Claim is satisfied pursuant to the SIR Setoff Order, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Secured Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, and (ii) the date such Secured Claim becomes Allowed, each Holder of an Allowed Secured Claim shall receive, at the option of the Reorganized Debtors, either:

    (a)    Cash in an amount equal to such Allowed Secured Claim;

    (b)    the proceeds of the sale or disposition of the collateral securing such Allowed Secured Claim to the extent of the value of the Holder's interest in such collateral;

    (c)    the collateral securing such Allowed Secured Claim; or

    (d)    such other treatment rendering such Holder's Allowed Secured Claim Unimpaired including, but not limited to, payment in the ordinary course of business in accordance with the terms of any agreement governing such Allowed Claim.

In the event that the Reorganized Debtors elect to treat an Allowed Secured Claim under clause (a) or (b) of this section 3.1.2, the Liens securing such Claim shall be deemed released without the need for further action.  Upon the occurrence of the Effective Date, SIR Properties Trust shall have an Allowed Secured Claim in the amount of $3,739,382.00, which shall be deemed fully satisfied by the exercise of its setoff rights pursuant to the SIR Setoff Order.

3.1.3    Voting: Class 1 is an Unimpaired Class, and the Holders of Secured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject this Plan.

3.2    *Class 2—Priority Claims*

3.2.1    Classification: Class 2 consists of all Priority Claims.

3.2.2    Treatment: Except to the extent that a Holder of an Allowed Priority Claim agrees to a less favorable treatment of its Allowed Priority Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Claim, on or as soon as reasonably practicable after the later of (a) the Effective Date, or (b) the date such Priority Claim becomes Allowed, each Holder of an Allowed Priority Claim shall receive, at the option of the Reorganized Debtors, either:

    (a)    Cash equal to the full amount of such Allowed Priority Claim; or

    (b)    such other treatment rendering such Holder's Allowed Priority Claim Unimpaired.

3.2.3    Voting: Class 2 is an Unimpaired Class, and the Holders of Priority Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject this Plan.

3.3    *Class 3—SIR Rejection Damage Claims*

3.3.1    Classification: Class 3 consists of the SIR Rejection Damage Claims.

3.3.2    Treatment: The SIR Rejection Damage Claims shall be Allowed in an aggregate amount equal to the SIR Settlement Amount. The SIR Settlement Amount shall be paid in full within 60 days after the Effective Date in full and final satisfaction, settlement, release and discharge of and in exchange for the SIR Rejection Damage Claims.

3.3.3    Voting: Class 3 is an Impaired Class. Pursuant to section 1126 of the Bankruptcy Code, SIR Properties Trust (the sole Holder of Claims in Class 3) is entitled to vote to accept or reject this Plan.

3.4    *Class 4—Technicolor Indemnification Claims*

3.4.1    Classification: Class 4 consists of the Technicolor Indemnification Claims.

3.4.2    Treatment: The Technicolor Indemnification Claims shall be Allowed in the aggregate amount of the Technicolor Allowed Claim Amount.  In full and final satisfaction, settlement, release and discharge of and in exchange for the Technicolor Indemnification Claims, the Technicolor Allowed Claim Amount shall be paid as follows: (a) $1,000,000 shall be paid within 10 days after the Effective Date to Technicolor (the "Technicolor Initial Distribution"), and (b) $500,000 (the "Technicolor Olyphant Distribution", collectively with the Technicolor Initial Distribution, the "Technicolor Distributions") shall be deposited no later than 30 days after the Effective Date in immediately available funds with the Escrow Agent (as defined in Section 6.8 of this Plan) and held and distributed in accordance with the terms of Section 6.8 of this Plan and the Escrow Agreement (as defined in Section 6.8 of this Plan).  In addition, pursuant to Sections 6.6 and 6.7 of this Plan, on the Effective Date, the Olyphant Second Mortgage shall be executed by CPG and delivered to Technicolor, the Tuscaloosa Second Mortgage shall be executed by COI and delivered to Technicolor, and the Olyphant Subordination Agreement (as defined in Section 6.6 of this Plan) shall be executed by Technicolor and the Plan Sponsor.  For the avoidance of doubt, notwithstanding execution and delivery of the Olyphant Second Mortgage and the Tuscaloosa Second Mortgage, under no circumstance shall the Technicolor Indemnification Claims be Allowed in an amount greater than the Technicolor Allowed Claim Amount.

3.4.3    Voting: Class 4 is an Impaired Class. Pursuant to section 1126 of the Bankruptcy Code, Technicolor Southeast (the sole Holder of a Claim in Class 4) is entitled to vote to accept or reject this Plan.

3.5    *Class 5—General Unsecured Claims*

3.5.1    Classification: Class 5 consists of all General Unsecured Claims.

3.5.2    Treatment: Except to the extent a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed General Unsecured Claim, each Holder thereof shall receive such Holder's Pro Rata share of Cash in the amount of the GUC Distribution Amount, which shall be paid by the Debtors on or before the Effective Date into a segregated bank account for the benefit of Holders of Allowed General Unsecured Claims, and from which Distributions shall be made as soon as practicable after the date on which all General Unsecured Claims are either Allowed or Disallowed.

3.5.3    Voting: Class 5 is an Impaired Class. Pursuant to section 1126 of the Bankruptcy Code, each Holder of a Claim in Class 5 is entitled to vote to accept or reject this Plan.

3.6    *Class 6—Workers' Compensation Insurance Claims*

3.6.1    Classification: Class 6 consists of all Workers' Compensation Insurance Claims.

3.6.2    Treatment: On the Effective Date, all Allowed Workers' Compensation Insurance Claims shall be Reinstated.

3.6.3    Voting: Class 6 is an Unimpaired Class, and the Holders of Workers' Compensation Insurance Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject this Plan.

3.7    *Class 7—Intercompany Claims*

3.7.1    Classification: Class 7 consists of all Intercompany Claims.

3.7.2    Treatment:  On the Effective Date, all net Allowed Intercompany Claims (taking into account any setoffs of Intercompany Claims) shall, at the election of the Reorganized Debtors, be either (i) Reinstated, or (ii) released, waived, and discharged without any Distribution on account of such Claims.

3.7.3    Voting: Class 7 is an Unimpaired Class, and the Holders of Intercompany Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  In addition, Holders of Intercompany Claims, as proponents of this Plan, are deemed to accept this Plan.  Therefore, the Holders of Intercompany Claims are not entitled to vote to accept or reject this Plan.

3.8    *Class 8—Interests*

3.8.1    Classification: Class 8 consists of all Interests in a Debtor.

3.8.2    Treatment: On the Effective Date, Allowed Interests shall be Reinstated and shall not be discharged, canceled, released, extinguished or otherwise altered as a result of or by this Plan.

3.8.3   Voting: Class 8 is an Unimpaired Class, and the Holders of Interests are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject this Plan.

3.9   *No Waiver of Defenses.*  Except as otherwise provided in this Plan, nothing in this Plan is intended to or shall affect the Debtors' or Reorganized Debtors' rights and defenses in respect of any Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against such Claims.

## ARTICLE IV
## Treatment of Unclassified Claims

4.1   *Summary.*  Pursuant to section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims (including Professional Fee Claims) and Tax Claims against the Debtors are not classified for purposes of voting on, or receiving Distributions under, this Plan. All such Claims are instead treated separately in accordance with this Article IV and in accordance with the requirements set forth in sections 1129(a)(9)(A) and (C) of the Bankruptcy Code.

4.2   *Administrative Expense Claims.*

4.2.1   Unless otherwise agreed to by the Holder of an Allowed Administrative Expense Claim or Allowed Professional Fee Claim and the Debtors or Reorganized Debtors, as applicable, to the extent an Allowed Administrative Expense Claim or an Allowed Professional Fee Claim has not already been paid in full or otherwise satisfied during the Bankruptcy Cases, each Holder of an Allowed Administrative Expense Claim and/or Allowed Professional Fee Claim will receive, in full and final satisfaction of its Allowed Administrative Expense Claim and/or Allowed Professional Fee Claim, Cash equal to the amount of the unpaid portion of such Allowed Administrative Expense Claim and/or Allowed Professional Fee Claim either: (1) if such Administrative Expense Claim and/or Professional Fee Claim is Allowed as of the Effective Date, no later than thirty (30) days after the Effective Date or as soon as reasonably practicable thereafter; (2) if such Administrative Expense Claim and/or Allowed Professional Fee Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which such Administrative Expense Claim is Allowed; or (3) if an Administrative Expense Claim (other than a Professional Fee Claim) is based on liabilities incurred by the Debtors' Estates in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Expense Claim, without any further action by the Holder of such Administrative Expense Claim.

4.2.2   **Except as otherwise provided in this Plan, any Person holding an Administrative Expense Claim (other than a Professional Fee Claim) shall File a request for payment of such Administrative Expense Claim and serve a copy thereof upon the Reorganized Debtors no later than the Administrative Expense Claims Bar Date. Any Person who is required but fails to timely File and serve a request for payment of an Administrative Expense Claim on or before the Administrative Expense Claims Bar Date shall be forever barred from seeking payment of such Administrative Expense Claim by the Debtors, their Estates or the Reorganized Debtors, and such Administrative Expense Claim shall be deemed discharged as of the Effective Date.  Any objection to a request for**

**payment of an Administrative Expense Claim must be Filed and served on the requesting party on or before the Claims Objection Deadline.**

4.2.3    Any Person seeking allowance by the Bankruptcy Court of a Professional Fee Claim shall File a final application for allowance of such Professional Fee Claim within sixty (60) days after the Effective Date. The provisions of this paragraph shall not apply to any Person providing services to the Debtors as an "ordinary course professional" that, pursuant to a Final Order, is not required to File fee applications.

4.2.4    As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors or Reorganized Debtors shall establish and fund the Professional Fee Escrow.  The Debtors or Reorganized Debtors shall fund the Professional Fee Escrow with Cash equal to the Professional Fee Claims Estimate. Funds held in the Professional Fee Escrow shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors, but shall revert to the Reorganized Debtors only after all Professional Fee Claims allowed by the Bankruptcy Court have been irrevocably paid in full. The Professional Fee Escrow shall be held in trust for Professionals retained by the Committee or the Debtors and for no other parties until all Professional Fee Claims Allowed by the Bankruptcy Court have been paid in full. Professional Fees owing to the applicable Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; provided, that obligations with respect to Professional Fee Claims shall not be limited nor deemed limited to the balance of funds held in the Professional Fee Escrow. No Liens, claims, or interests shall encumber the Professional Fee Escrow in any way.

4.3    *Tax Claims.*  Except to the extent that a Holder of an Allowed Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Tax Claim, each Holder of such Allowed Tax Claim shall receive Cash in an amount equal to such Allowed Tax Claim as soon as reasonably practicable after the later of the Effective Date and the date such Claim becomes Allowed. Notwithstanding the foregoing, the Reorganized Debtors reserve the right to treat any Allowed Tax Claim in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

4.4    *Post-Effective Date Fees and Expenses.*  Except as otherwise specifically provided in this Plan, on and after the Effective Date, the Reorganized Debtors may employ and pay the reasonable fees and expenses of any professional or advisor in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court. Upon the Effective Date, any requirement that Professionals engaged by the Debtors comply with sections 327 through 331 of the Bankruptcy Code or any order governing interim compensation of Professionals in the Bankruptcy Cases in seeking retention or compensation for services rendered after such date will terminate.

## ARTICLE V
### Treatment of Executory Contracts and Unexpired Leases

5.1    *Executory Contracts and Unexpired Leases.*  On the Effective Date, all Executory Contracts or Unexpired Leases of the Debtors will be deemed rejected in accordance with

sections 365 and 1123(b)(2) of the Bankruptcy Code, except those Executory Contracts or Unexpired Leases that (a) have been previously rejected or assumed by a Debtor pursuant to an order of the Bankruptcy Court, (b) are the subject of a motion to assume Filed by the Debtors which is pending on the Effective Date, (c) are designated by the Debtors in an Assumption Notice as Executory Contracts or Unexpired Leases that are to be assumed by the Debtors effective as of the Effective Date, or (d) are director and officer liability insurance policies that are to be assumed by the Debtors pursuant to Section 6.24 of this Plan.   Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections or assumptions, as applicable, pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code.

**5.2    *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*  All Proofs of Claim with respect to Claims arising from the rejection pursuant to this Plan of any Executory Contracts or Unexpired Leases, if any, must be Filed and served upon the Reorganized Debtors within thirty (30) days after the Effective Date.  Any Claims arising from the rejection of Executory Contracts or Unexpired Leases that become Allowed Claims are classified and shall be treated as Class 5 General Unsecured Claims. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to this Plan not Filed within the time required by this Section will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates and property of the Debtors and Reorganized Debtors unless otherwise ordered by the Bankruptcy Court or provided in this Plan. Notwithstanding the foregoing, a Claim for damages arising from the rejection of an Executory Contract or Unexpired Lease rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date must be Filed prior to any deadline set forth in such order.**

5.3    *Cure of Defaults for Executory Contracts or Unexpired Leases Assumed by the Debtors.*  Any monetary defaults under each Executory Contract or Unexpired Lease to be assumed pursuant to this Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount specified in an Assumption Notice in Cash within 30 days after the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding: (1) the amount of any payments to cure such a default; (2) the ability of the Debtors or Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption, the cure amount required by section 365(b)(1) of the Bankruptcy Code shall be paid following the entry of a Final Order or orders resolving the dispute and approving the assumption; provided, that the Debtors or Reorganized Debtors, as applicable, may settle any dispute regarding assumption of an Executory Contract or Unexpired Lease without any further notice to any other party or any action, order, or approval of the Bankruptcy Court; provided, further, that, notwithstanding anything to the contrary herein, prior to the entry of a Final Order resolving any dispute and approving the assumption and assignment of an Executory Contract or Unexpired Lease, the Debtors or Reorganized Debtors, as applicable, reserve the right to reject any such Executory Contract or Unexpired Lease which is subject to dispute, whether by amending an Assumption Notice to remove any such Executory Contract or Unexpired Lease or withdrawing an Assumption Notice. The Debtors shall serve a copy of any Assumption Notice on the

applicable counterparties to any Executory Contract or Unexpired Lease designated for assumption therein.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served, and actually received by the Debtors or Reorganized Debtors, as applicable, no later than thirty (30) days after service of the Assumption Notice.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to a proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.  Assumption of any Executory Contract or Unexpired Lease pursuant to this Plan shall constitute the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of such assumption. **Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice, action, order, or approval of the Bankruptcy Court.**

5.4    *Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases.*  Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such Executory Contract or Unexpired Lease.

5.5    *Survival of Certain Indemnification Obligations.*  Notwithstanding any other provision of this Plan, the obligations of the Debtors pursuant to their certificates or articles of incorporation, bylaws and other organizational documents to indemnify persons serving after the Petition Date as officers, directors, agents, or employees of the Debtors with respect to actions, suits and proceedings against the Debtors or such officers, directors, agents, or employees, based upon any act or omission for, on behalf of, or relating to the Debtors and occurring prior to or after the Petition Date, shall not be discharged or impaired by Confirmation of the Plan and shall continue to be obligations of the Debtors and Reorganized Debtors, as applicable, from and after the Confirmation Date.

5.6    *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*  Modifications, amendments, supplements, and restatements to a prepetition Executory Contract or Unexpired Lease that have been executed by the Debtors during the Bankruptcy Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

5.7    *Contracts and Leases Entered Into After the Petition Date.*  Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contract or Unexpired Lease assumed by such Debtor, will be performed by the applicable Debtor or Reorganized Debtor in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contract or Unexpired Lease) will survive and remain unaffected by entry of the Confirmation Order.

5.8    *Reservation of Rights.*  Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on an Assumption Notice, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Debtors has any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of

assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Effective Date.

## ARTICLE VI
## Means for Implementation of the Plan

6.1     *General Settlement of Claims.*   Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, allowance of Claims, distributions, releases and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan will constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to this Plan.

6.2     *Substantive Consolidation.*   This Plan shall serve as a motion by the Debtors seeking entry of an order substantively consolidating each of the Estates of the Debtors into a single consolidated Estate solely for the purposes of voting and Distributions under this Plan. On and after the Effective Date, solely for the purpose of Distributions under this Plan, (1) all assets and liabilities of the substantively consolidated Debtors will be deemed to be merged, (2) the obligations of each Debtor will be deemed to be the obligation of the substantively consolidated Debtors, (3) any Claims filed or to be filed in connection with any such obligations will be deemed Claims against the substantively consolidated Debtors, (4) each Claim filed in the Bankruptcy Case of any Debtor will be deemed filed against the Debtors in the consolidated Bankruptcy Cases in accordance with the substantive consolidation of the assets and liabilities of the Debtors, (5) all transfers, disbursements and distributions made under this Plan will be deemed to be made by the substantively consolidated Debtors, and (6) all guarantees by a Debtor of the obligations of any other Debtor and any joint or several liability of any of the Debtors shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the substantively consolidated Debtors. Holders of Allowed Claims in each Class shall be entitled to their share of Distributions to such Class without regard to which Debtor was originally liable for such Claim.

The substantive consolidation effected pursuant to this Section shall not (other than for purposes related to funding Distributions under the Plan) result in the merger or otherwise affect the separate legal existence of each Debtor, and shall not affect (1) defenses to any Claims and/or Causes of Action or requirements for any third party to establish mutuality in order to assert a right to setoff under section 553 of the Bankruptcy Code, (2) distributions out of any insurance policies or proceeds of such policies, (3) executory contracts or unexpired leases that were entered into during the Bankruptcy Cases or that have been or will be assumed or rejected, or (4) the Reorganized Debtors' ability to subordinate or otherwise challenge Claims on an entity by entity basis.

6.3     *Continued Corporate Existence.*   Each Debtor, as reorganized, will continue to exist after the Effective Date as a separate corporate entity with all the powers of a corporation under applicable law in the jurisdiction in which it is incorporated or otherwise formed and pursuant to its certificate or articles of incorporation and bylaws or other organizational

documents in effect prior to the Effective Date, except to the extent such articles of incorporation and bylaws or other organizational documents are amended by this Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Consummation Date.

6.4    *Revesting of Assets*.    Except as otherwise provided in this Plan or the Confirmation Order, on the Effective Date, all assets and property of the respective Debtors and their Estates (including all Causes of Action unless otherwise released pursuant to this Plan, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall automatically vest in each respective Reorganized Debtor, free and clear of all Claims, Liens, encumbrances, charges and other interests.

6.5    *Exit Financing*.    On the Effective Date, the Debtors shall be and are authorized to borrow the Plan Funding Amount from the Plan Sponsor, and CPG and COI, as applicable, shall be and are authorized to execute and deliver the Olyphant First Mortgage and the Tuscaloosa First Mortgage to the Plan Sponsor.    On the Effective Date, the Debtors shall be and are further authorized to execute and deliver any related loan documents, and to execute, deliver, file, record and issue any other notes, guarantees, deeds of trust, security agreements, documents, amendments to the foregoing, or agreements in connection therewith, in each case without further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.    Substantially final forms of the Olyphant First Mortgage and the Tuscaloosa First Mortgage shall be included in the Plan Supplement.    The Plan Funding Amount shall accrue simple interest from and after the Effective Date at the rate of 8% per annum (computed based on the actual number of days elapsed in a year consisting of 365 days) on the outstanding balance and shall be repayable to the Plan Sponsor upon, and from the net proceeds of, any sale of Owned Real Property.    The accrued interest shall be paid to the Plan Sponsor on a monthly basis in arrears on the first Business Day of each month commencing with the first Business Day occurring subsequent to the first full calendar month after the Effective Date.    In the event of a default in payment of interest when due, the interest rate on the outstanding balance of the Plan Funding Amount shall increase to 12% per annum (computed based on the actual number of days elapsed in a year consisting of 365 days) until such time as the default is cured.

6.6    *Olyphant Second Mortgage and Olyphant Subordination Agreement*.    On the Effective Date, CPG and the Reorganized Debtors, as applicable, shall be and are authorized to execute and deliver the Olyphant Second Mortgage to Technicolor, and to execute, deliver, file, record and issue any other notes, guarantees, deeds of trust, security agreements, documents, amendments to the foregoing, or agreements in connection therewith, including the Olyphant Subordination Agreement (as defined below), in each case without further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.    A substantially final form of the Olyphant Second Mortgage shall be included in the Plan Supplement, which Olyphant Second Mortgage shall be acceptable to Technicolor, the Debtors and the Plan Sponsor, and so approved by Technicolor, the Debtors and the Plan Sponsor at least 3 days prior to the Voting Deadline.    The Olyphant Second Mortgage shall be in an amount equal to the aggregate sum of the face amount of the Technicolor Letters of Credit that remain outstanding as of the Effective Date and shall be automatically reduced, dollar for dollar, if, as, and when the face amount of any of the

Technicolor Letters of Credit outstanding is reduced or cancelled (in each case, other than as the result of a draw on a letter of credit by the beneficiary thereof).

The Olyphant First Mortgage shall be subject and subordinate in all respects to the liens and terms of the Olyphant Second Mortgage with respect to an amount equal to, but not to exceed, the lesser of (i) $250,000, and (ii) the aggregate sum of the face amount of the Technicolor Letters of Credit that remain outstanding at any time, in accordance with the terms of a subordination agreement between Technicolor and the Plan Sponsor (the "Olyphant Subordination Agreement"). A substantially final form of the Olyphant Subordination Agreement shall be included in the Plan Supplement, which Olyphant Subordination Agreement shall be acceptable to Technicolor and the Plan Sponsor, and so approved by Technicolor and the Plan Sponsor at least 3 days prior to the Voting Deadline. The Olyphant Subordination Agreement shall be self-operative and no further instrument of subordination shall be required. If requested, however, CPG, the Reorganized Debtors or the Plan Sponsor shall execute, deliver, file, record and issue such further instruments as are reasonably necessary to effectuate this subordination. In the event of a draw on a Technicolor Letter of Credit on or after the Effective Date, Technicolor shall provide notice and evidence thereof to the Reorganized Debtors, the Plan Sponsor and Najafi Companies, LLC at least forty-five (45) days prior to taking any action seeking to exercise or enforce any rights or remedies under the Olyphant Second Mortgage and/or the Olyphant Subordination Agreement.

6.7     *Tuscaloosa Second Mortgage.*  On the Effective Date, COI and the Reorganized Debtors, as applicable, shall be and are authorized to execute and deliver the Tuscaloosa Second Mortgage to Technicolor, and to execute, deliver, file, record and issue any other notes, guarantees, deeds of trust, security agreements, documents, amendments to the foregoing, or agreements in connection therewith, in each case without further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. A substantially final form of the Tuscaloosa Second Mortgage shall be included in the Plan Supplement, which Tuscaloosa Second Mortgage shall be acceptable to Technicolor, the Debtors and the Plan Sponsor, and so approved by Technicolor, the Debtors and the Plan Sponsor at least 3 days prior to the Voting Deadline. The Tuscaloosa Second Mortgage shall be in an amount equal to the aggregate sum of the face amount of the Technicolor Letters of Credit that remain outstanding as of the Effective Date and shall be automatically reduced, dollar for dollar, if, as, and when the face amount of any of the Technicolor Letters of Credit outstanding is reduced or cancelled (in each case, other than as the result of a draw on a letter of credit by the beneficiary thereof). In the event of a draw on a Technicolor Letter of Credit on or after the Effective Date, Technicolor shall provide notice and evidence thereof to the Reorganized Debtors, the Plan Sponsor and Najafi Companies, LLC at least forty-five (45) days prior to taking any action seeking to exercise or enforce any rights or remedies under the Tuscaloosa Second Mortgage.

6.8     *The Olyphant Exit, Technicolor Olyphant Distribution, and the Escrow Agreement.*  Technicolor Southeast shall vacate the Olyphant Premises and surrender the Olyphant Premises to CPG solely in accordance with the Olyphant Premises Surrender Conditions (the "Olyphant Exit Obligations") on or before June 30, 2019 or such later date as may be agreed upon by Technicolor Southeast and the Debtors or Reorganized Debtors (the "Olyphant Exit Deadline"); provided, however, that in the event the Effective Date occurs after

March 31, 2019, the Olyphant Exit Deadline shall be automatically extended to the date that is 90 days after occurrence of the Effective Date.  The Olyphant Exit Obligations are contingent upon the deposit of the Technicolor Olyphant Distribution with the Escrow Agent as set forth in section 3.4.2 of this Plan.  The Technicolor Olyphant Distribution shall be deposited no later than 30 days after the Effective Date in immediately available funds with an escrow agent acceptable to the Debtors and Technicolor Southeast (the "Escrow Agent"), to be held in an interest bearing account in accordance with the terms of the Escrow Agreement (the "Escrow Agreement") to be entered into by and among the Escrow Agent, Technicolor Southeast and the Debtors no later than 30 days after the Effective Date.  A substantially final form of the Escrow Agreement shall be included in the Plan Supplement, which Escrow Agreement shall be acceptable to Technicolor Southeast and the Debtors, and so approved by Technicolor Southeast and the Debtors at least 3 days prior to the Voting Deadline.  The Technicolor Olyphant Distribution shall be released in accordance with the terms of this Plan and the Escrow Agreement, which shall provide (without other conditions) for immediate release of the full Technicolor Olyphant Distribution to Technicolor Southeast upon the date that a certification (the "Olyphant Exit Certification") signed by a duly-authorized representative of Technicolor Southeast is delivered to the Escrow Agent and the Debtors or Reorganized Debtors stating that Technicolor Southeast has complied with the Olyphant Exit Obligations on or before the Olyphant Exit Deadline.  The Escrow Agreement shall further provide that if (a) the Technicolor Olyphant Distribution is deposited in escrow as provided for herein, (b) the Debtors and Reorganized Debtors have not intentionally impeded Technicolor Southeast's exit of the Olyphant Premises, and (c) the Olyphant Exit Certification is not delivered to the Escrow Agent and the Debtors or Reorganized Debtors on or before the Olyphant Exit Deadline, the Technicolor Olyphant Distribution shall be forfeited and forever waived by Technicolor Southeast and instead irrevocably released to the Reorganized Debtors.  If the Olyphant Exit Deadline is extended by agreement of Technicolor Southeast and the Debtors or Reorganized Debtors, Technicolor Southeast and the Debtors or Reorganized Debtors shall jointly notify the Escrow Agent of such extension.  The Debtors and the Reorganized Debtors shall provide reasonable cooperation in connection with any reasonable request for assistance made by Technicolor Southeast in connection with Technicolor Southeast's exit of the Olyphant Premises and shall not intentionally impede such exit; provided, however, that compliance with any such request by Technicolor Southeast for assistance shall not include the expenditure or incurrence of any out-of-pocket costs by the Debtors or Reorganized Debtors, unless otherwise reasonably agreed upon by Technicolor Southeast and the Debtors or Reorganized Debtors.  Technicolor Southeast shall continue to permit CPG and its authorized representatives access to the Olyphant Premises in accordance with the terms of Paragraph 13 of the Olyphant Lease, or as otherwise agreed between the parties, until the Olyphant Lease Termination Date (as defined in Section 6.9 of this Plan).

6.9    *The Olyphant Termination Agreement*.  The form of an agreement terminating the Olyphant Lease (the "Olyphant Lease Termination Agreement") shall be agreed to by and between Technicolor Southeast and CPG at least 3 days prior to the Voting Deadline and shall be executed by Technicolor Southeast and CPG and delivered to the Escrow Agent no later than 30 days after the Effective Date and held in accordance with the Escrow Agreement. The Olyphant Lease Termination Agreement shall be released from escrow and made effective immediately upon the earlier of (i) the Escrow Agent's and the Debtors or Reorganized Debtors receipt of the Olyphant Exit Certification and Technicolor Southeast's receipt of the Technicolor Olyphant Distribution, or (ii) occurrence of the Olyphant Exit Deadline without delivery of the Olyphant

Exit Certification to the Escrow Agent and the Debtors or Reorganized Debtors; provided the Technicolor Olyphant Distribution was previously deposited in escrow as provided for herein (in either case the "Olyphant Lease Termination Date").  For clarification, the Escrow Agreement shall reflect the foregoing.  The Olyphant Lease Termination Agreement shall provide that CPG shall accept the Olyphant Premises, and Technicolor Southeast's surrender thereof, on the Olyphant Lease Termination Date in its "as is" and "where is" condition without warranty of any kind, express or implied, including, without limitation, any warranty as to title or physical condition.  This Section shall negate any lease termination notice required under the Olyphant Lease.  From and after the date this Plan is filed with the Bankruptcy Court and until the Olyphant Lease Termination Date, Technicolor Southeast shall (i) bring current (to the extent unpaid) and continue to pay all costs of insurance, taxes, utilities, regular rubbish removal, lawn maintenance, snow removal, and rent as required by the Olyphant Lease, (ii) maintain existing alarm and/or security systems at the Olyphant Premises, (iii) use commercially reasonable efforts to mitigate (on a temporary basis until the Olyphant Lease Termination Date) any condition of the Olyphant Premises causing significant physical damage to the Olyphant Premises that comes to Technicolor Southeast's attention during such period, and (iv) promptly notify the Debtors or Reorganized Debtors of any such condition and Technicolor Southeast's commercially reasonable efforts to mitigate such condition during such period (collectively the "Interim Olyphant Obligations").  Technicolor Southeast's share of taxes for the Olyphant Premises for the year in which the Olyphant Lease is terminated shall be prorated based on the portion of the tax year that the Olyphant Lease is in effect, and Technicolor Southeast shall be credited or charged, as the case may be, consistent with the foregoing (the "Olyphant Tax Proration").  In the event the Olyphant Lease Termination Agreement is made effective as a result of occurrence of the Olyphant Exit Deadline without delivery of the Olyphant Exit Certification to the Escrow Agent, Technicolor Southeast shall be deemed to be holding over beyond the term of the Olyphant Lease and shall be subject to eviction or ejectment from the Olyphant Premises under applicable law.

Technicolor Southeast shall provide the Debtors or Reorganized Debtors sixty (60) days' prior written notice of its intention to vacate and surrender the Olyphant Premises.  Technicolor Southeast shall have the option to vacate the Olyphant Premises and surrender the Olyphant Premises to CPG solely in accordance with the Olyphant Premises Surrender Conditions by providing the Debtors or Reorganized Debtors sixty (60) days' prior written notice of its intention to vacate and surrender the Olyphant Premises, in which case the Olyphant Lease Termination Date shall occur effective upon the later of (i) the date that is sixty (60) days after such written notice is provided to the Debtors or Reorganized Debtors, and (ii) the date Technicolor Southeast delivers the Olyphant Exit Certification to CPG or the Reorganized Debtors; provided, however, that in no event shall the Olyphant Lease Termination Date occur prior to March 1, 2019.    The Olyphant Lease Termination Agreement and the Escrow Agreement shall reflect the foregoing.  If Technicolor Southeast exercises the foregoing option, the Technicolor Olyphant Distribution shall nevertheless be deposited with the Escrow Agent no later than 30 days after the Effective Date and held in accordance with the Escrow Agreement.

6.10    *Releases Between the Debtors, the Reorganized Debtors, the Released Parties, Technicolor and Technicolor Southeast Relating to the Olyphant Premises*.  Upon Technicolor Southeast's receipt of the Technicolor Olyphant Distribution in accordance with this Plan or Technicolor Southeast's forfeiture and waiver thereof (if applicable) in accordance with Section

6.8 of this Plan, Technicolor and Technicolor Southeast, on behalf of themselves and each of their respective Affiliates, parents, subsidiaries, predecessors, successors and assigns, shall release, and shall be deemed to have released without further action, the Debtors, their Estates, the Reorganized Debtors, the Released Parties, and each of their respective Insiders, parents, subsidiaries, predecessors, successors and assigns, current and former stockholders, shareholders, equity holders, members, limited partners, general partners, partners, principals, managed funds, employees, agents, officers, directors, secretaries, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, solely from any and all claims (as defined in section 101(5) of the Bankruptcy Code), obligations and liabilities relating in any way to the Olyphant Premises (and Olyphant Property) arising under the Olyphant Lease or otherwise, including but not limited to matters related to the maintenance, repair or physical condition of the Olyphant Premises (and Olyphant Property) or any other obligation of the Debtors, the Reorganized Debtors or the Released Parties related to the Olyphant Premises (and Olyphant Property), whether asserted in a Proof of Claim filed by Technicolor, Technicolor Southeast or otherwise, from the beginning of time through the Olyphant Lease Termination Date; except, with respect to the claims, obligations and liabilities related to the Olyphant Tax Proration.

Upon the later of (i) Technicolor Southeast's delivery of the Olyphant Exit Certification in accordance with the Plan on or before the Olyphant Exit Deadline, and (ii) the Effective Date, the Debtors, their Estates, the Reorganized Debtors and the Released Parties, on behalf of themselves and each of their respective Affiliates, parents, subsidiaries, predecessors, successors and assigns, shall release, and shall be deemed to have released without further action, Technicolor and Technicolor Southeast, and each of their respective Insiders, parents, subsidiaries, predecessors, successors and assigns, current and former stockholders, shareholders, equity holders, members, limited partners, general partners, partners, principals, managed funds, employees, agents, officers, directors, secretaries, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, solely from any and all claims (as defined in section 101(5) of the Bankruptcy Code), obligations and liabilities relating in any way to the Olyphant Premises (and Olyphant Property) arising under the Olyphant Lease or otherwise, including but not limited to matters related to the maintenance, repair or physical condition of the Olyphant Premises (and Olyphant Property) or any other obligation of Technicolor or Technicolor Southeast related to the Olyphant Premises (and Olyphant Property),  whether asserted in a Proof of Claim filed by Technicolor, Technicolor Southeast or otherwise, from the beginning of time through the Olyphant Lease Termination Date; except, with respect to the claims, obligations and liabilities related to (i) the Olyphant Premises Surrender Conditions, (ii) the Interim Olyphant Obligations, and (iii) the Olyphant Tax Proration.

The foregoing releases provided for in this Section 6.10 shall be referred to as the "Olyphant Mutual Releases".

6.11   *Releases Between SIR Properties Trust and the Debtors*.  Upon payment in full of the SIR Settlement Amount in accordance with this Plan, SIR Properties Trust, on behalf of itself and its Affiliates, parents, subsidiaries, predecessors, successors and assigns, shall release, and shall be deemed to have released without further action, all causes of action, obligations liabilities, Claims and administrative expenses under section 503(b) of the Bankruptcy Code against the Debtors and their Affiliates, and their respective Insiders, parents, subsidiaries,

predecessors, successors and assigns, current and former stockholders, shareholders, equity holders, members, limited partners, general partners, partners, principals, managed funds, employees, agents, officers, directors, secretaries, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, including but not limited to CAI Holdings, Inc., JCIN Holdings, Inc., Najafi Companies, LLC, the Plan Sponsor, Jahm Najafi, Tina Rhodes-Hall, Glenn R. Langberg, Karen Kessler and Joseph Catalano based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date.

Upon payment in full of the SIR Settlement Amount in accordance with this Plan, the Debtors, on behalf of themselves and their Affiliates, parents, subsidiaries, predecessors, successors and assigns, shall release, and shall be deemed to have released without further action, all causes of action, obligations liabilities and claims (as defined in section 101(5) of the Bankruptcy Code)  against SIR Properties Trust and its Affiliates, and their respective Insiders, parents, subsidiaries, predecessors, successors and assigns, current and former stockholders, shareholders, equity holders, members, limited partners, general partners, partners, principals, managed funds, employees, agents, officers, directors, secretaries, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants based on, relating to, or arising from, in whole or in part, in any manner whatsoever, the Hanover Premises, the Hanover Lease, the Huntsville Premises, the Huntsville Lease, the Consent to Sublease, the Huntsville Sublease, the Debtors, the assets, liabilities, operations or business of the Debtors, or the Bankruptcy Cases, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date.

6.12    *Releases Between SIR Properties Trust and Technicolor.*  Upon payment in full of the SIR Settlement Amount in accordance with this Plan, SIR Properties Trust, Technicolor, Technicolor Southeast, and each of their respective Affiliates, shall release and forever discharge each other, and shall be deemed to have released and forever discharged each other without further action, from any and all claims (as defined in section 101(5) of the Bankruptcy Code), obligations and liabilities relating in any way to the Huntsville Premises arising under the Huntsville Lease, the Huntsville Sublease, the Consent to Sublease or otherwise, including but not limited to matters related to the maintenance, repair or physical condition of the Huntsville Premises or any other obligation of Technicolor or Technicolor Southeast related to the Huntsville Premises, whether asserted in a Proof of Claim filed by SIR Properties Trust, Technicolor, Technicolor Southeast or otherwise, from the beginning of time through the Effective Date.  Nothing in this Section requires SIR Properties Trust, Technicolor or Technicolor Southeast to release each other from, nor does anything in the Section constitute a release of, any claims (as defined in section 101(5) of the Bankruptcy Code), obligations or liabilities first arising, and solely relating to the period of time, *after* the Effective Date, nor does anything in this Section, except as expressly set forth herein, terminate, modify or alter any term or condition set forth in the Huntsville Sublease by and between Technicolor Southeast and SIR Properties Trust by attornment pursuant to the attornment provision contained in the Huntsville Sublease and the Consent to Sublease, which attornment has been recognized by letter dated August 18, 2017 from SIR Properties Trust to Technicolor, nor does anything in this Section, except as expressly set forth herein, terminate, modify or alter any of the representations set forth in the letter dated September 19, 2018 from SIR Properties Trust to Technicolor.

6.13    *Releases Between the Debtors, the Reorganized Debtors, the Released Parties, Technicolor and Technicolor Southeast Relating to the Huntsville Premises.*  Upon payment in full of the Technicolor Initial Distribution in accordance with this Plan, Technicolor and Technicolor Southeast, on behalf of themselves and each of their respective Affiliates, parents, subsidiaries, predecessors, successors and assigns, shall release, and shall be deemed to have released without further action, the Debtors, their Estates, the Reorganized Debtors, the Released Parties, and each of their respective Insiders, parents, subsidiaries, predecessors, successors and assigns, current and former stockholders, shareholders, equity holders, members, limited partners, general partners, partners, principals, managed funds, employees, agents, officers, directors, secretaries, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, solely from any and all claims (as defined in section 101(5) of the Bankruptcy Code), obligations and liabilities relating in any way to the Huntsville Premises arising under the Huntsville Lease, the Huntsville Sublease, the Consent to Huntsville Sublease or otherwise, including but not limited to matters related to the maintenance, repair or physical condition of the Huntsville Premises or any other obligation of the Debtors, the Reorganized Debtors or the Released Parties related to the Huntsville Premises, whether asserted in a Proof of Claim filed by Technicolor, Technicolor Southeast, SIR Properties Trust or otherwise, from the beginning of time through the Effective Date.

Upon payment in full of the Technicolor Initial Distribution in accordance with this Plan, the Debtors, their Estates, the Reorganized Debtors and the Released Parties, on behalf of themselves and each of their respective Affiliates, parents, subsidiaries, predecessors, successors and assigns, shall release, and shall be deemed to have released without further action, Technicolor and Technicolor Southeast, and each of their respective Insiders, parents, subsidiaries, predecessors, successors and assigns, current and former stockholders, shareholders, equity holders, members, limited partners, general partners, partners, principals, managed funds, employees, agents, officers, directors, secretaries, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, solely from any and all claims (as defined in section 101(5) of the Bankruptcy Code), obligations and liabilities relating in any way to the Huntsville Premises arising under the Huntsville Lease, the Huntsville Sublease, the Consent to Huntsville Sublease or otherwise, including but not limited to matters related to the maintenance, repair or physical condition of the Huntsville Premises or any other obligation of Technicolor or Technicolor Southeast related to the Huntsville Premises, whether asserted in a Proof of Claim filed by Technicolor, Technicolor Southeast, SIR Properties Trust or otherwise, from the beginning of time through the Effective Date.

6.14    *Releases Between the Debtors, the Reorganized Debtors, the Released Parties, Technicolor and Technicolor Southeast.*   On and after and subject to the occurrence of the Effective Date and payment in full of the Technicolor Initial Distribution in accordance with section 3.4.2 of this Plan and deposit of the Technicolor Olyphant Distribution with the Escrow Agent in accordance with sections 3.4.2 and 6.8 of this Plan, Technicolor and Technicolor Southeast, on behalf of themselves and each of their respective Affiliates, parents, subsidiaries, predecessors, successors and assigns, shall release and forever discharge, and shall be deemed to have released and forever discharged without further action, each of the Debtors, their Estates, the Reorganized Debtors, and the Released Parties from any and all claims (as defined in section

101(5) of the Bankruptcy Code), obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of any of the Debtors or their Estates), whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the PSA, the Debtors, the Debtors' restructuring, the Bankruptcy Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any claim (as defined in section 101(5) of the Bankruptcy Code) that is treated in this Plan, the business or contractual arrangements between any Debtor and Technicolor or Technicolor Southeast, the restructuring of claims (as defined in section 101(5) of the Bankruptcy Code) prior to or in the Bankruptcy Cases, the negotiation, formulation, or preparation of this Plan, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event or other occurrence relating to the Debtors or the Bankruptcy Cases taking place on and before the later of payment in full of the Technicolor Initial Distribution in accordance with section 3.4.2 of this Plan and deposit of the Technicolor Olyphant Distribution with the Escrow Agent in accordance with sections 3.4.2 and 6.8 of this Plan; except, with respect to (a) the obligations of the LC Guarantor (as defined in the PSA) under the LC Guarantee (as defined in the PSA), and (b) the obligations of the Parent (as defined in the PSA) solely with respect to its guarantee of CGI's obligations under section 4.15(b) of the PSA to reimburse Technicolor for any amounts that are actually drawn on any of the Technicolor Letters of Credit, each of which obligations described under subpart (a) and (b) of this section 6.14 of the Plan shall not be released until each of the Technicolor Letters of Credit are cancelled and/or terminated or those obligations are otherwise satisfied; and except, with respect to the claims (as defined in section 101(5) of the Bankruptcy Code), obligations and liabilities related to the Olyphant Premises and the Olyphant Lease as set forth in the Olyphant Mutual Releases (as defined in section 6.10 of this Plan), which Olyphant Mutual Releases shall only become effective as provided in section 6.10 of this Plan.   Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing release and, further, shall constitute the Bankruptcy Court's finding that the foregoing release is: (1) in exchange for good and valuable consideration; (2) a good faith settlement and compromise of the Claims released by Technicolor and Technicolor Southeast; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to Technicolor and/or Technicolor Southeast asserting any claim or Cause of Action released hereunder.

On and after and subject to the occurrence of the Effective Date and payment in full of the Technicolor Initial Distribution in accordance with section 3.4.2 of this Plan and deposit of the Technicolor Olyphant Distribution with the Escrow Agent in accordance with sections 3.4.2 and 6.8 of this Plan, the Debtors, their Estates, the Reorganized Debtors, and the Released Parties, on behalf of themselves and each of their respective Affiliates, parents, subsidiaries, predecessors, successors and assigns, shall release and forever discharge, and shall be deemed to have released and forever discharged without further action, each of Technicolor and Technicolor Southeast from any and all claims (as defined in section 101(5) of the Bankruptcy Code), obligations, rights, suits, damages, Causes of Action, remedies and liabilities

whatsoever (including any derivative claims, asserted or assertable on behalf of any of the Debtors or their Estates), whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the PSA, the Debtors, the Debtors' restructuring, the Bankruptcy Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any claim (as defined in section 101(5) of the Bankruptcy Code) that is treated in this Plan, the business or contractual arrangements between any Debtor and Technicolor or Technicolor Southeast, the restructuring of claims (as defined in section 101(5) of the Bankruptcy Code) prior to or in the Bankruptcy Cases, the negotiation, formulation, or preparation of this Plan, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event or other occurrence relating to the Debtors or the Bankruptcy Cases taking place on and before the later of payment in full of the Technicolor Initial Distribution in accordance with section 3.4.2 of this Plan and deposit of the Technicolor Olyphant Distribution with the Escrow Agent in accordance with sections 3.4.2 and 6.8 of this Plan; except, with respect to the claims (as defined in section 101(5) of the Bankruptcy Code), obligations and liabilities related to the Olyphant Premises and the Olyphant Lease as set forth in the Olyphant Mutual Releases (as defined in section 6.10 of this Plan), which Olyphant Mutual Releases shall only become effective as provided in section 6.10 of this Plan.   Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing release and, further, shall constitute the Bankruptcy Court's finding that the foregoing release is: (1) in exchange for good and valuable consideration; (2) a good faith settlement and compromise of the Claims released by the Debtors, their Estates, the Reorganized Debtors, and the Released Parties; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to the Debtors, their Estates, the Reorganized Debtors, and/or the Released Parties asserting any claim or Cause of Action released hereunder.

6.15   *Cooperation Between Technicolor and the Reorganized Debtors*.   Within seven (7) Business Days of the filing of this Plan, Technicolor and Technicolor Southeast shall perform a diligent search and, at the election of the Debtors or Reorganized Debtors, as applicable, make available for inspection and copying, turn over and/or provide copies (either electronic or physical) to the Debtors or Reorganized Debtors, as applicable, of any existing building plans, site plans, drawings, surveys, blueprints and any other reports of the Debtors relating to the Owned Real Property (collectively the "Property Plans") in their respective possession, custody or control (it being understood that the Property Plans were "Excluded Assets" under the PSA and that Technicolor and Technicolor Southeast do not believe that they have any Property Plans related to the Tuscaloosa Property).   Technicolor and Technicolor Southeast shall have no liability with respect to the content or substance of the Property Plans. Unless the Debtors or Reorganized Debtors otherwise agree, Technicolor Southeast shall not remove any Property Plans from the Olyphant Premises.

Technicolor and Technicolor Southeast shall provide reasonable cooperation to the Debtors or Reorganized Debtors in responding to requests by the Debtors or Reorganized Debtors for documents and/or information in their respective possession, custody or control

relating to the reconciliation of Claims against the Debtors to the extent such documents and/or information is not reasonably deemed by Technicolor or Technicolor Southeast to be business sensitive to Technicolor or Technicolor Southeast or their Affiliates (e.g., is protected from disclosure by a pre-existing confidentiality agreement).  If requested by the Debtors or Reorganized Debtors, Technicolor or Technicolor Southeast and the Debtors of Reorganized Debtors shall discuss any specific request for any such information, consistent with the foregoing, and if requested by Technicolor or Technicolor Southeast, the Debtors or Reorganized Debtors shall execute a reasonable and customary confidentiality agreement with respect to any such responsive documents and/or information prior to receipt thereof.  Nothing in this Plan shall limit or impair the Debtors' or Reorganized Debtors' legal rights and remedies to obtain any such documents and/or information from Technicolor or Technicolor Southeast.

6.16   *Sources of Distributions*.  The Reorganized Debtors shall fund Distributions and satisfy Allowed Claims under this Plan from (1) the Plan Funding Amount, (2) Cash on hand, including any Cash from operations or from the lease of Owned Real Property, (3) the proceeds of any asset sales, including sales of Owned Real Property, (4) the proceeds of any additional secured or unsecured financing, and (5) capital contributions, if any, received from Najafi Companies, LLC, CAI Holdings, Inc. and/or its parent, affiliates, partners or designees.  For the avoidance of doubt, nothing herein shall require Najafi Companies, LLC, CAI Holdings, Inc., its parent, affiliates, partners or designees to make any capital contributions to the Reorganized Debtors.  Upon the Effective Date, the Reorganized Debtors shall set aside and hold in a reserve funds in an amount that the Reorganized Debtors believe, in their reasonable discretion, may be necessary to satisfy their obligations under this Plan with respect to Workers' Compensation Insurance Claims that the Reorganized Debtors anticipate may become Allowed until all such Claims are either Allowed and satisfied or Disallowed.  The amount of this reserve may be adjusted from time to time in the Reorganized Debtors' reasonable discretion as Workers' Compensation Insurance Claims are Allowed and satisfied or Disallowed.

6.17   *Operation of the Reorganized Debtors*.  From and after the Effective Date, the Reorganized Debtors may operate their business, use, lease, acquire, sell or dispose of any asset, including Owned Real Property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

6.18   *Continuance of Certain Non-Debtor Guarantees*.  The PSA shall remain in effect solely with respect to (i) the obligations of the LC Guarantor (as defined in the PSA) under the LC Guarantee (as defined in the PSA), and (ii) the obligations of the Parent (as defined in the PSA), in each case   solely with respect to its guarantee of CGI's obligations under section 4.15(b) of the PSA to reimburse Technicolor for any amounts that are actually drawn on any of the Technicolor Letters of Credit, until each of the Technicolor Letters of Credit are cancelled and/or terminated or those obligations are otherwise satisfied.

6.19   *Limitation on Distributions to Holders of Intercompany Claims and Interests*. Notwithstanding any other provision of this Plan to the contrary, the Reorganized Debtors shall not make any Distribution to any Holder of a Class 7 Intercompany Claim or Class 8 Interest unless and until each Holder of an Allowed Claim in Classes 1, 2, 3, 4, 5 and 6 shall have received all Distributions such Holder is entitled to receive under Article III of this Plan.

6.20    *Maintenance of Bank Accounts.*  The Reorganized Debtors shall be authorized to continue to use the Debtors' bank accounts that are in existence as of the Effective Date and to open such bank or other depository accounts as may be necessary or appropriate in their discretion to enable them to carry out the provisions of this Plan.

6.21    *Books and Records.*  The Reorganized Debtors shall maintain an adequate set of books, records or databases that will allow the Reorganized Debtors to accurately track the Claims asserted against the Estates and the amounts paid to each Holder of an Allowed Claim pursuant to the terms of this Plan.

6.22    *Directors, Managers, and Officers of the Reorganized Debtors.*  As of the Effective Date, the current officers, directors and managers of the Debtors, as applicable, shall each continue to serve in such capacities for the Reorganized Debtors. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors shall disclose the nature of any compensation to be paid to such Persons in the Plan Supplement.

6.23    *Corporate Action.*  All matters provided for in this Plan involving the legal or corporate structure of each Debtor or Reorganized Debtor, as applicable, and any legal or corporate action required by each Debtor or Reorganized Debtor, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or Reorganized Debtors or any other Person.

All matters provided for in this Plan that would otherwise require approval of the stockholders, directors, managers or members of any Debtor will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, managers or members of such Debtor, or the need for any approvals, authorizations, actions or consents of any Person.

6.24    *Director and Officer Liability Insurance.*  Notwithstanding anything contained in this Plan to the contrary, all director and officer liability insurance policies of the Debtors in effect on the Effective Date shall be continued.  To the extent that such insurance policies are deemed to be executory contracts, then, notwithstanding anything in this Plan to the contrary, the Debtors shall be deemed to have assumed such insurance policies pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of each such unexpired director and officer liability insurance policy.  Notwithstanding anything to the contrary contained in this Plan, Confirmation of this Plan shall not discharge, impair, or otherwise modify any indemnity or other obligations of the insurers under such policies.

6.25    *Preservation of Causes of Action.*  In accordance with section 1123(b)(3) of the Bankruptcy Code, except to the extent a Cause of Action is expressly waived, relinquished or released pursuant to this Plan or a Final Order, the Debtors and Reorganized Debtors shall retain and may (but are not required to) enforce all rights to commence and pursue, as appropriate, any

and all Causes of Action, whether arising before or after the Petition Date, and the Debtors' and Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  After the Effective Date, the Reorganized Debtors, in their sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Causes of Action (or decline to do any of the foregoing), without further approval of the Bankruptcy Court.  The failure of the Debtors to specifically list any claim, right of action, suit, proceeding or other Cause of Action in this Plan does not, and shall not be deemed to, constitute a waiver or release by the Estates or the Debtors of such claim, right of action, suit, proceeding or other Cause of Action, and the Debtors and Reorganized Debtors shall retain the right to pursue such claims, rights of action, suits, proceedings and other Causes of Action in their sole discretion and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such claim, right of action, suit, proceeding or other Cause of Action upon, after, or as a consequence of the Confirmation or consummation of this Plan.

**No Entity may rely on the absence of a specific reference in this Plan or the Disclosure Statement to any Cause of Action against such Entity as any indication that the Debtors and Reorganized Debtors will not pursue any and all available Causes of Action against such Entity. Without limiting the foregoing, except to the extent a Causes of Action is expressly waived, relinquished or released pursuant to this Plan or a Final Order, the Debtors and Reorganized Debtors expressly reserve the right to pursue any and all Causes of Action they may have against any party that has asserted or asserts a Claim against the Debtors, or who may be liable for a Claim asserted against the Debtors by reason of any cross-claim, third party claim, claim for indemnification, reimbursement or contribution, or other Claim of the Debtors against such party on any contractual, legal or equitable grounds.**

6.26   *Effectuating Documents; Further Transactions*.   Each of the Debtors and Reorganized Debtors and their respective officers and designees are authorized to issue, execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents, and to take such actions as may be necessary, desirable or appropriate to effectuate or further evidence the provisions of this Plan or to otherwise comply with applicable law, in each case without further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval, consent or authorization by the security holders, officers or directors of the Debtors or Reorganized Debtors or any other Person.

6.27   *Exemption From Certain Transfer Taxes and Recording Fees*.  Pursuant to and to the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers from a Debtor or Reorganized Debtor to any other Person or any agreement regarding the transfer of title to or ownership of any of the Debtors' or Reorganized Debtors' real or personal property pursuant to or in furtherance of this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, use tax, privilege tax, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order shall direct and be deemed to direct the appropriate federal, state or local governmental officials or

agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) any sale of an asset by the Debtors or Reorganized Debtors in furtherance of this Plan, including but not limited to any sale of personal or real property; (2) the creation or recording of any mortgage, deed of trust, lien or other security interest in or against any asset of the Debtors or Reorganized Debtors in furtherance of this Plan, including, but not limited to, the Olyphant First Mortgage, the Olyphant Second Mortgage, the Tuscaloosa First Mortgage and the Tuscaloosa Second Mortgage; (3) the assumption of any contract, lease or sublease by the Debtors; and (4) any other transaction contemplated or authorized by this Plan.

6.28    *Further Authorization.*  The Reorganized Debtors shall be entitled to seek such orders, judgments, injunctions and rulings as they deem necessary or desirable to carry out the intentions and purposes, and to give full effect to the provisions, of this Plan.

## ARTICLE VII
## Provisions Regarding Corporate Governance of Debtors

7.1    *Amendment of Charters.*  On and as of the Effective Date, the charters of each of the Debtors shall be deemed to have been amended to prohibit the issuance of nonvoting equity securities in accordance with section 1123(a)(6) of the Bankruptcy Code.  After the Effective Date, the Reorganized Debtors may amend and restate their respective certificates or articles of incorporation, bylaws and other organizational documents as permitted by the laws of their respective states of incorporation and such organizational documents.

## ARTICLE VIII
## Distributions

8.1    *Disbursing Agent.*  Unless otherwise provided for herein, all Distributions under this Plan shall be made by the Disbursing Agent.

8.2    *Distributions.*  The Disbursing Agent shall make Distributions to the Holders of Allowed Claims in accordance with the terms of this Plan.  All Distributions pursuant to this Plan shall, in the Disbursing Agent's discretion, be made by check drawn on a domestic bank or by wire transfer from a domestic bank.

8.3    *No Interest on Claims*.  Except as otherwise specifically provided for in this Plan with respect to the SIR Settlement Amount or in the Confirmation Order, post-petition interest shall not accrue or be paid on Claims and no Holder shall be entitled to interest accruing on or after the Petition Date on any Claim.

8.4    *Undeliverable Distributions and Unclaimed Property.*  Distributions to a Holder of an Allowed Claim shall be made by the Disbursing Agent (a) at the address set forth on the Proof of Claim Filed by such Holder, (b) at the address set forth in any written notices of address change delivered to the Debtors or Reorganized Debtors, as applicable, after the date of any related Proof of Claim, (c) at the address set forth in any Filed notice of transfer of Claim, (d) at the address reflected in the Schedules if no Proof of Claim has been Filed and the Debtors have not received a written notice of a change of address, or (e) if the Holder's address is not listed in

-34-

the Schedules, at the last known address of such Holder according to the Debtors' books and records. If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until the Disbursing Agent is notified of such Holder's then-current address. Amounts in respect of undeliverable or uncashed (in the case of a check) Distributions shall be retained by the Disbursing Agent in a reserve  (the "Unpaid Claims Reserve") until such Distributions are claimed or cashed, as the case may be; provided, however, that any Distribution returned as undeliverable to the Disbursing Agent, or not cashed, as the case may be, and not claimed by the Holder entitled to such Distribution within six (6) months after such Distribution is made shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and irrevocably revert to the Reorganized Debtors automatically and without need for further order of the Bankruptcy Court (and any funds held in the Unpaid Claims Reserve on account of such Distribution shall be released to the Reorganized Debtors) notwithstanding any federal or state escheat, abandoned, or unclaimed property laws to the contrary, and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

8.5     *Distributions to Holders as of the Record Date*.  All Distributions on Allowed Claims or Interests shall be made to the Record Holders of such Claims or Interests unless otherwise agreed by the Debtors or Reorganized Debtors and a Record Holder. The Debtors or Reorganized Debtors may, but shall have no obligation to, recognize any transfer of any Claim or Interest occurring after the Record Date. The Debtors or Reorganized Debtors shall instead be entitled to recognize and deal for all purposes under this Plan with the Record Holders as of the Record Date.

8.6     *Required Tax Information.*  To the extent that the Disbursing Agent is required by applicable law to file information returns regarding payments to creditors with taxing authorities including, but not limited to, the Internal Revenue Service, the Disbursing Agent shall request an executed Internal Revenue Service Form W-9 (W-8 for non-US entities and individuals) from each Holder of an Allowed Claim as a condition to making any Distribution with respect such Allowed Claim.  Should any Holder of a Claim not provide the Disbursing Agent with such document within 60 days of a request for a W-9 or W-8, as applicable, then the Disbursing Agent shall provide written notice to such Holder of the failure to provide a W-9 or W-8, as applicable, and 30 additional days to provide such information. Should any Holder of a Claim not timely provide an executed W-9 or W-8, as applicable, within the 90 day period referenced above, the Reorganized Debtors may File an objection to the Claim of such non-responding Holder based on the non-responding Holder's failure to provide the W-9 or W-8 (with all required information) and shall serve the objection on such non-responding Holder via first class mail. If the non-responding Holder of the Claim fails to respond to the objection or fails to provide to the Disbursing Agent the W-9 or W-8, as applicable (with all required information), the Bankruptcy Court may disallow such Claim for all purposes and any Distribution that would have otherwise been made to such Holder shall revert to the Reorganized Debtors. The Holder of such a Disallowed Claim shall be forever barred from pursuing the Reorganized Debtors for payment of such Claim.

8.7     *De Minimis Distributions*.  The Disbursing Agent shall have no obligation to make any Distribution to the Holder of an Allowed Claim if the amount to be distributed to such Holder is less than Fifty Dollars ($50.00).

8.8     *Fractional Dollars*.   Notwithstanding any other provision of this Plan, the Disbursing Agent shall not be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under this Plan would otherwise be called for, the actual payment may, in the discretion of the Disbursing Agent, reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

8.9     *Withholding Taxes*.   The Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under this Plan shall be subject to any such withholding and reporting requirements.

### ARTICLE IX
### Procedures for Treating and Resolving Disputed Claims

9.1     *Objections to Claims*.   The Reorganized Debtors shall have the exclusive right to File objections to any Claim that has not been Allowed by a Final Order or the express terms of this Plan. Any objections to Claims must be Filed by the Claims Objection Deadline.

9.2     *Automatic Disallowance of Certain Claims*.   Any Claim that (a) has been or is hereafter listed in any of the Debtors' respective Schedules at zero or as contingent, unliquidated, or disputed, or (b) is not listed in any of the Debtors' respective Schedules, and, in each case, as to which a Claims Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed pursuant to any Final Order of the Bankruptcy Court, shall be deemed disallowed and expunged without further action by the Debtors or Reorganized Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Nothing herein shall preclude a party from Filing a motion seeking entry of an order of the Bankruptcy Court deeming timely Filed a Proof of Claim that is Filed after an applicable Claims Bar Date on notice to the Reorganized Debtors and without prejudice to the Reorganized Debtors' rights to oppose any such request.

9.3     *Adjustment to Claims Without Objection*.   Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors to the maximum extent provided by applicable law without a Claims objection having to be Filed and without any further notice or action, order, or approval of the Bankruptcy Court.

9.4     *No Distributions Pending Allowance*.   Except as otherwise provided herein, no Distributions will be made with respect to any portion of a Claim unless and until such Claim has been Allowed.

9.5     *Estimation of Claims.*   The Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502 of the Bankruptcy Code regardless of whether the Debtors or Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or

unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the Claims objection, estimation and resolution procedures set forth herein are cumulative and not exclusive of one another.

9.6    *Resolution of Claims and Claim Objections*.  On and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, or otherwise resolve any Claim or objection to a Claim, whether or not a formal objection is Filed, or to withdraw any objection to a Claim, without prior approval or further order of the Bankruptcy Court.

9.7    *Mediation of Claim Objections.*  The Reorganized Debtors reserve the right to request that the Bankruptcy Court refer any objection to a Claim to mediation pursuant to D.N.J. LBR 9019-2 or any other mediation procedure approved by the Bankruptcy Court.

9.8    *Distributions on Insured Claims*.  If any Holder has asserted a Claim that is covered as to liability, in whole or in part, by an insurance policy that is assumed or otherwise remains in effect pursuant to the terms of this Plan, such Holder will have a Claim entitled to a Distribution under this Plan only to the extent of any deductible or self-insured retention under the applicable insurance policy that was unpaid or otherwise unexhausted as of the Petition Date. Notwithstanding the foregoing, the Holder shall be entitled to pursue recovery of any amount in excess of such unpaid deductible or self-insured retention from the applicable insurance carrier and, in connection therewith, notwithstanding the discharge of the balance of such Claim provided pursuant to this Plan, such Holder may continue to pursue the balance of such Claim against the Reorganized Debtors solely for the purposes of liquidating such Claim and obtaining payment of the balance of such liquidated Claim from any otherwise applicable policy of insurance. Except as otherwise provided in the applicable insurance policy, the applicable insurance carrier may, at its expense, employ counsel, direct the defense, and determine whether and on what terms to settle any Claim for the purposes of determining the amount of insurance proceeds that will be paid on account of such Claim. If after liquidation of a Claim pursuant to this Section, it is determined that there are insufficient insurance proceeds available to satisfy the amount of such Claim that is in excess of any unpaid deductible or self-insured retention, then the Holder of such Claim shall have a Claim in the amount of such insufficiency. Notwithstanding any other provision of this Plan, after the Effective Date the Bankruptcy Court shall be authorized to enter one or more orders in the Bankruptcy Cases modifying and amending the provisions of this Section, provided that any such modifications shall not be material and adverse to the interests of Holders of insured Claims.

## ARTICLE X
## Effect of Plan on Claims and Interests

10.1    *Discharge of the Debtors.*  Except as otherwise expressly provided in this Plan or the Confirmation Order, pursuant to section 1141(d) of the Bankruptcy Code, and effective as of the Effective Date: (a) the Distributions and rights that are provided in this Plan, if any, and the treatment of all Claims under this Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Causes of Action that arose or are deemed to have arisen

prior to the Effective Date, whether known or unknown, including any interest accrued on such Claims and Causes of Action from and after the Petition Date, against, liabilities of, Liens on, obligations of, and rights against the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims and rights, including, but not limited to, Claims and debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such Claim, debt, or right is Filed or deemed Filed under section 501 of the Bankruptcy Code, (ii) a Claim based upon such Claim, debt, or right is Allowed under section 502 of the Bankruptcy Code, or (iii) the Holder of such a Claim, debt or right accepted this Plan; (b) the Plan shall bind all Holders of Claims and Interests; (c) all Claims shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other Claims based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.  This Section 10.1 of this Plan shall not affect any release set forth in Article 6 of this Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims against the Debtors, subject to the occurrence of the Effective Date.

10.2    *Release of Liens*.  Except as otherwise provided in this Plan, on the Effective Date and concurrently with the commencement of Distributions made pursuant to this Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, terminated, extinguished and discharged, in each case without further notice  or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor. Any Entity holding such mortgages, deeds of trust, Liens, pledges, or other security interests shall pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors, at the sole cost and expense of the Reorganized Debtors. This Section 10.2 of this Plan shall not affect any mortgages and/or liens set forth in Article 6 of this Plan.

10.3    **Release by Debtors of Certain Parties.  Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after and subject to the occurrence of the Effective Date, the Debtors and their Estates shall release each of the Released Parties, and each Released Party is deemed released by the Debtors, the Estates, and the Reorganized Debtors from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates or the Reorganized Debtors, as applicable) whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Estates, or the**

Reorganized Debtors would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Bankruptcy Cases, the purchase, sale, transfer, or rescission of the purchase, sale, or transfer of any security, asset, right, or interest of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Bankruptcy Cases, the negotiation, formulation, or preparation of the Plan or related agreements, instruments, or other documents, and any other act or omission, transaction, agreement, event, or other occurrence taking place on and before the Petition Date; **provided**, **however**, that the foregoing release shall not operate to waive or release (a) any Claim or Cause of Action of the Debtors against any party that has asserted or asserts a Claim against the Debtors, or who may be liable for a Claim asserted against the Debtors by reason of any cross-claim, third party claim, claim for indemnification, reimbursement or contribution, or other Claim of the Debtors against such party on any contractual, legal or equitable grounds, or (b) any obligations of any party under this Plan or any other document, instrument, or agreement executed to implement this Plan. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing release, and further, shall constitute the Bankruptcy Court's finding that such release is: (1) in exchange for good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or their Estates asserting any claim or Cause of Action released pursuant to such release.

10.4    *Third Party Release*.  On and after and subject to the occurrence of the Effective Date as to each of the Releasing Parties, the Releasing Parties shall release each of the Released Parties, and each of the Debtors, their Estates, and the Released Parties shall be deemed released from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of any of the Debtors or their Estates), whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Bankruptcy Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims prior to or in the Bankruptcy Cases, the negotiation, formulation, or preparation of this Plan, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event or other occurrence taking place on and before the Effective Date; **provided**, **however**, that the foregoing release shall not operate to waive or release any Claim or Cause of Action of the Debtors against any party

that has asserted or asserts a Claim against the Debtors, or who may be liable for a Claim asserted against the Debtors by reason of any cross-claim, third party claim, claim for indemnification, reimbursement or contribution, or other Claim of the Debtors against such party on any contractual, legal or equitable grounds; and **provided** **further**, **however**, that the foregoing release shall not become binding on SIR Properties Trust until payment in full of the SIR Settlement Amount has been made in accordance with this Plan. Notwithstanding anything to the contrary in the foregoing release, nothing herein shall release any obligations of any party under this Plan or any other document, instrument, or agreement executed to implement this Plan.    Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing release and, further, shall constitute the Bankruptcy Court's finding that the foregoing release is: (1) in exchange for good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim or Cause of Action released hereunder.

10.5    *Exculpation and Limitation of Liability*.    Except to the extent expressly provided otherwise in this Plan, the Exculpated Parties shall neither have nor incur any liability to any Entity for any Exculpated Claim; **provided**, **however**, that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct. The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code and, therefore, are not and shall not be liable at any time for the violation of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or Distributions made pursuant to the Plan.    This Section 10.5 of this Plan shall not affect any release set forth in Article 6 of this Plan.

10.6    *Injunction*.    Except as otherwise expressly provided in this Plan, the Confirmation Order, or a separate Final Order of the Bankruptcy Court, all Persons who have held, hold, or may hold Claims against any of the Debtors are permanently enjoined, on and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or Reorganized Debtors or their property with respect to any such Claim; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Debtors or Reorganized Debtors or their property on account of any such Claim; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against the Debtors or Reorganized Debtors or their property on account of any such Claim; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any such Claim; or (e) taking any action that is inconsistent with or interferes with the implementation or consummation of this Plan; **provided**, **however**, that nothing herein shall prevent any Person from taking action in the Bankruptcy Court to enforce their rights under and in accordance with this Plan.

10.7    *Setoff and Recoupment*.  Pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, the Debtors or Reorganized Debtors may, but shall not be required to, set off against or recoup from any Allowed Claim, and the payments or other Distributions to be made pursuant to this Plan in respect of such Allowed Claim, any Claims, rights or Causes of Action of any nature whatsoever that the Debtors may have against the Holder of such Allowed Claim; but neither the Debtors' or Reorganized Debtors' failure to do so nor the allowance of any Claim shall constitute a waiver or release by the Debtors, the Reorganized Debtors or the Estates of any such Claims, rights or Causes of Action that the Debtors or Reorganized Debtors may have against such Holder.  Any dispute related to setoff or recoupment rights of the Debtors or Reorganized Debtors shall be determined by the Bankruptcy Court.  In no event shall any Holder of a Claim be entitled to setoff or recoup any Claim against any Claim, right, or Cause of Action of any of the Debtors or Reorganized Debtors unless such Holder has Filed a motion requesting the authority to perform such setoff or recoupment on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff or recoupment pursuant to section 553 or otherwise.

10.8    *Binding Effect*.  On the Confirmation Date, the provisions of this Plan shall be binding on the Debtors, the Estates, the Reorganized Debtors, all Holders of Claims against or Interests in the Debtors, and all other parties-in-interest whether or not such Holders are Impaired and whether or not such Holders have accepted this Plan.

10.9    *Automatic Stay*.  The automatic stay arising out of section 362(a) of the Bankruptcy Code shall continue in full force and effect until the Consummation Date and the Debtors, Reorganized Debtors and the Estates shall be entitled to all of the protections afforded thereby.

## ARTICLE XI
## Conditions Precedent

11.1    *Conditions to Confirmation*.  The following are conditions precedent to Confirmation of this Plan that may be satisfied or waived to the extent provided by section 11.3 of this Plan:

11.1.1 The Bankruptcy Court shall have approved the Disclosure Statement with respect to this Plan in form and substance that is acceptable to the Debtors in their sole and absolute discretion; and

11.1.2 The Confirmation Order shall have been signed by the Bankruptcy Court and entered on the docket of the Bankruptcy Cases.

11.2    *Conditions to the Effective Date*.  The following are conditions precedent to the occurrence of the Effective Date that may be satisfied or waived to the extent provided by section 11.3 of this Plan:

11.2.1 The Confirmation Order shall be in all material respects reasonably acceptable to the Debtors, shall not have been vacated, reversed or modified and, as of the Effective Date, shall not be stayed;

11.2.2  The Debtors shall have borrowed the Plan Funding Amount from the Plan Sponsor;

11.2.3  The Professional Fee Escrow shall have been established and funded in accordance with Section 4.2.4 hereof;

11.2.4  All documents and agreements to be executed on the Effective Date or otherwise necessary to implement this Plan shall be in form and substance that is acceptable to the Debtors, in their reasonable discretion;

11.2.5  The Debtors shall have received any authorization, consent, regulatory approval, ruling, letter, opinion, or document that may be necessary to implement this Plan and that is required by law, regulation, or order; and

11.2.6  The Confirmation Order shall have become a Final Order.

11.3    *Waiver of Conditions to Confirmation or Effective Date.*  The conditions set forth in sections 11.1.1, 11.2.1, 11.2.4, 11.2.5 and 11.2.6 of this Plan may be waived, in whole or in part, by the Debtors without any notice to any other parties in interest or the Bankruptcy Court and without a hearing or order of the Bankruptcy Court.  The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Debtors in their sole discretion regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors).  The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

**ARTICLE XII**
**Retention and Scope of Jurisdiction of the Bankruptcy Court**

12.1    *Retention of Jurisdiction.*  Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, to the extent legally permissible, the Bankruptcy Court shall retain exclusive jurisdiction over the Bankruptcy Cases and all matters arising out of, or related to, the Bankruptcy Cases and the Plan, including jurisdiction to:

12.1.1  adjudicate, decide, or resolve Filed objections concerning the allowance, priority, classification, secured or unsecured status, or amount of any Claim and any subordination thereof, including the resolution of any request for payment of any Administrative Expense Claim;

12.1.2  liquidate the amount of any disputed, contingent or unliquidated Claim, to estimate the amount of any disputed, contingent or unliquidated Claim, and to establish the amount of any reserve that may be required to be withheld from any Distribution under this Plan on account of any disputed, contingent or unliquidated Claim;

12.1.3  refer any objection to a Claim to mediation pursuant to D.N.J. LBR 9019-2 or any other mediation procedure approved by the Bankruptcy Court;

12.1.4 adjudicate, decide, or resolve all matters related to the rejection, or assumption and/or assignment, of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including cure amounts pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease;

12.1.5 adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications or motions involving a Debtor that may be pending on the Effective Date or commenced after the Effective Date;

12.1.6 adjudicate, decide, or resolve any and all matters related to Causes of Action commenced or pursued by the Debtors or Reorganized Debtors;

12.1.7 adjudicate, decide, or resolve any and all matters related to sections 502(c), 502(j), or 1141 of the Bankruptcy Code;

12.1.8 hear and rule upon all applications for allowance of Professional Fee Claims;

12.1.9 remedy any defect or omission or reconcile any inconsistency in this Plan, as may be necessary to carry out the intent and purpose of this Plan;

12.1.10    construe or interpret any provisions of this Plan and make such determinations and enter such orders as may be necessary for the implementation, execution, effectuation or consummation of this Plan;

12.1.11    enter orders pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code approving the sale of any assets (including Owned Real Property) by the Reorganized Debtors after the Effective Date to the extent the Reorganized Debtors seek such approval;

12.1.12    enter orders pursuant to section 364 of the Bankruptcy Court authorizing the Reorganized Debtors to obtain credit or incur debt after the Effective Date to the extent the Reorganized Debtors seek such approval;

12.1.13    determine any suit or proceeding brought by the Debtors or Reorganized Debtors to recover property of the Debtors or the Estates  wherever located under any provisions of the Bankruptcy Code;

12.1.14    hear and determine any tax disputes concerning the Debtors or Reorganized Debtors and to determine and declare any tax effects under this Plan;

12.1.15    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

12.1.16    issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Person with consummation or enforcement of this Plan;

12.1.17    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article X of this Plan and enter such orders as may be necessary to implement such releases, injunctions, exculpations, and other provisions;

12.1.18    adjudicate any and all disputes arising from or relating to Distributions under this Plan;

12.1.19    consider any modifications of this Plan to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

12.1.20    determine such other matters as may arise in connection with or relate to this Plan or the Confirmation Order or as may be authorized by or under the provisions of the Bankruptcy Code;

12.1.21    hear, determine and adjudicate any suits, proceedings controversies, actions or disputes that may arise under the provisions of this Plan, or the rights, duties or obligations of any Person under the provisions of this Plan;

12.1.22    enforce all orders previously entered by the Bankruptcy Court;

12.1.23    hear any other matter not inconsistent with the Bankruptcy Code; and

12.1.24    enter an order or final decree concluding or closing the Bankruptcy Cases.

12.2    *Alternative Jurisdiction*.  In the event that the Bankruptcy Court is found to lack jurisdiction to resolve any matter, then the District Court shall hear and determine such matter. If the District Court does not have jurisdiction, then the matter may be brought before any court having jurisdiction with regard thereto.

12.3    *Final Decree*.  The Bankruptcy Court may, upon application of the Reorganized Debtors after Designated Notice, enter a final decree closing the Bankruptcy Cases pursuant to section 350 of the Bankruptcy Code, notwithstanding the fact that additional Distributions may be made under this Plan after entry of such final decree.  In such event, (a) the Reorganized Debtors and other parties in interest shall continue to have the rights, powers, and duties set forth in this Plan; and (b) any provision of this Plan requiring the absence of an objection shall no longer be required, except as otherwise ordered by the Bankruptcy Court.

## ARTICLE XIII
## Miscellaneous Provisions

13.1     *Modification of this Plan*.  The Debtors expressly reserve their rights to modify this Plan, whether such modification is material or immaterial, at any time before the Confirmation Date, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate and unless otherwise ordered by the Bankruptcy Court, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors and Reorganized Debtors, as applicable, further expressly reserve their rights  to alter, amend or modify the Plan at any time after the Confirmation Date and before substantial consummation of the Plan, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this section. A Holder of a Claim that has accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, such Holder changes its previous acceptance or rejection.

13.2     *Effect of Confirmation on Modifications*.  Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127 of  the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

13.3     *Allocation of Plan Distributions Between Principal and Interest*.  To the extent that any Allowed Claim entitled to a Distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such Distribution shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

13.4     *Dissolution of Creditors' Committee*.  On the Effective Date, the Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be released from any further duties and responsibilities in the Bankruptcy Cases and under the Bankruptcy Code, provided that, after the Effective Date, the Committee shall be deemed to continue to exist solely with respect to the filing of applications pursuant to sections 330 and 331 of the Bankruptcy Code and objections thereto.

13.5     *Applicable Law*.  Except to the extent that the Bankruptcy Code or the Bankruptcy Rules are applicable, the rights and obligations arising under this Plan shall be governed by the laws of the State of New Jersey.

13.6     *Preparation of Tax Returns and Resolution of Tax Claims.*  The Reorganized Debtors shall file all applicable tax returns and other filings with governmental authorities that may be required and may File determination requests under section 505 of the Bankruptcy Code to resolve any Claim relating to taxes with a governmental authority.

13.7    *Headings*.  The headings of the Articles and the sections of this Plan have been used for convenience of reference only and shall not limit or otherwise affect the meaning of this Plan. Whenever the words "include," "includes" or "including" (or other words of similar import) are used in this Plan, they shall be deemed to be followed by the words "without limitation."

13.8    *Revocation of Plan*.    The Debtors reserve the right, unilaterally and unconditionally, to revoke or withdraw this Plan at any time prior to entry of the Confirmation Order, and upon such revocation or withdrawal, (1) this Plan shall be deemed null and void and of no force or effect, (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any claims held or Causes of Action by the Debtors; (b) prejudice in any manner the rights of the Debtors or any other entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other entity.

13.9    *Confirmation of Plans for Separate Debtors*.  In the event the Debtors are unable to confirm this Plan with respect to any Debtor, the Debtors reserve the right, unilaterally and unconditionally, to proceed with this Plan with respect to any Debtor for which the confirmation requirements of the Bankruptcy Code are met.

13.10   *No Admissions; Objection to Claims*.  Nothing in this Plan shall be deemed to constitute an admission that any Person as being the Holder of a Claim is the Holder of an Allowed Claim, except as expressly provided in this Plan. The failure of the Debtors to object to or examine any Claim for purposes of voting shall not be deemed a waiver of the Debtors' rights to object to or reexamine such Claim in whole or in part (including for purposes of Distribution).

13.11   *No Bar to Suits*.  Except as otherwise provided in Article X of this Plan, neither this Plan nor Confirmation hereof shall operate to bar or estop the Debtors or Reorganized Debtors from commencing any Cause of Action or any other legal action against any Holder of a Claim or Interest or any other Person, whether such Cause of Action or other legal action arose prior to or after the Confirmation Date and whether or not the existence of such Cause of Action or any other legal action was disclosed in any disclosure statement Filed by the Debtors in connection with this Plan or whether or not any payment was made or is made on account of any Claim or Interest.

13.12   *Exhibits/Schedules*.    All exhibits and schedules to this Plan, if any, are incorporated into and are a part of this Plan as if set forth in full herein.

13.13   *Conflicts*.  In the event that provisions of the Disclosure Statement and provisions of this Plan conflict, the terms of this Plan shall govern and control.

13.14   *Notices*.  Any notice required or permitted to be provided to the Debtors or Reorganized Debtors under this Plan shall be in writing and served by overnight mail or certified mail, return receipt requested, addressed as follows:

Cinram Group, Inc., *et al.*

c/o GRL Capital Advisors, LLC
Attn: Glenn Langberg, CEO
220 South Orange Avenue
Livingston, NJ 07039

with a copy to (which shall not constitute notice):

Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068
Attn:   Mary E. Seymour
Attn:   Michael Savetsky

13.15   *Section 1125 of the Bankruptcy Code*.   The entry of the Confirmation Order shall constitute the determination by the Bankruptcy Court that the Debtors have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and the Debtors (and each of their respective Affiliates, officers, directors, employees, consultants, agents, advisors, members, attorneys, accountants, financial advisors, other representatives and Professionals) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, and/or purchase of any securities offered or sold under this Plan, and are not, and on account of such offer, issuance, sale, solicitation, and/or purchase will not be, liable at any time on account of such solicitation or participation for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or the offer, issuance, sale, or purchase of any securities offered or sold under this Plan.

13.16   *Severability*.   Should the Bankruptcy Court determine, prior to the Confirmation Date, that any provision of this Plan is either illegal on its face or illegal as applied to any Claim or Interest, such provision shall be unenforceable as to all Holders of Claims or Interests or to the specific Holder of such Claim or Interest, as the case may be, as to which such provision is illegal. Unless otherwise determined by the Bankruptcy Court, such a determination of unenforceability shall in no way limit or affect the enforceability and operative effect of any other provision of this Plan. The Debtors reserve the right not to proceed with Confirmation or consummation of this Plan if any such ruling occurs.

13.17   *Designated Notice*.   Notwithstanding any other provision of this Plan, when notice and a hearing is required with regard to any action to be taken after the Confirmation Date by the Debtors or Reorganized Debtors, as applicable, Designated Notice shall be adequate.

13.18   *Payment of Statutory Fees*.   All fees due and payable pursuant to section 1930(a) of the Judicial Code prior to and after the Effective Date shall be paid by the Debtors or Reorganized Debtors, as applicable, when due and payable. The Reorganized Debtors shall File quarterly reports in a form reasonably acceptable to the U.S. Trustee.

13.19   *Notice of the Effective Date*.   The Debtors will File, and serve a copy on all parties in interest, a notice of the occurrence of the Effective Date within five (5) Business Days after the occurrence thereof.

## CONFIRMATION REQUEST

The Debtors hereby request Confirmation of this Plan pursuant to section 1129(a) or section 1129(b) of the Bankruptcy Code.

[Signature page follows]

Dated: October 4, 2018

Respectfully submitted,

CINRAM GROUP, INC., CINRAM
PROPERTY GROUP, LLC, and CINRAM
OPERATIONS, INC., DEBTORS

By: */s/ Glenn R. Langberg*
    Name: Glenn R. Langberg
    Title:   CEO